# EXHIBIT A

JANE ROSE REPORTING

800-825-3341

74 FIFTH AVENUE NYC 10011
JANE ROSE REPORTING.COM
JANE ROSE @ JANE ROSE REPORTING.COM

## *US District Court - New York*

---

## In re Application of David A. Godfrey and Yukos Finance B.V.

---

## *Video Deposition of:*
## Robert Foresman
## November 30, 2018

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------
In re Application of DAVID A. GODFREY and
YUKOS FINANCE B.V. for an order to conduct
discovery for use in a foreign proceeding
from Robert Foresman,
          Petitioners.

Case No. 1:18-mc-00363-LAK
-------------------------------------------------

VIDEO DEPOSITION OF
Robert Foresman
November 30, 2018
New York, New York
Lead: Jeffrey Jacobson, Esquire
Firm: Kelley Drye & Warren


FINAL COPY
JANE ROSE REPORTING  1-800-825-3341

Page 2

ATTORNEYS FOR PETITIONER:

Jeffrey S. Jacobson, Esquire
Martin Krolewski, Esquire
KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, New York  10178
212.808.5145

   -and-

Bernard O'Sullivan, Esquire
Tamson Blow, Esquire
CMS CAMERON MCKENNA NABARRO
Olswang LLP
78 Cannon Street
London EC4N 6AF
United Kingdom

Page 3

ATTORNEYS FOR THE WITNESS:

Robert H. Pees, Esquire
Sheena Buddhdev, Esquire
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, New York  10036-6745
212.872.1000
Mark Dawkins, Esquire
Ten Bisops Square
London, E1 6EG
United Kingdom
+44.20.7012.9600

ALSO PRESENT
David Godfrey

JANE ROSE REPORTING
74 Fifth Avenue
New York, New York  10011
Jeffrey Benz, CRR, RMR, Court Reporter
Jonathan Popham, Legal Videographer

Page 4

TABLE OF CONTENTS

Witness: Robert Foresman

| Examination | Page |
|---|---|
| By Mr. Jacobson | 6 |
| Instruction not to Answer | 14 |
| Instruction not to Answer | 15 |
| Instruction not to Answer | 49 |
| Reporter Certificate | 303 |
| Notice to Read and Sign | 305 |
| Index to Exhibits | 307 |

---

Page 5

1                    * * *
2              New York, New York
3                  8:50 a.m.
4                    * * *
5         THE VIDEOGRAPHER:  Good morning.
6    Here begins media number 1 in the video
7    deposition of Robert Foresman, in the matter of
8    In Re:  Application of David A. Godfrey and
9    Yukos Finance B.V.
10        Today's date is November 30, 2018,
11   and the time is 8:50 a.m.  This deposition is
12   being taken at the offices of Kelley Drye,
13   101 Park Avenue, New York, New York.
14        I'm Jonathan Popham, videographer,
15   and the court reporter is Jeff Benz, from Jane
16   Rose Reporting, New York, New York.
17        Can we please have the questioning
18   and defending counsel introduce themselves for
19   the record, and please speak slowly for the
20   court reporter.
21        MR. JACOBSON:  This is Jeffrey
22   Jacobson, from Kelley Drye & Warren.  I will be
23   asking questions today.
24        MR. PEES:  And I am Robert Pees, of
25   the law firm Akin Gump, counsel for the

---

Page 6

1    witness, Mr. Foresman.
2         THE VIDEOGRAPHER:  Okay.  Will the
3    court reporter please swear in the witness.
4    ROBERT FORESMAN,
5         called as a witness, having been first
6         duly sworn by Jeffrey Benz, a Notary
7         Public within and for the State of New
8         York, was examined and testified as
9         follows:
10   EXAMINATION BY MR. JACOBSON:
11        Q.  Good morning, Mr. Foresman.  Would
12   you mind just spelling your name just for the
13   record.
14        A.  F-O-R-E-S-M-A-N.
15        Q.  And I know that you gave a deposition
16   once before in another Yukos-related matter.
17   Other than that, have you ever given a
18   deposition?
19        A.  Deposition?
20        Q.  I don't mean -- in a setting like
21   this with a court reporter asking questions in
22   a conference room --
23        MR. PEES:  Conference room, testimony
24   under oath in a private civil litigation.
25        A.  I -- no, I have not.

---

Page 7

1         Q.  So just to refresh your recollection
2    about how this works, from the last time,
3    you're the most important person in the room
4    today.  The second most important person in the
5    room is the court reporter, who is taking down
6    everything I say with his magic machine.  And
7    he'll be taking down everything you say and
8    Mr. Pees says.  And because he can only take
9    down one of us a time, I will let you finish
10   your answers.  It would help if you let me
11   finish my question, because we can't talk over
12   each other, because the court reporter can't do
13   his job if we do that.
14        If at any point you need to take a
15   break -- as I say, you're the most important
16   person in the room.  The only thing I ask is
17   that we not take a break while a question is
18   pending.  So I ask a question and you answer
19   it, and then we take a break if you need one.
20        If you need anything else during the
21   course of the day, let me know.  But so long as
22   we both don't talk over each other and keep our
23   voices up, we'll -- we'll get through this and
24   be done with it as soon as possible.
25        So when I asked if you'd been deposed

---

Page 8

1    before and then we had a little colloquy about
2    it, have you given testimony under oath in any
3    other form?
4         MR. PEES:  You can answer it yes or
5    no.
6         A.  I would say yes.
7         Q.  In what other form have you given
8    testimony under oath?
9         MR. PEES:  I'm going to caution the
10   witness not to answer that question.  If you
11   want to ask him whether it relates to this
12   proceeding, you can do so.
13        And we can go offline, Jeff, at some
14   point if you'd like to.
15        MR. JACOBSON:  Well, let me -- let me
16   do this, because I have a feeling I know where
17   this is going.
18        Q.  Have you given testimony to a grand
19   jury?
20        MR. PEES:  You can answer yes or no.
21        A.  Yes.
22        Q.  Other than the testimony to a grand
23   jury, have you given testimony under oath?  I'm
24   sorry.  Other than -- other than your prior
25   deposition and testimony to a grand jury, have

Page 9

1   you given any testimony under oath?
2       A.   I don't believe so, no.
3       Q.   And in preparation for today's
4   deposition, did you review any documents?
5       A.   Yes, I did.
6       Q.   Do you remember what documents you
7   reviewed?
8       A.   I --
9           MR. PEES:  You can answer that yes.
10      A.   Yes, I do.
11          MR. PEES:  And, Mr. Jacobson, in the
12  interests of time --
13          MR. JOHNSON:  Sure.
14          MR. PEES:  -- and efficiency and
15  before another question is pending, I wish to
16  make a standing objection on the record.
17          It's my understanding that
18  petitioners have acquired a large volume of
19  confidential and, in some instances, privileged
20  documents, from Renaissance Capital,
21  Mr. Foresman's former employer.
22          I understand that counsel for
23  petitioners have recently represented in the
24  London proceedings that those Renaissance
25  Capital documents were obtained legitimately.

Page 10

1           But if the Renaissance Capital
2   documents were not obtained legitimately, we'll
3   whether by espionage, improper inducements,
4   threats, or encouraging breaches of legal
5   duties owed by Renaissance Capital to its
6   business partners or employees, we hereby
7   object to their use by the claimants in this
8   deposition.
9           And on behalf of Mr. Foresman, we
10  reserve all of his rights, remedies, and
11  privileges, none of which are waived.  Now, in
12  the interests of efficiency, I do not intend to
13  repeat this objection; but it should be viewed
14  as a standing objection with respect to the use
15  of those Renaissance Capital documents in this
16  deposition.
17          MR. JACOBSON:  So although I disagree
18  with the premise of the objection, I accept it
19  as a standing objection in this matter.  And I
20  appreciate that we're going to be able to get
21  through the deposition with all of your rights
22  reserved.
23          MR. PEES:  Thank you.
24      Q.   Just so we have it in it record,
25  Mr. Foresman, I'm going to mark the Court's

Page 11

1   order and the subpoena to you, that caused the
2   deposition today.  And we'll mark them Exhibits
3   Foresman 1 and Foresman 2.  I'm not going to
4   ask you any questions about those documents,
5   but I just want to have them in the record of
6   the proceeding.
7           THE COURT REPORTER:  Do you have a
8   preference for which is which?
9           MR. JOHNSON:  No.
10          ---
11          (Foresman Exhibit 1 was marked for
12          identification.)
13          ---
14          ---
15          (Foresman Exhibit 2 was marked for
16          identification.)
17          ---
18          MR. PEES:  Is the order 1?  Just for
19  my --
20          THE COURT REPORTER:  I'll show you.
21          MR. PEES:  Thank you.
22      Q.   So what -- during the course of the
23  deposition, I'll occasionally mark an exhibit
24  like that.  Most of the time I'll have
25  questions about it.  This time I didn't.

Page 12

1           And so what you want to do is hang on
2   to it; we'll ask questions about it and then
3   keep it in some semblance of order because
4   sometimes we might need to refer back to a
5   document that we used earlier.  But I'll try to
6   be as streamlined as possible.
7           So you mentioned that you had
8   reviewed some documents in preparation for the
9   deposition.  Do you recall -- and you said you
10  recalled which documents you reviewed.  What
11  documents do you remember reviewing in
12  preparation for today?
13      A.   I reviewed some of the many e-mails
14  that the claimants provided with respect to the
15  U.K. court matter that were referred to as the
16  RenCap cache.  Not all of such documents.
17      Q.   Did you review your prior deposition
18  transcript?
19      A.   I did, yes.
20      Q.   Did you review any other deposition
21  transcripts?
22      A.   Not other than skimming through some.
23      Q.   Which ones did you skim through?
24      A.   Deitz, I believe, and the -- a Lynch
25  deposition.

Page 13

1      Q.   And other than with your attorneys --
2  and I certainly don't want to know anything you
3  discussed with your attorneys -- did you
4  discuss your testimony today with anybody else?
5      A.   The fact of the testimony, yes.
6      Q.   With whom?
7      A.   With Steven Lynch.
8      Q.   Just Mr. Lynch?
9      A.   With Richard Deitz.
10     Q.   Anyone else?
11     A.   And with Robert Reid.
12          And my wife.
13          And Mr. Godfrey.
14     Q.   You're currently employed by UBS; is
15  that correct?
16     A.   Correct.
17     Q.   Does UBS know that you're a defendant
18  in this lawsuit?
19     A.   Yes.
20     Q.   So does anyone at UBS know that
21  you're testifying here today?
22     A.   No.
23     Q.   Before UBS hired you, did you
24  disclose the existence of this lawsuit to them?
25     A.   I was not a defendant before I was

Page 14

1  hired.  So no.
2      Q.   And are you registered with FINRA as
3  a broker-dealer?
4      A.   I am.
5      Q.   Has this lawsuit been disclosed to
6  FINRA?
7      A.   It has been deemed not required to,
8  so no.
9      Q.   Who deemed it not required?
10         MR. PEES:  I would caution you not to
11  reveal any attorney-client communications.  And
12  I think the question is -- would capture such
13  communication.
14         MR. JACOBSON:  Understood.
15     Q.   Have you ever been interviewed by
16  federal agents?
17     A.   Yes.
18     Q.   What were the circumstances of that?
19             ---
20         (Instruction Not to Answer.)
21             ---
22         MR. PEES:  I'm going to object and
23  instruct the witness not -- not to answer.
24         MR. JACOBSON:  On what basis?
25         MR. PEES:  That it is not relevant to

Page 15

1  this deposition.  If -- if you want to rephrase
2  it to ask him whether he's been questioned by
3  federal agents regarding the circumstances of
4  this deposition, subject matter of it, that
5  would be fine.
6      Q.   You've been questioned by federal
7  agents regarding the country of Russia?
8             ---
9         (Instruction Not to Answer.)
10            ---
11         MR. PEES:  Again, I think that's
12  broader than merely the subject matter of this
13  litigation.  So I'm going to instruct the
14  witness not to answer.  And I'm happy to go
15  offline with you at some point during the
16  break, Jeffrey, and explain the nature of my
17  objection.
18         MR. JACOBSON:  We want to keep things
19  moving.  We'll come back to it, and I am happy
20  to have that conversation.  I'm not necessarily
21  going to leave that subject behind, but we'll
22  come back to it.
23     Q.   You hold a U.S. passport; is that
24  correct?
25     A.   Yes.

Page 16

1      Q.   Do you hold any other countries?
2      A.   No.
3      Q.   And in what city were you born?
4      A.   Auburn, New York.
5      Q.   And what's your date of birth?
6      A.   May 3rd, 1968.
7      Q.   So I'm going to try to go through
8  this stuff as quickly as possible.  Can you
9  just tell me your educational background since
10  high school?
11     A.   Bucknell University.  Harvard
12  University Graduate School of Arts and
13  Sciences.
14     Q.   Did you spend some time at the Moscow
15  Energy Institute?
16     A.   Yeah, as an exchange student.
17     Q.   And how would you describe your level
18  of fluency in the Russian language?
19     A.   Fluent.
20     Q.   And do you read and write as fluently
21  as you speak?
22     A.   I don't write very often in Russian
23  or type very often.  So no.
24          Reading, I would say yes.
25     Q.   And how would you describe your level

Page 17

1  of fluency in the Ukrainian language?
2      A.  I used to be what I would call
3  proficient.  But that would be very rusty and
4  generous today.
5      Q.  You're away ahead of me, in most
6  respects.  And I'm pretty impressed that you've
7  got two and a half.
8          And then I'm going to try to go
9  through your employment background as quickly
10  as possible as well.  Was your first job
11  after -- after university for the International
12  Financing Corporation?
13      A.  Correct.
14      Q.  And is it fair to describe that
15  organization as the private sector arm of the
16  World Bank?
17      A.  Yes.
18      Q.  And when did you work there?
19      A.  From summer of '93, I believe June,
20  through -- until July, I believe, two thou- --
21  sorry, 1997.
22      Q.  So going back to your education, at
23  some point you earned a master's degree in
24  Soviet studies from Harvard; is that correct?
25      A.  Yes.  The exact term was regional

Page 18

1  studies, Russia, Eastern Europe, Central Asia.
2      Q.  And when did you get that degree?
3      A.  In 1993, June.
4      Q.  And when you worked for the
5  International Finance Corporation, where were
6  you based?
7      A.  I was based first in Kiev, Ukraine.
8  And then in Washington, D.C.
9      Q.  And what was your role for that
10  company?
11      A.  I would describe it as an
12  organization, as opposed to a company.
13      Q.  Sure.
14      A.  I was -- my first role was as a
15  consultant, for the Ukraine small-scale
16  privatization project.
17          And after six months, I was the
18  project head, for such -- U.S.
19  government-funded project.
20          And then I was in Washington, D.C.,
21  as -- what IFC calls an investment officer.
22      Q.  And what was your next job after you
23  left the International Finance Corporation in
24  1997?
25      A.  Head of corporate finance for

Page 19

1  Ukraine, for the -- for ING Barings bank.
2      Q.  I suspect I know the answer to this
3  question, but where were you based in that
4  role?
5      A.  In Kiev -- in Kiev for that specific
6  role.
7      Q.  And then did your -- did you
8  subsequently change roles for that company?
9      A.  Yes.
10      Q.  And what was your -- your next role?
11      A.  My next role was head of corporate
12  finance for Russia/CIS based in Moscow for
13  ING Barings.
14      Q.  And how long did you stay with
15  ING Barings?
16      A.  Until the end of 2000.
17      Q.  And where did you go next?
18      A.  I went to Dresdner Kleinwort Benson
19  and then Dresdner Kleinwort Wasserstein.
20      Q.  Just for the court reporter's aid,
21  Dresdner is D-R-E-S-D-N-E-R and Kleinwort is
22  K-L-E-I-N-W-O-R-T; is that right?
23      A.  And Wasserstein is --
24      Q.  That one, I think -- I figured that
25  one is a little easier for the court reporter,

Page 20

1  but it's W-A-S-S-E-R-S-T-E-I-N.
2          And where were you based when you
3  worked for Dresdner?
4      A.  In Moscow.
5      Q.  And what was your role there?
6      A.  My role was as CEO of -- or chairman
7  of the management committee, of the investment
8  banking arm of Dresdner, which was Dresdner
9  Kleinwort Wasserstein.
10      Q.  And how long were you at that
11  company?
12      A.  I was there until summer of 2006.  I
13  believe my leave period ended at the end of
14  July 2006.
15      Q.  So by this point, you've been out of
16  school about 13 years.  Is that about right?
17      A.  That's about right, yes, out of
18  graduate school.
19      Q.  Right.  And then so of those 13
20  years, how many of those years were you based
21  in Moscow?
22      A.  Sorry.  Until 19 -- until 2006?
23      Q.  Through -- right.  Through the end
24  of -- through the end of your time at Dresdner.
25      A.  So I was three months in 1989 as a

Page 21

1 student.  I was about a month and a half in the
2 summer of '91.
3       And I was in Moscow from, I believe,
4 August, 1999, until -- well, through that
5 period, yeah.
6       Q.   So about -- grand total of about
7 eight years?
8       A.   Sounds about right.
9       Q.   So I realize this may be a question
10 with a complex answer.  But why did you choose
11 Moscow as a place to base your professional
12 life to this point?
13      A.   I, from a young age, felt a calling
14 to be a peacemaker between the United States
15 and the Soviet Union and then Russia.
16      Q.   And then after you left Dresdner,
17 what was your next job?
18      A.   As deputy chairman of Renaissance
19 Capital investment bank.
20      Q.   So was there a leave period between
21 Dresdner and what I'll call RenCap?
22      A.   Yes.
23      Q.   And how long was that leave period?
24      A.   I -- I -- I don't -- I don't recall.
25 One month, maybe -- month and a half.

Page 22

1       Less than two months, I believe.
2       Q.   And when you joined RenCap, were you
3 also based in Moscow?
4       A.   Yes.
5       Q.   And how long were you at RenCap?
6       A.   I was at RenCap from, I believe,
7 August 2006 until my leave period ended,
8 November 30, 2009.
9       Q.   And you then joined Barclays Bank?
10      A.   Correct.
11      Q.   And where were you based in your job
12 for Barclays?
13      A.   In Moscow and then New York.
14      Q.   When did you shift to New York?
15      A.   I -- so my family moved back to
16 New York in the summer of 2013.  And from -- in
17 the fall of 2013, I spent about a week a month
18 in New York, three weeks in Moscow.  And then
19 from the beginning of 2014, the reverse.  So
20 about three weeks in New York and about a week
21 in Moscow.
22      Q.   What was your role at Barclays Bank?
23      A.   Barclays Group country head for
24 Russia and the broader region.
25      Q.   And how long did you hold that job?

Page 23

1       A.   For the entirety of my time at
2 Barclays, which was December 1st, as I recall,
3 December 1st, 2009, until my termination period
4 concluded with Barclays in, I believe,
5 May 2016.
6       Q.   And your current employer is
7 UBS Securities?  Is that an accurate -- how --
8 how do we refer to your UBS entity that employs
9 you, is the best way.
10      A.   I'm a New York-based -- I have a
11 contract from UBS Securities in New York.  I
12 have a -- a -- yeah, that's the -- the legal
13 entity of which I'm -- by which I'm employed.
14      Q.   And you started that job in
15 July 2016?  Is that correct?
16      A.   No.  I -- sorry.  No.  I started that
17 job the beginning of October, I believe
18 October 2nd, whatever the Monday was, 2016.
19      Q.   And what's your title at UBS?
20      A.   I've -- more than one title, my -- I
21 have -- my main title is vice chairman of the
22 investment bank of UBS.  And --
23      Q.   Sure.  Please finish.  Go ahead.
24      A.   I'm sorry.  And that was from the
25 day 1 of my employment there.

Page 24

1       And then as of the end of 2018 or the
2 beginning of 2018, I was given an additional
3 title as the UBS group country head for Russia
4 and the broader region and chairman of UBS bank
5 in Russia.
6       Q.   So what's the best way to summarize
7 your role at UBS with those various hats?
8       A.   Not to.
9       I'm sorry.
10      Q.   No -- I want to --
11      A.   It's -- yeah.  It's -- it's -- so my
12 first role is considered a global role, as vice
13 chairman of the investment bank.
14      I work across the investment bank and
15 with the public and the private sides.
16      Most of what I do specific to that
17 role is based -- is focused on the U.S., mainly
18 investment banking, also collaboration with our
19 wealth management platform.  And most of those
20 clients are U.S.
21      And I -- my -- my other two roles as
22 group country head for Russia and the broader
23 region and as chairman of our bank in Russia is
24 specific to that region where I oversee the
25 group business, which is primarily investment

Page 25

1  banking a wealth management for the region.
2  Q.  Do you maintain a residence in
3  Russia?
4  A.  No, I do not.
5  Q.  So I don't want to replow too much
6  ground from the prior deposition.  But while --
7  going back to your time at Dresdner, did you
8  report to a gentleman named Matthias Warnig,
9  W-A-R-N-I-G?
10  A.  I -- I had a dual report into
11  Mr. Warnig, yes.
12  Q.  Who -- who was the other person to
13  whom you reported?
14  A.  In the London-based head of corporate
15  finance.
16  Q.  And did you know Mr. -- you're
17  pronouncing it better than I do.  I apologize
18  for that.
19  A.  "Warnig."
20  Q.  Did you know Mr. Warnig's background
21  before he joined Dresdner?
22  A.  I knew some of his background.
23  Q.  Can you describe that which you knew
24  of his background?
25  A.  Could you repeat the first part of

Page 26

1  your question.
2  Q.  Sure.  I said -- you can only tell me
3  what you knew, but you said you knew some of
4  his background.  So can you tell me what you
5  knew of his background.
6  A.  I'm sorry.  When?  Did you --
7  Q.  Before he joined Dresdner.
8  A.  Before he joined Dresdner?
9  Q.  Before he joined Dresdner,
10  Mr. Warnig.
11  A.  Oh, sorry.  Okay.  Did I --
12  Q.  I asked you, did you know of his
13  background before he joined Dresdner?
14  A.  Can I ask a clarifying question?
15  Q.  Yeah.
16  MR. PEES:  Maybe I can clarify.
17  There's some confusion over the timing.
18  In other words, are you asking him of
19  his knowledge, at the time he, Bob Foresman,
20  joined Dresdner, of the background of
21  Mr. Warnig?
22  MR. JACOBSON:  No.  I'm asking what
23  Mr. Foresman knows sitting here today --
24  MR. PEES:  Oh, okay.  Okay.
25  MR. JACOBSON:  -- of Mr. Warnig's

Page 27

1  background before Mr. Warnig joined Dresdner.
2  MR. PEES:  Thank you.  That was the
3  confusion.
4  A.  What I know today?
5  Q.  Yes.
6  A.  What I know from him, I don't know
7  from other people, that I can recall, that he
8  is East German and had worked in the Stasi, the
9  East German secret police.  And then in -- I
10  think the trade ministry or commerce ministry
11  in the unified Germany, where he had some
12  involvement with Russia.
13  Q.  And so Mr. Warnig left Dresdner in
14  2006; is that correct?
15  A.  I can't recall.  I can't recall when
16  he -- when he left.  He -- may have been 2005;
17  it may have been 2006.  He left full-time
18  employment, as I recall, at Dresdner but
19  remained either chairman or senior advisor.  I
20  can't recall when he entirely left Dresdner.
21  It was after my time.
22  Q.  Do you remember -- do you know what
23  position he took after he left Dresdner?
24  A.  He took the position as general
25  director of Nord Stream.

Page 28

1  Q.  That's N-O-R-D, and then new word
2  Stream, like the stream.
3  A.  Correct.  Nord Stream, N-O-R-D.
4  Q.  And do you know what Nord Stream
5  does?
6  A.  Yes.
7  Q.  What does it do?
8  A.  It built and brings Russian natural
9  gas through a pipeline along the seabed of the
10  Baltic Sea from Vyborg, V-Y-B-O-R-G, Russia,
11  into Germany and then beyond.
12  Q.  And are you aware of whether
13  Mr. Warnig is also on the board of a company
14  called Transneft?
15  A.  I was aware that he was on the board
16  of Transneft.  I'm not entirely sure if he's
17  still on the board.  I believe he may be.
18  Q.  And does Mr. Warnig also have a
19  position with the company Rosneft,
20  R-O-S-N-E-F-T?
21  A.  I believe he's on the board of
22  directors of Rosneft.
23  Q.  Is he the deputy chairman of Rosneft?
24  A.  I believe so.
25  Q.  Did Mr. Warnig's departure from

Page 29

1 Dresdner have any correlation to your departure
2 from Dresdner?
3 A. Not that I can recall, because I
4 can't -- well, I can't recall whether he
5 stepped down from a permanent role at Dresdner
6 while I was still there. I believe he had --
7 was still in a permanent role when I left. So
8 I believe the answer is no.
9 Q. So let me ask this way: Did you
10 discuss your departure from Dresdner with
11 Mr. Warnig?
12 A. Before I --
13 Q. Before you departed?
14 A. Yes, I did.
15 Q. And did he give you any advice on
16 what your next move should be?
17 A. No.
18     I informed him, I should say.
19 Q. And after you and Mr. Warnig both
20 left Dresdner, did you keep in touch with him?
21 A. Yes.
22 Q. So speaking only of the year 2007,
23 which is the year after you left Dresdner, how
24 often would you say you spoke with Mr. Warnig
25 in 2007?

Page 30

1 A. In 2007 -- frequently.
2 Q. And then just to compare that to over
3 the past year, before today, how -- how often
4 do you speak to Mr. Warnig over the past year?
5 A. Less frequently but regularly.
6 Q. Okay.
7     I'm going to mark the first --
8 A. We're in different locations now.
9 Q. Understood.
10     I'm going to mark an exhibit for you.
11     MR. JACOBSON: Foresman 3.
12     ---
13     (Foresman Exhibit 3 was marked for
14         identification.)
15     ---
16 Q. Mr. Foresman, I'm just showing you a
17 news article from 29th of September, 2016. The
18 first question I'm going to ask and then I'll
19 give you a chance to read it is, have you seen
20 this before?
21 A. Yes, I've seen this.
22 Q. Okay.
23     So the first paragraph of this
24 article describes a -- a -- a memorandum, that
25 I think was written by Andrea Orcel, describing

Page 31

1 your appointment at UBS.
2     Are you aware of a memo written by
3 Ms. Orcel about your appointment?
4 A. It's "Andrea."
5 Q. Oh, sorry.
6 A. That's okay. He gets that a lot.
7 He's Italian.
8 Q. My apologies.
9 A. That's okay.
10     There was, I think what UBS would
11 call an internal announcement. Not a memo but
12 an internal announcement about my hiring.
13 Q. Did you have any role in preparing
14 that memorandum?
15 A. I don't recall that I did. I may
16 have seen a draft. I don't recall.
17 Q. So there's a heading about
18 three-quarters of the way down the first page
19 that says "power player." And it says there
20 that you maintain connections to the inner
21 circle surrounding Russian President Vladimir
22 Putin.
23     I'll stop there.
24     What connections to the inner circle
25 surrounding President Putin do you maintain?

Page 32

1 A. For -- for the record, this is not
2 the internal announcement. This is a news
3 article.
4 Q. I completely agree. So -- but -- I
5 mean, is it -- well, let me -- let me -- I'll
6 back up, then. Would you say that it's fair to
7 describe you as someone who maintains ties to
8 the inner circle surrounding President Putin?
9 A. I wouldn't use that phrase. But I
10 don't know that it would be unfair. It's a --
11 it's a vernacular phrase.
12 Q. So understanding that there may be
13 some unfairness in the term, who would you
14 describe as your closest connections to
15 president Vladimir Putin?
16 A. Mr. Warnig.
17 Q. Anyone else?
18 A. As my closest connection, no.
19 Q. And what's your understanding of the
20 relationship between Mr. Warnig and
21 President Putin?
22 A. Friendly.
23 Q. Say very friendly or just friendly?
24 A. I'm -- friendly.
25     I -- could you clarify? I'm not sure

## Page 33

1  what very friendly -- I would say friendly
2  relationship.
3      Q.  So I could show you a -- I might, if
4  you want me to, a New York Times article from
5  2014 that describes Mr. Warnig as one of only
6  six people in President Putin's inner circle.
7  I mean, would you -- would you agree with that
8  characterization of Mr. Warnig's friendship
9  with President Putin?
10     A.  I would say it's a close
11 relationship, friendly relationship.
12     Q.  When you worked for RenCap, did
13 RenCap compensate Mr. Warnig in any way?
14     A.  Yes.
15     Q.  And how did it compensate Mr. Warnig?
16     A.  It compensated Mr. Warnig, as I
17 recall, for a short period of time as a
18 consultant or senior advisor, a consultant.
19     Q.  Has UBS compensated Mr. Warnig in any
20 way?
21     A.  No.
22     Q.  I'll go through some of these
23 questions very quickly.
24        Have you met President Putin
25 yourself?

## Page 34

1      A.  No.
2      Q.  Have you met Dmitry Medvedev?
3      A.  Yes.
4      Q.  How many times?
5      A.  I think twice.
6        Not as president -- or prime
7  minister.
8      Q.  Oh.  Do you recall when you met him?
9      A.  I -- it was -- I recall it was in
10 2001, '2, or '3.
11     Q.  And have you met Igor Sechin,
12 S-E-C-H-I-N?
13     A.  Yes.
14     Q.  And how many times have you met
15 Mr. Sechin?
16     A.  Twice, including at a reception.
17     Q.  Do you recall when those meetings
18 occurred?
19     A.  The reception was an IPO Rosneft
20 closing reception, so I believe in the
21 summer/fall, maybe, of 2006.
22     Q.  And the other time you met him, was
23 it before or after that?
24     A.  It was after that.  I believe it was
25 2008, I believe.

## Page 35

1      Q.  And do you have a relationship with
2  Andrey Akimov, A-K-I-M-O-V, the chairman of
3  Gazprombank?
4      A.  Not currently.
5      Q.  Have you met him before?
6      A.  Yes.
7      Q.  How many times would you say?
8      A.  Maybe a dozen.
9      Q.  Do you recall during about what
10 period of time?
11     A.  During my Dresdner years, and -- I
12 can't recall if I met him during my RenCap
13 years, maybe -- maybe once or twice.
14     Q.  And then just going back to
15 Mr. Sechin for a minute, do you recall why you
16 met him in 2008, the circumstances of that
17 meeting?
18     A.  Yes.
19     Q.  What are those circumstances?
20     A.  I was invited to join him for a
21 dinner.  And I recall that we discussed a
22 proposal from Mr. Godfrey about Rosneft
23 acquiring some -- or about RenCap brokering
24 some agreement between Mr. Godfrey's entities
25 and Rosneft -- or, sorry, yes, about some

## Page 36

1  claims against Rosneft that some of
2  Mr. Godfrey's structures had.
3        THE COURT REPORTER:  I'm sorry.  Some
4  of Mr. Godfrey's what?
5        THE WITNESS:  Structures.
6        THE COURT REPORTER:  Structures had?
7        THE WITNESS:  Structures --
8  structures had.
9        THE COURT REPORTER:  Thank you.
10       THE WITNESS:  Sorry.
11     Q.  And have you met a gentleman Nikolai
12 Borisenko, B-O-R-I-S-E-N-K-O?
13     A.  I had met him.
14     Q.  How many times have you met him?
15     A.  I don't recall.  Maybe four or five.
16     Q.  Do you remember during what period of
17 time?
18     A.  I recall this would have been --
19 leading up to the Rosneft IPO, so 2006, maybe
20 2005, and maybe 2007 with RenCap.  I don't
21 recall.
22     Q.  And is he -- was he then the vice
23 president of Rosneft?
24     A.  I recall, yes.
25     Q.  I'm almost done with these "Who do

1    you know?" questions.
2          Alexander Ryazanov, R-Y-A-Z-A-N-O-V?
3          A.   "Ryazanov."  It rings -- it rings a
4    bell, but --
5          Q.   Is he a former president of
6    Gazprom Neft?
7          A.   I can't -- I can't recall.  He may
8    have been.  The name rings a bell.  I don't
9    recall if I've met him or --
10         Q.   And how about Sergei Gorkov?
11         A.   Sergei Gorkov.
12         Q.   Do you know a gentleman named Sergei
13   Gorkov?
14         A.   I've met a gentleman named Sergei
15   Gorkov.
16         Q.   How many times?
17         A.   Once.
18         Q.   Do you recall when?
19         A.   Sorry.  I believe only once.
20              Yes, I do.
21         Q.   And what are those circumstances?
22         A.   Those circumstances were -- I'd
23   actually like to consult with counsel on that.
24              Or --
25         MR. PEES:  Is this a --

1          THE WITNESS:  It relates to something
2    that -- that --
3          MR. PEES:  Does it relate to
4    something for which my firm has rendered you
5    legal advice?
6          THE WITNESS:  No.
7          MR. PEES:  So it's -- this is
8    obviously an area that touches upon some
9    sensitivity for Mr. Foresman, and he would like
10   to consult counsel.  I understand there's a
11   question pending and the rules of the road for
12   that, Mr. Jacobson.  But I would like your
13   indulgence in this one instance.
14         MR. JACOBSON:  I'll tell you what.
15   I'll withdraw the question for now.  We'll come
16   back to it.  If it's okay with you, I want to
17   go another ten minutes or so; then we can take
18   a break.
19         MR. PEES:  Okay.
20         MR. JACOBSON:  We can come back to
21   it.
22         MR. PEES:  I just want to be very
23   mindful of privilege issues and other issues.
24         MR. JACOBSON:  No.  Of course.  Just
25   for later, the question was simply does he

1    recall the circumstances in which he met the
2    man.
3          THE WITNESS:  Yes.  I'm sorry.
4          MR. JACOBSON:  And so I will -- you
5    know, I will -- you can let me know if he can
6    answer that question.  And then we can also --
7          MR. PEES:  Got it.  Got it.
8          MR. JACOBSON:  -- figure out how far
9    I can delve into that.
10         MR. PEES:  Yes.
11         MR. JACOBSON:  We can build it out.
12         THE WITNESS:  Okay.
13         Q.   So speaking of your career, kind of
14   starting at Dresdner and then through
15   Renaissance and Barclays, it's fair to say that
16   you had a number of Russian oil companies as
17   clients?  Is that correct?
18         A.   Correct.
19         Q.   Was Yukos a client?
20         A.   Yes.
21         Q.   Gazprom Neft?
22         A.   Yes.
23         Q.   Lukoil?
24         A.   Yes.
25         Q.   Rosneft?

1          A.   Yes.
2          Q.   Novatek?
3          A.   Yes.
4          Q.   RussNeft, R-U-S-S-N-E-F-T?
5          A.   We pitched them.  I don't recall
6    whether I executed a transaction for them.  But
7    it would have been a company that from time to
8    time we sought business from.
9          Q.   So I probably should have asked you
10   to list them before I did.  So we have done
11   Yukos, Gazprom Neft, Lukoil, Rosneft, Novatek,
12   maybe RussNeft.  Any other Russian oil
13   companies that you had as clients?
14         A.   TNKBP.  Yes.
15         THE COURT REPORTER:  I'm sorry.  Say
16   it again.
17         THE WITNESS:  Sorry.
18         A.   Yes.
19         Q.   And what are they?
20         A.   TNKBP.
21              Gosh, it's changed a lot.  There's
22   been a lot of...
23              Gazprom.  In addition to Gazprom
24   Neft, which you mentioned.
25         Q.   Yes.

Page 41

1     A.  BaiTex, B-A-I-T-E-X, which is an
2 American company. And I'm sure a number of
3 smaller companies that I -- if you were to give
4 me time and desire such, I could probably come
5 up with.
6     Q.  And then you had a number of foreign
7 oil companies as clients that did business in
8 Russia; is that correct?
9     A.  That's correct.
10     Q.  And one of them was BP?
11     A.  Correct.
12     Q.  And what other foreign -- large
13 foreign oil companies?
14     A.  Chevron, Texaco, Repsol, my -- not
15 necessarily my relationship, but my firm's.
16     Statoil. Sinopec.
17     Unocal. And I would have to --
18     Q.  Yeah, suffice it to say you had a
19 number of --
20     A.  Yes.
21     Q.  -- oil companies as clients.
22     So I -- the last questions that I
23 want to ask -- and it's a series, but I want to
24 give you an overview so you know where I'm
25 headed. And then we can -- then we can take a

Page 42

1 little break.
2     I want to ask you about how you
3 developed your relationships with Gazprom on
4 the one hand and Rosneft on the other.
5     A.  Uh-huh.
6     Q.  So I'm going to ask you how you
7 developed your relationships, who you were in
8 touch with.
9     So we'll start with Gazprom. So how
10 did you development the relationship with
11 Gazprom that led them -- led them to become
12 your client and then as you served them?
13     A.  So at first, developed a relationship
14 with Gazprom when I was at ING Barings.
15     In, I believe, 1999.
16     I think having to do with some of the
17 debt that Ukraine owed to Gazprom, I think.
18 And to pitch for business from ING Barings, on
19 behalf of ING Barings to Gazprom.
20     Q.  And then over time, who would, among
21 the senior leadership at Gazprom, did you come
22 to know?
23     A.  While at ING Barings or --
24     Q.  No. During your --
25     A.  Alexey Miller was the CEO. Today.

Page 43

1     Andrey Kruglov, K-R-U-G-L-O-V, who
2 then was the head of corporate finance, and
3 then the CFO. I think now maybe he's deputy
4 CEO.
5     Mikhail or "Mikhail" Sereda, which is
6 S-E-R-E-D-A, was on the board of directors and
7 was head of administration or chief of staff, I
8 guess, for Gazprom.
9     Keep going?
10     Q.  A couple more. The point is a great
11 many members of senior leadership; would that
12 be fair?
13     A.  Many, many. Yeah.
14     Q.  And then let's -- same question about
15 Rosneft. So how did you first come to work
16 with Rosneft?
17     A.  When did I first -- I don't recall
18 whether at ING Barings I had met with Rosneft.
19 I may have.
20     But at Dresdner, we did -- at
21 Dresdner, we led what I believe was their first
22 bond issue, eurobond issue, in, I believe it
23 was the fall of 2002.
24     Or maybe it was 2001. 2001 or 2002.
25 And -- I'm sorry. Could you repeat your

Page 44

1 question?
2     Q.  No. I was -- I didn't -- I asked an
3 open-ended question. So I'll shift it to
4 over -- again, over the course of time,
5 speaking only of the senior leadership of
6 Rosneft, who -- who would you say are your --
7 are your main contacts? I'll start with now.
8 And then if you just -- I'm going to ask it a
9 little bit open-ended, if you can sort of go
10 back in time to the sort of 2007 timeframe that
11 we're going to be spending a lot of time on.
12     A.  Okay. So now? Starting with now?
13     Q.  Now and then --
14     A.  So now I would say Pavel Federov,
15 which is not how it sounds. F-E-D-E-R-O-V.
16     And he is, I believe, first deputy
17 CEO of Rosneft today.
18     No other current relationships that I
19 can --
20     Q.  Okay.
21     A.  -- think of or would --
22     Q.  And then in 2007, who were you
23 dealing with at Rosneft?
24     A.  So in 2007, I was dealing with Peter
25 O'Brien, who was -- I think his title was vice

Page 45

1    president of finance and -- and strategy, I
2    think.
3         Sergei Bogdanchikov,
4    B-O-G-D-A-N-C-H-I-K-O-V.  And he was the
5    president of Rosneft.
6         A few meetings with Mr. Borisenko to
7    whom you referenced.
8         Sergei Kudryashov,
9    K-U-D-R-Y-A-S-H-O-V, I believe, was his name.
10   And he was head of production.
11        We're talking about 2007?
12        Q.   '7.
13        A.   I believe at that -- so Sergei
14   Alexeev would have left.  I think those were
15   the main relationships.
16        MR. JACOBSON:  Okay.  This is the
17   point where I apologize to the court reporter,
18   both in the past and in advance for all of
19   these Russian spellings.  It's as rough for me
20   as it is for you.
21        A.   I'll help.
22        Q.   And I'm very grateful for it.
23        MR. JACOBSON:  Mr. Pees, why don't we
24   take a five-minute break.
25        MR. PEES:  Excellent.

Page 46

1         MR. JACOBSON:  We've been going about
2    an hour.  It's a good time for a --
3         THE WITNESS:  Thank you.
4         THE VIDEOGRAPHER:  We're going off
5    the record at 9:35 a.m.
6         (Recess from 10:26 to 10:35.)
7         THE VIDEOGRAPHER:  We are back on the
8    record at 9:46 a.m.
9         Q.   So, Mr. Foresman, before we took a
10   break, I had asked you the circumstances -- I
11   had asked you, first, if you had met a
12   gentleman named Sergei Gorkov.  And you wanted
13   to consult with counsel, so I'm now going to
14   try again.
15        Have you met with a gentleman named
16   Sergei Gorkov?
17        A.   Yes.
18        Q.   And what were the circumstances of
19   that meeting?
20        MR. PEES:  Could you -- that's an
21   open-ended question.  And Mr. Foresman has
22   received advice from another law firm in
23   connection with that meeting.  And I don't want
24   to invade the privilege inadvertently with such
25   an open-ended question.

Page 47

1         So my suggestion to you, and -- is
2    that the question be reframed.  Let's just
3    establish the timing of it first.
4         MR. JACOBSON:  That's what I was
5    going to do next.
6         MR. PEES:  And then -- then we can
7    take it one step at a time.
8         Q.   So is it only -- is it only one
9    meeting with Mr. Gorkov or multiple meetings?
10        A.   I believe it was only one meeting.
11        Q.   And what was the approximate
12   timeframe of that meeting?
13        A.   2016.
14        Q.   2016.  Do you recall in what month of
15   2016?
16        A.   Yes.
17        Q.   What month was that?
18        A.   December.
19        Q.   December of 2016.
20        MR. JACOBSON:  Just waiting for my
21   colleague to come back who has more copies of
22   this, but I'll mark this for now.
23             ---
24        (Foresman Exhibit 4 was marked for
25             identification.)

Page 48

1             ---
2         MR. PEES:  Mr. Jacobson, just to
3    speed things along, I would note that the
4    document that's just been marked as Exhibit 4
5    is a letter from the -- a ranking member of the
6    United States Senate Committee on Judiciary
7    regarding, among other things, the committee's
8    investigation of Russian interference in the
9    2016 presidential election.
10        It's our view that this is beyond the
11   scope of the subject matter of the underlying
12   English proceedings and the events that took
13   place in connection with the Yukos auction in
14   2007.
15        And I'll be instructing Mr. Foresman
16   not to be answering any questions on this
17   topic.  And I understand you can certainly
18   reserve your rights to make an application to
19   the Court, but he will not be answering
20   questions on that topic.
21        Q.   Mr. Foresman, did you engage counsel
22   to assist you in responding to this letter from
23   the Senate judiciary committee?
24        A.   Yes.
25        Q.   What counsel did you engage?

Page 49

1     I'm just asking --
2     A.  Yeah.  No.  I know.
3     Q.  I want to be very clear.  I'm not
4  going to be asking you about the substance of
5  advice you received.
6     A.  I believe it was Gibson Dunn.
7     Q.  Did you produce any documents in
8  response to this letter?
9     MR. PEES:  Objection.  I'm
10  instructing the witness not to answer for the
11  reasons I set forth earlier.
12         ---
13     (Instruction Not to Answer.)
14         ---
15     MR. JACOBSON:  You're not going to
16  let him answer whether he produced any
17  documents in response to this letter?
18     MR. PEES:  That's correct.  And if,
19  absent some sort of connection between the
20  subject matter of English proceedings and the
21  Senate's investigation into Russian
22  interference in the 2016 U.S. presidential
23  election, I don't intend to allow Mr. Foresman
24  to go down this road at all.
25     MR. JACOBSON:  I suspect we'll be --

Page 50

1  we reserve our rights, and I suspect we'll be
2  seeing Mr. Foresman again at another -- at
3  another table much like this one in due course
4  under that circumstance.
5     MR. PEES:  We'll take it one step at
6  a time, Mr. Jacobson.
7     Q.  So with regard to Igor Sechin, who
8  you said you met twice, did you have any other
9  sources of information about Mr. Sechin?  It's
10  not beyond your meetings with him?
11     A.  Sorry.  Could you clarify -- any
12  other source of information?
13     Q.  Sure.  So, in other words, other than
14  your -- other than your personal interactions
15  with Mr. Sechin, did you have any other sources
16  of knowledge about Mr. Sechin?
17     A.  Yes.
18     Q.  And what were those sources?
19     A.  The media.  Acquaintances that --
20  that knew of him.  And whether -- with respect
21  to his government work or with respect to his
22  commercial work.
23     Q.  From time to time, Mr. Foresman, have
24  you had conversations with personnel at the
25  United States embassy in Russia?

Page 51

1     A.  Yes.
2     (A cell phone ringing.)
3     MR. PEES:  My apologies.
4     MR. JACOBSON:  Of course.
5     Q.  Over the years, how many times would
6  you say you've had conversations with personnel
7  at the U.S. embassy in Moscow?
8     A.  Dozens.  Or more.
9     Q.  Have you met the -- whoever it may be
10  from time to time -- the United States
11  ambassador to Russia?
12     A.  Yes.
13     Q.  How many times have you personally
14  interacted with the actual ambassador to
15  Russia?
16     A.  The current ambassador or --
17     Q.  No.  Over time.  Whoever was in the
18  role at the time.
19     A.  Numerous.  Many.
20     Q.  So I want to show you a WikiLeaks
21  cable.
22         ---
23     (Foresman Exhibit 5 was marked for
24         identification.)
25         ---

Page 52

1     Q.  So I would ask you when you have a
2  chance to turn to the second page of this
3  document.
4     And particularly, paragraph 6.
5     Do you recall having a conversation
6  with a someone at the United States embassy
7  about Igor Sechin?
8     A.  Yes.
9     Q.  And can you take a look at
10  paragraph 6 and read it over, and I'm going to
11  ask you if that generally comports with your
12  recollection of what you told the person at the
13  embassy about Mr. Sechin.
14     A.  Sorry -- what -- can you repeat the
15  question.  Could you repeat the question.
16     Q.  I said, does paragraph 6 comport with
17  your recollection of what you told an embassy
18  official about Mr. Sechin?
19     A.  Not entirely.
20     Q.  In what respects does it not match
21  your recollection?
22     A.  I would not have said that I worked
23  with Sechin over many years.  No.
24     Otherwise, it looks -- it looks
25  broadly familiar and accurate.

Q. Did you -- did you describe Mr. Sechin as incredibly hard-working?
A. I don't recall what I described him at as a specific -- him as at a specific meeting, but I don't dispute that I would have referred to him that way.
Q. And that he was always in the office?
A. Sounds familiar.
Q. And is this -- how did you come to gain the knowledge that you passed on to the embassy about a gentleman you met twice?
A. The specific reference that I gave, about doormen, drivers, guards, et cetera, was specific to the dinner, which I had had with -- the one dinner I had had with him where the waiter, who must have known who Mr. Sechin was, was a bit nervous, and he dropped a plate and was very panicked. And Mr. Sechin picked up the plate and told him not to worry about it.
That was the one reference.
The -- as often was the case when I met with people from our government, I would share my views that were not necessarily firsthand views, briefings, from what I had picked up as a person deeply familiar with the

market and the players.
Q. Did you -- do you remember telling the embassy official that this was not firsthand knowledge by you?
A. I -- I did not represent that it was firsthand knowledge.
But I would note that in my vast experience, firsthand knowledge can sometimes be more misleading and less accurate than informed views from others.
MR. JACOBSON: Mr. Pees, I'm putting the judiciary committee letter to the side for a minute, and I want to just ask a couple of questions about Sergei Gorkov.
Q. What do you know about Mr. Gorkov's background?
A. He had been, I think in 2016, appointed as the chairman of the management committee, who is like the CEO of the Russian state development bank, Vnesheconombank. And before -- I'm sorry.
Q. No. Please continue.
A. And before that, he had been, I think, a regional official at Sberbank.
Q. Do you know whether he at some point

worked for Yukos?
A. I don't know that. I did not know that, to the best of my recollection. If we're talking about the same Sergei Gorkov who was with the state development bank, I don't recall his name associated with Yukos.
Q. So while you were at Dresdner, did the Russian Federation ask you to provide evaluation of -- here we go again, Mr. Court Reporter -- Yuganskneftegaz, Y-U-G-A-N-S-K-N-E-F-T-E-G-A-Z?
A. Which we know as YNG.
Q. Which after this I'm going to do YNG, just like you, Mr. Foresman. I've done it for years.
Did the Russian government ask you to provide evaluation of YNG?
A. We were asked by the Ministry of Justice of the Russian Federation, as I recall, so yes.
Q. And I'll ask in a general -- what was YNG at the time?
A. YNG was, as I understand it now and I believe as I understood at the time, the largest or what we call the main production

asset of Yukos Oil Company.
Q. So the assignment to -- to generate that valuation did you consider that a major assignment?
A. Not economically, but in terms of importance, I would say yes.
Q. And do you know why Dresdner was selected to provide that valuation?
A. I -- I believe I do.
Q. What's your understanding of why Dresdner was picked?
A. My understanding was that we were -- Dresdner at the time, Dresdner Kleinwort, DKW, Dresdner Kleinwort Wasserstein, at the time was known as a leading global energy investment bank in the energy sector. And it had good relationships in -- in Russia, as a -- a -- a well-known and well-committed-to-Russia investment bank.
Q. And did you personally play a role in drafting the valuation report?
A. I played a minor role. I wasn't -- that wasn't part of what I did, but I would have reviewed it. And I believe I would have made comments on it.

Page 57

1    Q.  I wasn't suggest -- I was trying to
2 get a sense of how extensive your role was.
3    A.  Yeah.
4    Q.  And you answered that question.
5    When you reviewed the report, did you
6 work with a version that was in Russian or
7 English or both?
8    A.  I believe it would have been in
9 English because it would have been prepared by
10 our U.K. office, which didn't speak Russian,
11 most of whom didn't speak Russian.
12    Q.  And then to your knowledge -- let me
13 ask it this way:  Who was the audience for the
14 valuation report?
15    A.  The audience?
16    Q.  I don't mean to be -- I'm trying to
17 figure -- I'm getting a sense of how public did
18 the report become, is where I'm going with
19 this.
20    A.  So I would -- I would answer by
21 saying that the client was the -- so the
22 recipient of the report, the client, I believe,
23 was the Ministry of Justice of the Russian
24 Federation or maybe more specifically the
25 bailiff.  It's a little bit vague.

Page 58

1    But the audience, I can't recall at
2 the time whether it was meant to become public,
3 which it did become public, but I can't recall
4 at the time whether we intended to become
5 public.  I don't believe that that was the
6 assumption.
7    Q.  So I'm going to show you a document.
8 I have an English copy of it, and I want to see
9 if it's something that you've seen before.  And
10 then I'll ask you questions about it.
11    MR. PEES:  We are on 5?
12    THE COURT REPORTER:  I just marked 6.
13    MR. PEES:  Oh, 6.
14    ---
15    (Foresman Exhibit 6 was marked for
16 identification.)
17    ---
18    Q.  I'm going to give you plenty of time
19 to look at this.  But the first question I just
20 want to ask is, have you seen this document in
21 this form before?
22    A.  Could you please give me some time
23 to --
24    Q.  Take your time.  I just wanted to let
25 you know what the first question was.

Page 59

1    A.  Okay.
2    Should I read the entire document or
3 just review --
4    Q.  No, no.  I mean just enough to --
5 just please skim it enough to see you're -- if
6 you can say that you've seen this document in
7 this form before.  It's only a couple parts of
8 it that I'm going to direct your attention to
9 specifically.
10    THE WITNESS:  (Perusing document.)
11    A.  Okay.
12    Q.  Is this a document that you've seen
13 before in this form?
14    A.  It's familiar to me.  I don't know --
15 I can't -- I'd have no way of knowing whether
16 I've seen it in exactly this form.  But
17 broadly, I recognize much of the substance.
18    Q.  That's fair enough.  So please turn
19 to -- the pages aren't numbered, but it's about
20 three pages from the back, Section 11.1.
21    It's headed "A Limited Circle of
22 Potential Acquirers."
23    Just let me know when you've finished
24 reading that paragraph.
25    A.  Yes.  I have.

Page 60

1    Q.  So I'm looking in particular at the
2 first bullet, which says, "There is a
3 widespread opinion that political support is
4 needed to participate, which may limit the
5 number of acceptable foreign participants able
6 to compete."
7    So that refers to the sale of YNG.
8 Is that correct?
9    If YNG is offered for sale --
10    A.  I understand it to be that, yes.
11    Q.  And at the time this report was
12 written, was it your personal opinion that
13 political support would be necessary for
14 someone to acquire YNG?
15    A.  Let me rewind.  My -- this is a long
16 time ago.
17    Support was required...
18    I believe -- I believe it was my
19 opinion at the time that, whether it was
20 political support or lack of political
21 resistance for such a large oil-producing asset
22 in Russia to be acquired, that it would, as a
23 minimum, require antimonopoly approval.  And
24 you probably would require some degree of -- of
25 support from the Russian government -- or at

Page 61

1    least lack of resistance.
2        Q.   In your view, what could the Russian
3    state do to preclude a nonsupported buyer from
4    participating in an auction if that was its
5    goal?
6        A.   I'd like to preface my answer by
7    saying I'm -- it's difficult for me to strip
8    out what knowledge I may have acquired in the
9    last 15 years when answering the questions --
10   what I know now versus what I was thinking
11   then.
12       But, for example, a very specific
13   example, the -- the Russian government has an
14   antimonopoly arm, which I don't know if
15   "approval" is the right word, but it could
16   oppose an application if it believed that there
17   was antimonopoly concerns.
18       I believe at this time -- at that
19   time, there were also -- I don't know whether
20   these were written rules or unwritten rules.  I
21   recall distinctly that it -- that -- well, not
22   distinctly.  I have a recollection that Chinese
23   companies, whether by a written order or by a
24   perception, were not allowed to acquire oil
25   fields beyond, I think, 500 million barrels or

Page 62

1    maybe a billion barrels.
2        And -- and I would add that our
3    government, the U.K. government, governments
4    throughout the world, reserve the right to
5    prevent certain owners, as has happened in the
6    last year in this country with oil assets.
7        Absolutely a strategic sector for
8    Russia energy sector, and I don't recall.  It
9    was many billions of barrels that YNG, the
10   reserves.  So this was definitely a strategic
11   asset that -- that the government would care
12   about and would oppose if they didn't like the
13   buyer, in my understanding.
14       Q.   So you can put this aside for now,
15   but I'll -- this one I'll be coming back to
16   later, but we can put it aside for now.
17       While at Dresdner, were you also
18   asked to advise Gazprom in connection with a
19   possible merger with Rosneft?
20       A.   Yes, whether it was a merger and
21   acquisition, but an M&A transaction, yes.
22       Q.   Understood.  How did you come to get
23   that engagement?
24       A.   How did we come to get that
25   engagement?

Page 63

1        I think this was, to the best of my
2    recollection, 2005 maybe, maybe '4.
3        Dresdner had done a lot of work for
4    Gazprom.
5        Dresdner had been a -- the key
6    advisor advising Gazprom on removing what we
7    called the ring fence.  Gazprom's share market
8    had -- they had local shares.  And then you had
9    ADRs, international -- American depository
10   receipts.  And there was big delta between the
11   valuation of those two things.
12       And we advised -- this was called the
13   ring fence, that -- Gazprom local shares were
14   only permissible, were only acquirable by
15   Russian parties.
16       And international investors had to
17   acquire -- anyhow, so we advised on the removal
18   of the ring fence.
19       We -- I believe by that point we had
20   a -- an ongoing and substantial lending
21   relationship with Gazprom.  We had advised
22   Gazprom on a number of -- of transactions.
23   And -- and so we were -- Dresdner was very well
24   known.  We had done some very good work, and we
25   had some very good relationships -- my own,

Page 64

1    Mr. Warnig's, our oil and gas team.
2        Even the head office in Frankfurt
3    were very well known within Gazprom, so we
4    were -- and we were very knowledgeable of the
5    energy sector, so I think a logical fit.
6        Q.   In February 2007, were you nominated
7    to become a director of Gazprom?
8        A.   I -- a member of the board of
9    directors.
10       Q.   Yes.
11       A.   I don't -- I don't recall whether it
12   was 2007.  There were several years where I was
13   nominated to be on the board of directors.
14       Q.   I just want to -- just for -- just so
15   we can make it clear on the date, I'm just
16   going to show you a set of board minutes.
17       ---
18       (Foreman Exhibit 7 was marked for
19   identification.)
20       ---
21       Q.   I just wanted to -- I mean, the only
22   reason why I showed you this document was just
23   because it's the board of directors meeting
24   from 5 February 2007, and it shows you your
25   name and nomination for the board.  So I just

Page 65

1    wanted to -- does this -- do you agree with me
2    that you were nominated for the board in
3    February 2007 to become a director?
4        A.  I -- to the best of my recollection,
5    I was nominated four times.
6        Q.  I -- I agree.  Just -- this was one
7    of them.
8        A.  I believe this was.  I don't remember
9    the years.
10        I didn't recall that being in my
11   Renaissance years.  But according to this, it
12   would have been.  Yeah.
13        Q.  So do you know how you came to be
14   nominated for that position?
15        A.  I -- not entirely.  I was -- I didn't
16   seek the nomination.  I believe I was told that
17   I was nominated by one of the minority
18   shareholders, I believe.
19        But I think it may have been -- and
20   I'm -- I don't have a firm recollection of
21   this, the Gazprom pension fund.  Leader, called
22   Leader, I believe.
23        Q.  Was it unusual for a Westerner to be
24   nominated to the board of Gazprom?
25        A.  It wasn't common.  It was -- It

Page 66

1    wasn't necessarily unusual.  I think I believe
2    there was a sitting German, Mr. Bergmann, who
3    was already a member of the board.  But it was
4    not -- it was not common, but it was not
5    unprecedented.
6        Q.  And as you say, you were nominated
7    three or four times.
8        A.  Uh-huh.
9        Q.  But you never did become a director;
10   is that correct?
11        A.  I never became a director.  I never
12   campaigned, as we say.
13        Q.  Do you know why you didn't get the
14   position?
15        A.  I never campaigned.  I never
16   campaigned for -- I -- I believe, to the
17   best of my recollection, I had to get approval
18   from my employer, which was Dresdner at one
19   stage and then Renaissance, to -- actually, I'm
20   not sure whether I -- whether my permission and
21   my employer's permission was required to
22   nominate me.
23        To be elected, you certainly would
24   have needed that approval.
25        And frankly, I don't believe that --

Page 67

1    looking at this document, from February 2007, I
2    don't believe -- I can't exclude it but I don't
3    believe that I was told ahead of time that I
4    was going to be nominated, to give my approval.
5        Q.  So we talked earlier, before the
6    break, about your conversations with U.S.
7    embassy officials.
8        Why -- in general terms, why would
9    embassy officials reach out to you for
10   information?  What did they consider you
11   knowledgeable about that they would call you
12   for information?
13        A.  Russia.
14        Q.  The country generally or the oil and
15   gas market specifically?
16        A.  The oil and gas market, the business
17   environment, and to a degree, the political
18   environment, insofar as a lot of the
19   state-owned companies were -- sorry.
20        A lot of the top companies were
21   state-owned, government-owned, and were
22   important politically.
23        Q.  So I'm now going to try to focus
24   these questions on the 2007, 2008, time period.
25        What news sources did you consult on

Page 68

1    a regular basis to keep abreast of business and
2    political developments in Russia in 2007 and
3    2008?
4        A.  News sources --
5        Q.  And this is the Sarah Palin "What
6    newspapers did you read in the morning?"
7    question.  What news sources did you consult on
8    a regular basis to keep abreast of
9    developments?
10        A.  So the -- do I understand your --
11        Q.  Media.
12        A.  -- question correctly to be the
13   media?
14        Q.  Media.
15        A.  Fore example, among others -- sorry.
16   Vedomosti, V-E-D-O-M-O-S-T-I.  Vedomosti, which
17   is a Russian language joint venture between the
18   Wall Street Journal and I think the Financial
19   Times.
20        The Wall Street Journal and the
21   Financial Times themselves.
22        Kommersant, K-O-M-M-E-R-S-A-N-T.
23        The Moscow Times.
24        Can't recall where we were in terms
25   of Internet news back then.

Page 69

1    Q.   Pretty far along, as I recall.
2    A.   But I think it was doing more print,
3  in terms media reading.  There was various
4  industry-specific energy newsletters, as I
5  recall.  Regional business newsletters and
6  mailings.
7         New York Times, Washington Post.  I
8  was a pretty voracious reader of news.
9    Q.   And in terms of source, media sources
10 you consulted, how is that different today
11 versus 2007, 2008?
12        Are there sources you're consulting
13 now that didn't exist then?
14    A.   In the media?  Yes.
15    Q.   What sources now are you consulting
16 that didn't exist then?
17    A.   There's a lot of publications that
18 focus on sanctions and U.S. public policy
19 toward that.  That issue did not exist.  So
20 we're very sanctions-focused.
21        Politico -- I don't know if -- and
22 The Hill.  I don't know if I had been aware of
23 those publications back then, but they give a
24 good view of what the policy makers and
25 congressional leaders are thinking.  I don't

Page 70

1  think I was as focused on that back then.
2         Yeah.  So I would say the main
3  difference is that today, people that have the
4  sort of role that I have with respect to
5  Russia, professionally, are much more focused
6  on the direction of travel of sanctions and the
7  geopolitical environment.
8         Whereas, back then when the political
9  environment within the United States was quite
10 strong, back in the early Dresdner years, the
11 focus was more on:  What does everything mean
12 within Russia?
13    Q.   Makes perfect sense.
14        Couple questions ago you quite
15 correctly asked for clarification about whether
16 I was talking, when I said "news sources" and
17 you said "media."  So that anticipated the next
18 question, which is, in terms of how you kept
19 abreast of business and political developments,
20 what percentage would you say was news sources
21 versus contacts?
22    A.   I wouldn't venture to guess.
23        I -- I never thought about it in such
24 terms.  It would be --
25    Q.   I'll ask it differently.  It was a

Page 71

1  terrible question, so let me try it this way.
2  Would you say you gained a significant
3  percentage of your knowledge about business and
4  political affairs in Russia in 2007 and 2008
5  from talking to people you knew?
6    A.   Yes, I would say that.
7    Q.   Was this sort of inviting people to
8  lunch and dinner?  Social events?  Just in
9  general terms, how were you maintaining ties
10 with contacts that were keeping you abreast of
11 developments in 2007 and 2008?
12    A.   In 2007, 2008.
13        Client meetings.  I may have had five
14 client meetings a day in that era.
15        Many of these clients were clients of
16 influence and status.
17        Friends, acquaintances.
18        In the business world, officials that
19 I might encounter, embassy people from
20 different embassies.
21        I am now and was then a fluent
22 Russian speaker.
23        I was very involved in the community,
24 through church, through coaching, through
25 Scouts.

Page 72

1         And the expat community was quite
2  tight-knit, but these included people that were
3  quite influential in that small sandbox.  And I
4  had a lot of contacts and a lot of the sources
5  of information --
6    Q.   So --
7    A.   -- or insights.
8    Q.   Understood.
9         2005, '6, '7, '8, would you say there
10 were countries in the world that were
11 particularly dependent on oil and gas from
12 Russia?
13    A.   Yes.
14    Q.   And what countries would you say
15 were -- are particularly -- in that timeframe
16 in particular, in 2005 through '8 were
17 particularly dependent on oil and gas from
18 Russia?
19    A.   Europe, Western Europe, Central
20 Europe, Eastern Europe, Southern Europe.
21    Q.   And still thinking of that 2004, '5,
22 '6, '7, '8 period, can you think of examples of
23 Russia leveraging that dependence to achieve
24 geopolitical strategic aims?
25    A.   I have heard that terminology.  I

Page 73

1    wasn't a big user of that terminology.
2        Q.   And I don't mean to -- I don't mean
3    to cause you to adopt terminology you don't
4    agree with.  But, I mean -- so I'll break it
5    up.  Are you aware of disputes that arose
6    between Russia and other countries over the
7    supply of oil and gas in that timeframe?
8        A.   Of gas.  I'm not sure about oil.  But
9    of gas, I am aware.
10       Q.   So --
11       A.   Natural gas.  Sorry.
12       Q.   What -- what disputes can you recall
13   from that time period, 2004 through 2008, that
14   arose about the supply of natural gas?
15       A.   Between Gazprom and Ukraine.
16       Q.   In your words, can you describe that
17   dispute and how it arose?
18       A.   I have a better understanding than
19   the average person in Manhattan.  But I -- not
20   so expert in this that I can answer this
21   concisely without thinking.
22           So I -- so Ukraine has a gas transit
23   infrastructure system, pipeline system, through
24   its territory, which way back in the Soviet
25   times and up until today brings Russia natural

Page 74

1    gas through the pipeline system above ground
2    into Europe through Ukraine.
3            And Ukraine -- this is -- has
4    traditionally been a very significant source of
5    revenues for the Ukrainian budget, the transit
6    fees that Gazprom will pay.  And Gazprom --
7    sorry.
8            And Ukraine would also get much or
9    most -- I can't recall if it's much or most of
10   its own natural gas supply from the Russian gas
11   that comes through the pipeline.
12           And I believe at some point in the
13   winter, I think December of -- I don't know if
14   it was '04, '05, '06 --
15           MR. PEES:  I think --
16       Q.   I think it was '05, but --
17       A.   Yeah, '05, maybe.  There's a Harvard
18   Business School case study which does a much
19   better job of explaining this than I am right
20   now.
21           And so I believe it was in late
22   December -- or late 2005, where there was a
23   pricing dispute.  I think Gazprom was accusing
24   the Ukrainians of syphoning off -- I'm using
25   quotation marks -- syphoning off more gas than

Page 75

1    their allotted volume, allotted by the
2    Russians.
3            And there was, I believe, a pricing
4    dispute, for -- this is not gospel.  A pricing
5    dispute about how much Gaz -- Gazprom would
6    charge Ukraine for the gas that Ukraine was
7    using for its own needs.
8            And for the first time, I think,
9    ever -- and this includes the height of the
10   Cold War and the Soviet days -- there was a
11   disruption in the Russian natural gas supply
12   into Europe during the winter because of this
13   dispute with Ukraine.  So it was very --
14       Q.   To take it out of the passive voice,
15   Russian actually reduced the pressure in the
16   pipeline and supplied less natural gas to
17   Ukraine.  Is that correct?
18       A.   I -- I can't recall the -- I can't
19   recall the details.  I can't recall the
20   details.  I -- I do recall reading a Harvard
21   Business School case study which had the
22   conclusion that Gazprom was actually acting
23   commercially rationally and the Ukrainians were
24   not.
25       Q.   And you mentioned -- we discussed the

Page 76

1    Nord Stream pipeline earlier that would transit
2    natural gas from Russia directly to Germany
3    under the Baltic Sea.  So once that pipeline is
4    completed, is it fair to say that Western
5    Europe would be able to get its natural gas
6    without it having to go through Ukraine?
7        A.   I don't know that it would be fair to
8    say that.
9        Q.   Why not?
10       A.   Yeah.  I'm not a deep expert in this.
11   I know more than most people in Manhattan for
12   sure.
13           As I understand it, both Europeans
14   and the Russian government and Gazprom have
15   agreed that flows through Ukraine should not
16   stop or even go down, maybe even go up, in
17   parallel with the Nord Stream supplies.
18           So I -- I don't -- I don't -- but I'm
19   not -- I'm not an expert in this area.
20       Q.   Understood.  In general terms,
21   though, is it fair to say that securing supply
22   lines for the export of oil and gas from Russia
23   is an important consideration for the
24   government of Russia?
25       A.   Yes, absolutely fair.

Page 77

1      And Europe.
2      Q.   So I've been told that we only have
3  about four minutes left on the tape.  I'm at a
4  natural stopping point anyway, so why don't we
5  take a little break.  Let's -- let's try to
6  keep it to five minutes, and then we can come
7  back and rock and roll.
8      THE VIDEOGRAPHER:  Okay.  We're going
9  off the record at 10:26 a.m.  This marks the
10  end of Media 1.
11      (Recess from 10:26 to 10:35.)
12      THE VIDEOGRAPHER:  We are back on the
13  record at 10:35 a.m.  This marks the beginning
14  of Media 2.
15      Q.   So you knew at some point we were
16  going to start talking about auctions.  So the
17  moment has arrived.  I'm going to try to just
18  streamline a few questions, get some
19  foundational matters out of the way.
20      The Lot 19 auction of Yukos assets
21  was for shares of Yukos Finance.  Is that
22  correct?
23      A.   I -- that's correct.  I -- shares and
24  other -- yes, shares, cash.  But I guess shares
25  was the proper term.

Page 78

1      Q.   And the Lot 19 auction took place on
2  August 15th, 2007?
3      A.   Correct.
4      Q.   And for purposes of participating in
5  the Lot 19 auction, RenCap was part of a
6  consortium, correct?
7      A.   Correct.
8      Q.   And the consortium consisted of --
9  I'm -- if you'll forgive me, I'm going to try
10  to do this quickly and object if you want.  The
11  consortium consisted of Stephen Lynch,
12  VR Capital and RenCap?
13      A.   Correct.
14      Q.   And VR Capital was backed --
15  partially backed by its client, HBK?
16      A.   Sorry.  Who?
17      Q.   VR Capital, was VR Capital backed by
18  a client of its -- HBK?
19      A.   I believe I came to understand that,
20  yes.
21      Q.   And RenCap was partially backed by
22  its client, Jervis, J-E-R-V-I-S?
23      A.   I came to know that, yes.
24      Q.   Am I correct that only two bidders
25  participated in the Lot 19 auction?

Page 79

1      A.   I'm not sure if it was two or if it
2  was three.  It may have been -- it may have
3  been two.  The record would show.
4      Q.   One of them was Promneftstroy.
5  That's a name we're going to be talking about,
6  P-R-O-M-N-E-F-T-S-T-R-O-Y.  But I think we may
7  call it PMS for --
8      A.   PNS.
9      Q.   PNS.  I'm sorry.  Yes.  PNS.
10      A.   That's okay.
11      Q.   Works for -- either one works.  We'll
12  use PNS.  It's probably easier.
13      So one of those -- Promneftstroy was
14  your vehicle; correct?  The consortium's --
15      A.   Bidding vehicle, yes, correct.
16      Q.   -- bidding vehicle.
17      And another bidder was a company
18  called Versar, V-E-R-S-A-R?
19      A.   Correct.
20      Q.   And Promneftstroy, PNS, won the
21  auction, correct?
22      A.   Correct.
23      Q.   And before your consortium bought
24  PNS, it was a Rosneft subsidiary?
25      A.   I don't know if that's the right

Page 80

1  word.  It was a -- it was owned by -- it was
2  set up by, as I understand, and owned by
3  Rosneft.  I don't know if the word "subsidiary"
4  is legally accurate, but it may have been.
5      Q.   Perfectly -- perfectly fair
6  correction.
7      Would you describe yourself as the
8  lead deal executive for RenCap on the Lot 19
9  matter?
10      A.   I was the lead relationship
11  executive.  I don't know the deal -- I have to
12  understand what you mean by "deal."  I wasn't
13  negotiating the terms.
14      Q.   I -- I think -- I think you answered
15  the question.  I was mostly getting at were you
16  the lead person at RenCap working on the deal?
17  I mean the person working on all matters
18  pertaining to the -- the bid for Lot 19.
19      A.   No.  I would -- not in all matters
20  related to.  I was a key Renaissance person on
21  that transaction, particularly as it related to
22  the relationship with Rosneft.  But not in all
23  matters of the deal, no.
24      Q.   We may come to some other names --
25      A.   Okay.

Page 81

1      Q.   -- during the course of the day, and
2  that may help to clarify it.
3           Who was the owner of RenCap at the
4  time of the Lot 19 auction?
5      A.   So the -- it was owned by partners,
6  which would mean the executive partners, the
7  controlling shareholder was Stephen Jennings,
8  with a P-H.
9           And then there were smaller
10  shareholders.
11      Q.   So in a few minutes, we're going to
12  start talking about your first contact with the
13  gentleman named Stephen Lynch.
14           But before I talk about the specific
15  contacts about Lot 19, at the time that you
16  first were -- you first spoke to Mr. Lynch, did
17  you know anything about him?  Strike that.
18           Had you met him before the first
19  contact with Lot 19?
20      A.   I had met him before.
21      Q.   In what context?
22      A.   I believe, but I'm not sure -- and I
23  don't know if he has this recollection.  I
24  thought I had met him once at a friend's party
25  in Ukraine ten years prior at a -- at a party

Page 82

1  and just saw him there.
2           The first substantial discussion I
3  had with him was, I believe -- I was at
4  Renaissance Capital.  I believe it was 2006.
5      Q.   And what interactions did you have
6  with him in 2006, Mr. Lynch?
7      A.   To the -- I believe he had approached
8  Renaissance Capital, in Atlanta with me about a
9  real estate transaction, vague recollection,
10  but a much more vivid recollection, I can
11  recall we had maybe two or three meetings
12  and/or calls with him about whether he might be
13  a candidate to join Renaissance to look after
14  our real estate, investment banking, and
15  principal investment and potentially asset
16  management activities.  And those discussions
17  didn't materialize.
18      Q.   At the time that you and Mr. Lynch
19  first communicated with each other about
20  Lot 19, did you already know that he had been
21  involved in the bid for another Yukos lot,
22  Lot 4?
23      A.   I don't believe so.
24           I can't rule it out, but I don't -- I
25  don't recall having known that prior to him

Page 83

1  coming to me with respect to Auction 19.
2      Q.   And before you and Mr. Lynch had your
3  first communication about Lot 19, did you
4  already know what Lot 19 consisted of?
5      A.   I don't believe that I did, to the
6  best of my recollection.
7      Q.   So you hadn't discussed the Lot 19
8  auction with any of your clients prior to the
9  first time Mr. Lynch came to you?
10      A.   Correct.  To the best of my
11  recollection, yes.
12      Q.   And just to be clear, had RenCap
13  itself considered participating in the Lot 19
14  auction before Mr. Lynch first contacted you?
15      A.   Not to my knowledge, but my knowledge
16  may not be universal.
17      Q.   To the best of your knowledge, when
18  did you first learn that Mr. Lynch had won the
19  Lot 4 auction?
20      A.   To the best -- to the best of my
21  knowledge, when he told me that having
22  approached me with his idea about Lot 19, to
23  the best of my recollection.
24           I don't know whether it was in the
25  media after Lot 4 and if I read about it there.

Page 84

1  I don't know -- still today, I don't know
2  whether his involvement was in the media
3  between Lot 4 and Lot 19.
4      Q.   Do you know what assets were in the
5  Lot 4 auction?
6      A.   I did not, I don't believe I did at
7  the time.
8           But there was a power asset, I
9  believe.
10      Q.   Well, RenCap itself considered
11  participating in the Lot 4 auction, didn't it?
12      A.   I -- it was in the course of
13  reviewing the documents that the claimants
14  provided, that I reviewed in the course of this
15  past week, that I put two and two together
16  that -- that RenCap had looked at Lot 4, which
17  Lynch had won.
18           I, to the best of my recollection,
19  which I think is quite vivid on this, I don't
20  believe I made that connection until this week.
21      Q.   Okay.  So I have a feeling I'm going
22  to show you one of the e-mails that you looked
23  at, and we can go through it a little bit.  And
24  I'll just repeat that I know Mr. Pees's
25  objections stands.

Page 85

1    A.  I'm sorry.  Which objection stands?
2    Q.  Use of the documents.
3        MR. PEES:  I had a standing objection
4  at the beginning of the deposition.  That's
5  what Mr. Jacobson is referring to.
6        MR. JACOBSON:  And I won't do that
7  again.
8        MR. PEES:  I think we are in
9  agreement that it's a standing objection.
10       MR. JACOBSON:  Yeah.
11       MR. PEES:  Thank you for the
12  clarification.
13       MR. JACOBSON:  Sorry.  Didn't mean
14  to --
15       THE WITNESS:  So do I have this?
16       THE COURT REPORTER:  As soon as I get
17  my hands free.
18       MR. JACOBSON:  Sorry, sorry, sorry,
19  take your time.  No rush.
20       THE COURT REPORTER:  Actually, while
21  I have your attention, if you could slow down a
22  little bit.
23       MR. JACOBSON:  Story of my life.
24       THE COURT REPORTER:  Thanks.
25                    ---

Page 86

1        (Foresman Exhibit 8 was marked for
2    identification.)
3                    ---
4    A.  Can I familiarize myself with it?
5    Q.  By all means.
6        MR. JACOBSON:  I'll note for the
7  record that the court reporter just became the
8  117th court reporter to tell me to slow down.
9        THE WITNESS:  (Perusing document.)
10       MR. JACOBSON:  I think we're on 7.
11       THE COURT REPORTER:  This is 8.
12       MR. JACOBSON:  8.  Sorry.  Thank you.
13   Q.  Just to save some time, I am going to
14  ask you some certain general questions.
15   A.  Okay.
16   Q.  And then I'll direct your attention
17  to particular --
18   A.  Okay.
19   Q.  -- parts of the document.  But some
20  easy stuff.
21       There's a gentleman Oleg Jelezko,
22  J-E-L-E-Z-K-O, on this e-mail exchange.  What
23  was Mr. Jelezko's position?
24   A.  I believe at the time he was head of
25  structured products or equity derivatives,

Page 87

1  something in that realm.
2    Q.  And then there's another gentleman,
3  Alexander Pertsovsky, P-E-R-T-S-O-V-S-K-Y.
4  What was his position?
5    A.  I think by that time, he was already
6  the -- Mr. Pertsovsky was already the CEO of
7  Renaissance Capital.
8    Q.  And then the last one I went to ask
9  you about is Philip Panov, P-A-N-O-V.  What was
10  Mr. Panov's position?
11   A.  Sorry.  What do you -- that doesn't
12  ring a bell.  Where is his name?
13   Q.  That's a fair question.  I might have
14  made a mistake.
15   A.  Oh, page 5.  I'm not familiar with --
16  I don't know if I was at the time.  That
17  doesn't ring a bell.
18   Q.  So it being an e-mail chain, the
19  earliest message in the chain is at the back.
20       So what I'm going to do is ask you to
21  look at the -- the first e-mail, you know, the
22  first e-mail chronologically in the chain,
23  which is an e-mail from Irina Khrabrova,
24  March 28th, 2007, at 10:56 a.m.
25       And then it seems as though

Page 88

1  Mr. Jelezko added Mr. Pertsovsky and Mr. Panov
2  at 11:00 a.m.  And then within about six
3  minutes of the original e-mail, and this is
4  what I really want to direct your attention to,
5  is on page 5 toward the top of the page, which
6  is at 11:02 a.m., Mr. Pertsovsky forwards an
7  e-mail, forwards this chain to you with a
8  one-line message:  "Can we do it?"
9        Do you see that?
10   A.  Yes.  I think that was the --
11  11:02 a.m.  But yes.
12   Q.  Yes.  And do you know why
13  Mr. Pertsovsky asked you in particular whether
14  RenCap could participate in the Lot 4 auction?
15       Take your time.
16   A.  Yeah.  Let me -- yeah.  Let me just
17  read my response.
18   Q.  By all means.
19       THE WITNESS:  (Perusing document.)
20   A.  I guess he wanted my view as to
21  whether this was something that Renaissance
22  should pursue.
23   Q.  In your mind, what considerations
24  went into whether Renaissance should or
25  shouldn't participate?

Page 89

1      A.  So I was head of what we called
2  client coverage, so I was responsible for our
3  client relationships.
4          And Renaissance was the leading, if I
5  may say, the leading investment bank in -- in
6  that market, Russian.  And we often had clients
7  that were -- that we were advising.  We all --
8  also did often principal business on our own
9  behalf or on behalf of -- and sometimes
10  brokerage business on behalf our advisory
11  clients.
12         So -- and we were headquartered in
13  Russia.  So our involvement in a transaction,
14  some of the things, if I understood your
15  question, that we would take into consideration
16  is, are we going to have a conflict with the
17  client, potentially, between two clients?  Are
18  we going -- is this something where our
19  participation would be welcomed by clients or
20  by the host government?
21         Are there some -- there was some
22  sensitivities around the Yukos-related auctions
23  for sure.  So we would have taken those things
24  into consideration.
25      Q.  So in particular -- well, how would

Page 90

1  you describe the sensitivities?  You mentioned
2  sensitivities that the Russian government had
3  with regard to the Yukos assets.  How would you
4  describe those sensitivities in your own words?
5      MR. PEES:  Slight objection.
6          His testimony wasn't quite as
7  extensive as the way you recapped it, I
8  understand you weren't meaning to --
9      MR. JACOBSON:  I was not.
10      MR. PEES:  -- add more to it.  But I
11  think if you rephrase the question to ask him
12  just to elaborate on the sensitivities he
13  referred to, that would clear up my objection.
14      MR. JACOBSON:  I accept that
15  objection.
16      Q.  So how would you describe the
17  sensitivities?
18      A.  So the -- the Yukos -- the whole
19  Yukos affair with the Yukos bankruptcy and
20  the -- the fate of Mr. Khodorkovsky,
21  Mr. Lebedev.
22      MR. JACOBSON:  I can do both of
23  those.  Khodorkovsky is K-H-O-D-O-R-K-O-V-S-K-Y
24  and Lebedev is L-E-B-E-D-E-V.
25      A.  Yeah.  This was very high-profile.

Page 91

1  It was all over the Russian media.  It was all
2  over the international media.  Some of the
3  claimants and their then-associates were taking
4  out advertisements saying these are -- sham
5  bankruptcy and these are rigged auctions, and
6  threatening people for not participating.  It
7  was a very high-profile, very sensitive topic.
8      Q.  So, I mean, and just to be clear, is
9  it fair to say, from this e-mail exchange, that
10  RenCap did consider participating in the Lot 4
11  auction?  Is that correct?
12      A.  Yes.  That is correct.  That's a fair
13  assessment.
14      Q.  And so in contrast to the six minutes
15  that it took Mr. Jelezko to get the "Can we do
16  it?" question to you after the first inquiry
17  came in, it was about three hours, three and a
18  half hours, to 2:22 p.m. when you responded.
19  Do you have any recollection as to what you did
20  during those three hours to formulate your
21  response?
22      A.  Just clarify, it was not Mr. Jelezko.
23  It was Mr. Pertsovsky that e-mailed.
24      Q.  Oh, you're absolutely right.  You're
25  absolutely right.

Page 92

1      A.  It would be misleading, to suggest
2  that I opened this e-mail at 11:02 and
3  contemplated it for three and a half hours.
4      Q.  I wasn't meaning to suggest that.  I
5  was just asking if you know anything you did
6  during that period of time to -- to prepare
7  your response.
8      A.  To the best of my recollection, I
9  opened the e-mail, read it, and started typing.
10      Q.  So you don't recall having spoken to
11  anybody else?
12      A.  No.
13      Q.  Okay.
14      A.  No.
15      Q.  So --
16      A.  Yeah.  I -- I can't rule out, but I'm
17  rather confident that I just started typing and
18  this was my -- what came out of my head without
19  consulting anybody.
20      Q.  So let's -- I want to take a closer
21  look at your response, which is at the bottom
22  half of page 4 of the exhibit.
23         The third sentence -- I'll do it one
24  at a time.  I mean, you saw from the below that
25  you need to submit your bid today.  And then

Page 93

1  you expressed your firm view that we go ahead.
2       But then the third sentence was:  "If
3  they" -- and you put "they" in quotes -- "don't
4  want us involved, then FAS" -- we'll get to
5  what FAS is in a minute -- "won't approve our
6  application."
7       What did you mean by "they" in
8  quotes?
9       A.  So a lot times didn't go -- I didn't
10 invest a lot of time in drafting this.  I
11 believe, to the best of my recollection,
12 from -- whatever that is, 11 and a half years
13 ago, that "they" would have meant the Russian
14 state, Russian state companies, Russian
15 government, maybe with an emphasis toward
16 Russian state companies that might be
17 interested in bidding for this.
18       But basically, the -- you know, the
19 government.
20       Q.  And FAS stands for the Federal
21 Antimonopoly Service?
22       A.  Yes, correct, in English, yes.
23       Q.  In English.  And then the next
24 sentence is, "If they do approve it, but we are
25 told before April 14 that we are not welcome,

Page 94

1  then we can stand down now."
2       Who did you envision might say that
3  RenCap was not welcome in this auction?
4       A.  I'm sorry.  Could you repeat the
5  question?  Sorry.
6       Q.  Sure.  So --
7       A.  Just the question.
8       Q.  Yeah.  No.
9       Who were you anticipating might
10 convey a message that RenCap is not welcome?
11      A.  I don't think I had in my mind a
12 specific person.  I think it was just that we
13 would come to know that -- that whether --
14 whether a client was bidding for this and it
15 would be awkward for us to be conflicted with a
16 client, whether this was considered a -- a
17 strategic energy grid -- I don't know what it
18 was, to be honest with you.
19      And whether a financial investor, an
20 American financial investor might not be
21 welcome, that we would just come to -- I didn't
22 have a specific thought in my mind, but that --
23 that -- that we would learn -- and that's
24 not -- I'm not saying today that that's a
25 correct assessment, that someone would let us

Page 95

1  know.
2       I'm trying to put myself in my mind
3  from 11 and a half years ago that the main
4  message I'm trying to convey here is I've just
5  learned about this.  The deadline, I'm told, is
6  today.  I don't want to tell the bank to not go
7  forward.  If we think it makes commercial
8  sense, go for it and then we'll figure it out.
9       Q.  Would there have been any in your
10 mind -- in your mind, would there have been any
11 antimonopoly concerns with RenCap participating
12 in this auction in this way?
13      A.  I don't know, and I'm really -- I'm
14 not -- and I saw various references to FAS in
15 the e-mails that you produced.  And I may have
16 come across as being more knowledgeable about
17 the Russian antimonopoly service than I was.
18      It's -- I'm not an expert in anti --
19 and I may have even used the wrong terms.  I
20 don't know if it's approval that they grant.
21      Q.  And then the next sentence was, "Not
22 every auction lot in this process is
23 sensitive."
24      A.  Uh-huh.
25      Q.  Again, you've -- I think you've

Page 96

1  talked about this.  But what -- in your mind,
2  at this time, how were you differentiating
3  between sensitive and nonsensitive?
4       A.  Major production, energy production
5  assets, oil in particular was -- it's a
6  strategic industry.
7       I seem to have thought or I seem to
8  have allowed for at the time that power was
9  sensitive.  Because it's the power grid or
10 whatever they were doing.  Whether they were
11 distribution or a producer, I don't -- I can't
12 recall.
13      But it seems that one of my
14 colleagues, all, like, thought that they
15 weren't sensitive, but for me power, oil, gas,
16 those are sensitive assets.  Real estate, cash,
17 frozen cash is not sensitive.  You know, retail
18 stores are not sensitive.
19      Q.  How about pipelines?
20      A.  Pipelines, generally, would be
21 considered sensitive.
22      Q.  And then you said, last sentence of
23 that first paragraph, "I'm trying to look into
24 this one."
25      You stated that in the present tense.

Page 97

1   I realize it's an e-mail that you're just
2   drafting.  But you said this in the presence
3   tense:  "I am trying to look into this one."
4   Do you recall what you were doing to try to
5   look into Lot 4?
6        A.   No.  No.
7             Can I finish -- just read the e-mail?
8        Q.   Sure, by all means.
9        A.   Maybe I referred to what I was doing.
10       Q.   By all means.  I'm going to keep
11  going through it anyway.
12       A.   Oh, okay.  Okay.  Well, then if I --
13  okay.
14       Q.   Take your time.  Read the whole
15  e-mail, please.
16       A.   Yeah.  I don't know -- I don't now
17  know -- I don't know, even if I had any
18  specific companies or individuals in mind then.
19       I may have.  I may not have.  But I
20  don't recall now.
21       Q.   So in the -- you have now read the
22  whole e-mail.  You know in the next paragraph,
23  the second sentence discusses the possibility
24  that the, quote, The Kremlin tells us we are
25  not welcome, unquote.

Page 98

1             What you did have in mind, when you
2   said the Kremlin might tell RenCap that it's
3   not welcome?
4        A.   So in my parlance, and I think --
5   this is not specific to me.  Well, I think it's
6   a broader usage.  "Kremlin" meant the
7   government, meant state companies, meant state
8   banks, things that were owned or controlled or
9   influenced by the State.
10            I'm sorry.  Was your question what I
11  meant by "Kremlin"?
12       Q.   Well, no.  It was -- my question was,
13  what did you have in mind when you said the
14  Kremlin might tell RenCap that it's not
15  welcome?
16       A.   I don't know.  If I were to surmise,
17  which I think is a reasonable approach in
18  this -- that maybe we would have called -- I
19  don't know -- I'm not very knowledgeable then
20  and I -- sorry, now when I was -- not
21  knowledgeable then about the power sector,
22  didn't have a lot of -- I don't think I knew
23  then, and I'm afraid I don't know now who might
24  be some clients, state-related or others, that
25  might be trying to bid for this.

Page 99

1        I don't know if this was one that
2   Lukoil had been looking at or not.  But you
3   would call around -- which is not, by the way,
4   a state company.  But if someone, if a company
5   like that didn't want us to participate and
6   it's a client, we're not going to do it.
7             So I probably -- I don't know if I
8   did.  But if I -- if I were to have asked
9   around, to see whether the so-called Kremlin
10  would object -- excuse me.
11            Let me back up.
12            That was a differ -- that was -- my
13  reference to if someone objects was that we
14  would be told.
15            What I would have done to try to find
16  out whether we were stepping on any toes by
17  bidding, I would have called, I guess, to some
18  state companies in the power sector, maybe in
19  the oil sector if there was some overlap, maybe
20  some state banks.  That's the best I can --
21       Q.   Would you have called Mr. Warnig?
22       A.   Not about something like this, I
23  don't believe.  That wouldn't be his thing.
24       Q.   So the -- what you just described was
25  kind of a sector-specific, possible objection.

Page 100

1             But then in the next paragraph of
2   your e-mail, you discuss the second -- I'll
3   just read it.
4             "The second scenario would be if
5   Branis" -- and Branis is the client who came to
6   RenCap with this proposal, returning to the
7   quote -- "is fronting someone who key Kremlin
8   officials do not want to win it.  For example
9   (just for example), Chubais," which is spelled
10  C-H-U-B-A-I-S.
11            So I have to unpack that sentence a
12  little bit.  The first question I want to ask
13  you is, what did you mean by "key Kremlin
14  officials"?  Now we're not talking about the
15  Kremlin anymore.  It's now key Kremlin
16  officials.  So what did you mean by that?
17       A.   I don't know now, and I don't know if
18  I knew then specific name -- I don't know if I
19  had specific names in my mind.  Chubais, I
20  believe, at the time was the head of the main
21  state-controlled power company called UES.
22            But they're different factions.
23  And --
24       Q.   Within the Kremlin?
25       A.   Well, within the government, within

Page 101

1 the government, within the Kremlin.
2  Q.  Sure.
3  A.  And -- and -- and it could have
4 become -- it could have become politicized.
5 And Renaissance was careful about which
6 assignments it would pursue.  We were sensitive
7 about the views of the host government.
8  Q.  And you currently serve on the
9 corporate board of a company called TMK; is
10 that correct?
11  A.  Correct.
12  Q.  And Mr. Chubais also serves on that
13 board; is that correct?
14  A.  Yes, he does.
15  Q.  How often does that board meet?
16  A.  Six or seven times a year, but often
17 without his physical presence.
18  Q.  And why did you think that, in your
19 words, key Kremlin officials might not want
20 Mr. Chubais to win this particular auction?
21  A.  I think it's an unfortunate example
22 of -- I don't know why he would be
23 considered -- maybe something was going through
24 my mind at the time, with the restructuring,
25 that he was running for the power company.  I

Page 102

1 don't know.  I don't know at this time.
2  Q.  Is it fair to say that it was
3 important to you that RenCap not be seen
4 working for a client who other factions within
5 the government didn't want to win an auction?
6  A.  Well, if you look at my e-mail, we
7 were -- what I was sensitive to, I believe, was
8 that we would be the face of the bid.
9  I -- it's normal institutional
10 investors.  Like Branis was, I believe,
11 Prosperity Capital, which is a leading
12 international equities investor, that they
13 would bid through a -- a bank.  But it's a
14 financial investor.  That's normal.
15  If there were a strategic -- like
16 Chubais's company, that we were -- that wasn't
17 revealing itself, that would have been -- that
18 would have been unusual for Renaissance as a
19 broker-dealer to be fronting, unlike a
20 financial investor where it would be more
21 normal.
22  Q.  And then in the next paragraph, you
23 basically say that you -- let's do it and,
24 quote, I will learn in time what we can and
25 can't do in terms of the political angle.

Page 103

1  A.  Yeah.
2  Q.  When you say "political angle," are
3 you referring to the Russian government or the
4 internal politics or something else?
5  A.  Sorry.  Internal politics,
6 internal --
7  Q.  In other words, when you said -- what
8 did you mean by "political angle"?
9  A.  I guess I meant the sensitivity, the
10 political sensitivity of our involvement.
11  Q.  So in the next e-mail of the chain,
12 Mr. Jelezko says, they -- which I guess he
13 meant Prosperity is not fronting for anyone.
14  Do you recall whether you -- strike
15 that.
16  Did you subsequently have any
17 conversations with -- I mean, you mentioned you
18 would -- you would learn things from -- by
19 calling energy companies and -- and the like.
20  Did you ever have communications
21 about this with anybody outside of RenCap to
22 discuss the political sensitivity or anything
23 else about the Lot 4 transaction?
24  A.  I don't know that we -- I don't know
25 that I did.

Page 104

1  I don't know that I did.  I think the
2 thing was due that day.
3  And then we seemed to have some time
4 between then and -- and the auction.  I don't
5 believe I took any steps.  But I -- I may have.
6  If I did, I presume you have a record
7 of it.
8  Q.  Do you know as you sit here what
9 price the Lot 4 assets ultimately sold?
10  A.  No, I don't.
11  Q.  So then a little higher in the chain
12 at -- it's at the top of page 2, it's now
13 4:34 p.m.  It's shown here at 16:34.  It's a
14 message from Mr. Jelezko to you and Stephen
15 Jennings and Hans Horn.
16  Mr. Jelezko says, "We have discussed
17 it with Stephen on the risk committee, and
18 Stephen will check Kremlin's reaction to our
19 bid.  We will not proceed until this is
20 clarified."
21  Does that reference to Stephen mean
22 Mr. Jennings?
23  A.  I -- yes.
24  Q.  Do you know whether Mr. Jennings did
25 anything to, in this parlance, check the

Page 105

1  Kremlin's reaction to the bid?
2      A.  I don't.  And I took this to be a
3  reflection of the fact that this wasn't a
4  sector that my contacts and information would
5  help us to address.
6      Q.  Now I'm going to show you another
7  e-mail.
8                    ---
9      (Foresman Exhibit 9 was marked for
10          identification.)
11                   ---
12     Q.  And, Mr. Foresman, you're not on this
13 one, so take your time -- and, again, the first
14 question I'm going to ask is whether you've
15 seen this before.
16     THE WITNESS:  (Perusing document.)
17     A.  No, no.
18     Q.  You say, no, you've not seen it
19 before?
20     A.  Not that I recall, no.
21     Q.  So I should have asked you in
22 connection with your earlier exchange:  Who is
23 Irina Khrabrova?  Who was she at this time?
24     A.  I don't know that I knew her.  I
25 could probably figure -- I don't know who she

Page 106

1  is.  I don't know -- she was with a RenCap
2  person, apparently.  I'm not sure.
3      Q.  How about Igor Sagiryan,
4  S-A-G-I-R-Y-A-N?
5      A.  So Igor was, I don't know if this was
6  his official title, but I think he was the head
7  of government relations.  And that's how he was
8  perceived, as like a GR function.
9          Although he may have had a different
10 title, I think that's how he was perceived.
11 Maybe the GR reported in to him.  I don't know.
12     Q.  And then there was another gentleman,
13 whose name I'm going to butcher even worse than
14 I've been butchering the others,
15 Mr. Aganbegyan, A-G-A-N-B-E-G-Y-A-N.  Do you
16 know who --
17     A.  Not bad.
18     Q.  -- who he was?
19     A.  Yes.  Yes, I do.  So Ruben was an
20 investment banker at RenCap, senior investment
21 banker.
22         At that time, he may have been a
23 co-head of -- what we call IBD, investment
24 banking department, or he may have still just
25 been like a senior banker.  He was a private

Page 107

1  side investment banker.
2      Q.  How about Vladimir Blinov,
3  B-L-I-N-O-V?
4      A.  So he would have worked for Ruben.
5  He was an investment banker, in the investment
6  banking department, focusing on oil and gas
7  energy -- sorry.  Oil and gas and power, I
8  guess.
9      Q.  So did -- head of government
10 relations is saying, "Please do not touch the
11 subject and do not even come close to it."
12         Do you know why -- I mean, let me --
13 since you weren't on this e-mail, let me ask
14 this way:  Did Mr. Sagiryan ever communicate
15 that view to you?
16     A.  Not that I recall.
17     Q.  And as you sit here today, do you
18 know why he communicated this view on
19 April 4th, 2007?
20     A.  I presume he felt it important to
21 communicate it.  So that -- to advise the firm
22 not to participate, I presume.
23     Q.  And I don't know that I asked the
24 question this way before, so let me just ask it
25 to tie it up.  Did anyone outside of RenCap

Page 108

1  communicate to you any view that RenCap should
2  not participate in the Lot 4 auction?
3      A.  Not to the best of my recollection.
4  I don't recall even having looked at Lot 4
5  auction until I saw e-mails much later from
6  you.
7      Q.  So -- and then, again, I just want to
8  make sure that I'm tying up all possible loose
9  ends.  To your knowledge, did -- to your
10 knowledge, did anyone outside RenCap
11 communicate to anyone inside RenCap that RenCap
12 should not participate in the Lot 4 auction?
13     A.  Not to -- not that I'm aware of.
14         Or not that I recall.
15                   ---
16     (Foresman Exhibit 10 was marked for
17          identification.)
18                   ---
19     Q.  I've just shown you a -- a RenCap
20 memorandum -- and, again, take your time to
21 look at it -- dated April 20, 2007.  And,
22 again, the first question I'm going to ask is
23 whether you've seen this before today.
24     THE WITNESS:  (Perusing document.)
25     A.  Okay.

Page 109

1    Q.   Have you seen this memo before today?
2    A.   I don't think so.  I -- there was
3  something related to this matter in the
4  production that I saw this week.  But I -- but
5  I don't recall being a memorandum without me --
6  I -- if I saw this, I saw it for the first
7  time, to the best of my recollection, this
8  week.
9    Q.   Were you a member of the risk
10  committee in April 2007?
11    A.   No, I was not.
12        I don't believe I was.  I don't
13  recall having been.
14    Q.   And then I'll just -- you haven't
15  seen it before, so -- but I'll direct your
16  attention to the item number 1 where it says
17  "political risk."
18        And it says, "As it was explicitly
19  stated by Stephen during discussion of another
20  trade with Yukos assets during recent risk
21  committee for Prosperity, we can't touch Yukos
22  assets due to high political risks related to
23  such a participation that is not agreed with
24  the Kremlin."
25        So I bring this up because the

Page 110

1  Prosperity transaction is Lot 4.  Correct?
2    A.   Yes.  Correct.
3    Q.   And then --
4    A.   The Branis one.  Yeah.
5    Q.   And to the best of your knowledge,
6  does the Stephen reference here, again, refer
7  to Mr. Jennings?
8    A.   Yes.  It should, yeah.
9    Q.   Did Mr. Jennings, to your knowledge,
10  express the view that RenCap should not, as
11  this memo puts it, touch Yukos's assets?
12    A.   I don't -- I don't recall -- I don't
13  recall him specifically stating that.
14        But I -- yeah, I don't dispute it,
15  but I don't recall it.
16    Q.   And was it your view at the time,
17  in -- you know, 2007, that it would not be a
18  good idea for RenCap to be participating in a
19  Yukos auction if that participation was not
20  approved of by the government?
21    A.   So I think there's lot of -- based on
22  a lot of the documentary evidence, I think I
23  went on record quite a few times as having a
24  strong view that we should not have looked to
25  participate in any Yukos auctions where a

Page 111

1  participation would not be welcomed.
2        I don't know if I used the word
3  "approved."  But that would be unwelcomed
4  either -- for whatever reason.
5    Q.   So this memo uses the term "high
6  political risks related to such participation."
7  Would you -- this was not a memo you were on,
8  but would you -- would you agree with that
9  terminology, "high political risks"?
10    A.   I might say a high political
11  sensitivity, but I wouldn't have a big problem
12  with this wording.
13    Q.   So I'm going to now go back in time a
14  couple of months.
15        ---
16    (Foreman Exhibit 11 was marked for
17        identification.)
18        ---
19    Q.   I'm willing to bet this is one you've
20  seen before today, and that will be my first
21  question again.
22    A.   If I can just read it.
23    Q.   Sure.  Take your time.
24        THE WITNESS:  (Perusing document.)
25    A.   Okay.

Page 112

1    Q.   Do you recall writing this e-mail?
2    A.   I recall seeing it this week.  I
3  don't recall writing it, but I don't dispute
4  that I wrote it.
5    Q.   That's exactly how I would answer a
6  question under these circumstances.  I have no
7  problem with that answer.
8        Do you recall how you knew that the
9  next day's newspaper would run with a story
10  that the first Yukos auction lot would be at
11  stake in Rosneft?
12    A.   No, but I can assume.  I can surmise.
13    Q.   To the best of your recollection?
14    A.   Probably asked -- called by a
15  reporter asking if I know anything about this
16  and -- for a story tomorrow, and that's
17  probably how it happened.
18    Q.   Would that also be true with regard
19  to the starting price of the auction?
20        It says, "It appears that the
21  starting price will be a 25 percent discount to
22  today's or six-month average price."
23        Do you know how you knew that?
24    A.   I'm quite -- I don't have a vivid
25  recollection.  But I'm quite confident, looking

Page 113

1  at the context, that anything that I wrote in
2  here, any specifics would have been conveyed to
3  me by a journalist who was looking to see if I
4  had any information to -- to give after she --
5  or he gave some information to me.
6      Q.  So the next sentence is, "I have
7  reason to believe that RC," which I assume
8  RenCap, "and only RC can pull off the trade of
9  our lives."
10     So what trade did you have in mind?
11     A.  So I don't exclude some grandstanding
12 here on my part.
13     Awkward.
14     When I saw this in the -- I think in
15 the production for the first time, I had no
16 idea what -- what trade this was.
17     Having looked at thousands of pages
18 in the production, I think I figured out what I
19 was talking about.  But seeing this -- until --
20 if you had shown me this last week, I wouldn't
21 have known what this meant.
22     Q.  So understanding that caveat --
23     A.  Yeah, yeah.
24     Q.  And I do understand it.
25     So as you sit here today, what do you

Page 114

1  think you meant by it, understanding that you
2  can't necessarily tell me what you meant by it
3  at the time?
4      A.  Okay.
5      I'll probably butcher -- butcher the
6  idea, which was raw to begin with, but
7  apparently, and now I'm -- it's starting to
8  come back to me in the course of this week,
9  although I had totally forgotten about it
10 before this week, that there was an auction lot
11 which somehow -- and I can't remember the
12 specifics, but somehow Yukos ended up with a
13 stake in Rosneft.
14     Yukos ended up with a stake in
15 Rosneft.  And I used to know exactly why that
16 was, but I don't recall exactly now.
17     And I believe my idea was to do a --
18 what we call an ECM transaction, equity capital
19 markets transaction, where we would --
20 Renaissance as the -- as the leading broker,
21 book runner, would execute a share placement,
22 international inventors of that stake, instead
23 of, you know, Rosneft buying the stake,
24 whatever, or some other Chinese or BP buying a
25 stake, which would be considered a strategic

Page 115

1  sale.  We would do a capital markets
2  transaction, a share placement into the -- into
3  the market --
4      Q.  So --
5      A.  -- with international investors.
6      Q.  -- understanding that that's how --
7  that's what you think you meant based on your
8  piecing together of the record, the next
9  sentence says, "I don't want to write more
10 here."
11     Do you know why you wouldn't have
12 wanted to put more detail in this message?
13     A.  I believe so, yes.
14     Q.  Why?
15     A.  It's the last sentence.  "This is
16 extremely sensitive, and we need to treat it
17 that way internally."
18     So I was sending it to Alexander
19 Pertsovsky, who at that point I think was
20 already -- he was already the CEO of the
21 investment bank; but for many years before
22 that, he was our head of equities trading.  So
23 he was on the public side.
24     And this was very -- this was insider
25 information.  This sort of an idea could --

Page 116

1  Rosneft was already publicly traded.  So this
2  had to stay on the private side of the
3  investment bank.
4      And I was -- that was a gentler,
5  other way to say to Sasha, "You can't forward
6  this to anybody in sales and trading research."
7      Q.  And you also characterized this
8  idea -- the idea that you had as being one that
9  would, in your words, allow the Kremlin to show
10 that the auction of Yukos assets is not rigged
11 but rather is competitive?
12     A.  Yeah.
13     Q.  How would -- how would your idea have
14 allowed the Kremlin to show that?
15     A.  Because it would have been a public
16 market transaction, to -- it would have been a
17 capital markets transaction with -- with a host
18 of international investors that wouldn't --
19 that weren't going to -- that they were going
20 to only bid based on commercial terms -- or not
21 bid.
22     Q.  Please.
23     A.  So the -- a lot of the PR, including
24 from the claimants and associates, was that
25 these auctions would be rigged, and the buyers

Page 117

1    were known in advance. And I thought, what
2    would make commercial sense is we do a capital
3    markets transaction. That -- that's -- that
4    would have been contrary to the view. That's
5    what I meant at the time. I'm not saying it
6    was a clever idea, but --
7        Q. And you said in the -- in the last
8    paragraph, "I didn't think this up out of thin
9    air."
10       So I assume you had done some
11   thinking about it. Do you recall what you had
12   done to -- to --
13       A. No.
14       Q. -- germinate this idea?
15       A. No, but it's very possible -- I
16   haven't read every word that was produced to me
17   in the recent week or two. But it may be in
18   there.
19       No. I -- so I had a discussion, a
20   meeting at some point, a meeting or phone call
21   at some point with Peter O'Brien, who was the
22   vice president of Rosneft. And as your records
23   will show, he said, Clever idea,
24   outside-the-box thinking, appreciate it,
25   but -- but that's not -- that's not the path

Page 118

1    that, at least from Rosneft's perspective, that
2    we're going to pursue.
3        So I may have spoken. I -- I don't
4    know that I did. But I may have spoken to him
5    in advance of this, and that he might have been
6    intrigued. This e-mail may have been, not
7    necessarily, but may have been in between the
8    time that I first raised it with him or he
9    thought it was intriguing, didn't think it up
10   in thin air. He -- maybe he even gave me some
11   feedback between the initial raising it and him
12   saying, Thanks, but we are going to go a
13   different direction.
14       I don't believe that he looked at my
15   idea or heard my idea in one meeting and said,
16   No; we're going to go in a different direction.
17       So -- but that's my recollection much
18   later today.
19       Q. Understood.
20       You also mentioned, in your words,
21   Rosneft's -- Rosneft's litigation risk.
22       Do you know what you meant by --
23   that's -- that's three lines up from the bottom
24   of the first paragraph. "Materially mitigates
25   Rosneft's litigation risk."

Page 119

1        Do you know what litigation risk you
2    had in mind?
3        A. Sorry. Give me just one second.
4        Q. Take your time.
5        A. I read this in your presence, but I
6    didn't see that.
7        I would have known at the time, and
8    maybe it's documented in these e-mails.
9        Mitigates the litigation risk.
10       I'm not sure what -- I'm not sure
11   what -- I trust that it was a sensible idea at
12   the time.
13       Q. Might it have been the possibility
14   that Rosneft would be sued by Yukos's
15   shareholders?
16       A. But why would this reduce that risk?
17   I mean, there was -- there was litigation risk,
18   no question. Rosneft and the Yukos
19   shareholders. But I don't know why this idea
20   would have mitigated that necessarily.
21       Q. Let me try coming at it this way: Do
22   you know what ultimately happened to the --
23   well, Yukos's shares in Rosneft?
24       A. I suspect I did at the time, but I
25   would be grateful to you -- I don't know now.

Page 120

1        Q. Rosneft obtained them.
2        Do you know at what price?
3        A. No. I would have at the time.
4        Q. So -- but it -- would it -- would it
5    make sense that if the -- as you sit here
6    today, would it make sense that if the price
7    was at a substantial discount to the market,
8    Yukos's shareholders might have had a stronger
9    claim against Rosneft than if it was a market
10   transaction?
11       A. Yes, understood, yeah. That may have
12   been. That is sensible. I don't know that
13   that's what I was thinking, but it sounds
14   sensible.
15       Q. But as you sit here today, you don't
16   know what ended up happening to these shares?
17       A. No. No. But your answer sounds
18   plausible. And it's certainly in the public
19   domain.
20       Q. And -- strike that.
21       Top e-mail shows that Mr. Pertsovsky
22   wanted to meet with you. Did you, in fact,
23   meet with him to discuss this transaction?
24       Or --
25       A. Let me just check the dates.

Page 121

1          Two --
2     (Witness reviewing document.)
3     Q.  He just said, "Let's meet today."
4     A.  Yeah.  I don't know.  I --
5     Q.  You don't know?
6     A.  -- suppose I -- he was the CEO.  I
7   suppose I met him, but I don't recall.
8     Q.  You don't recall anything you might
9   have discussed with him?
10    A.  No.  But he was a -- his background
11  was head of equity trading, so this was very
12  much in his sweet spot.  He had -- he had
13  overseen sales and trading.
14    Q.  Do you recall what happened with your
15  idea after this day?  Did anything happen with
16  your idea after this day?
17    A.  Only -- I had forgotten about this
18  idea until the production.
19        And to the best of my recollection,
20  as one of the e-mails said, that I brought it
21  to Peter O'Brien at Rosneft.  And he said, you
22  know, something like, Clever, outside-the-box
23  thinking, but that's not the approach that
24  we're going to take.  And nothing was pursued.
25    Q.  I think you correctly anticipated the

Page 122

1   very next document I was going to show you.  So
2   hold on.
3              ---
4     (Foreman Exhibit 12 was marked for
5            identification.)
6              ---
7     Q.  I'm going to ask you the same first
8   two questions before, which is, do you remember
9   writing this e-mail at the bottom?  And then
10  did you see it before today?
11        So do you remember writing this
12  e-mail?
13    A.  No, but it's -- I don't dispute that
14  I did.
15    Q.  And is this something that you
16  reviewed in preparation for your deposition
17  today?
18    A.  I -- yes.  I believe so, yes.
19        Yes, I did.
20    Q.  So looking at the -- at the -- this
21  is two e-mails, and I'm looking at the bottom
22  one, which is from you to several people.
23        And you said, "Spoke with my friend,
24  who showed our Rosneft trade presentation to
25  the necessary person."

Page 123

1     Do you recall who the friend you
2   spoke with was?
3     A.  So that was not Peter O'Brien.  Peter
4   was flagged separately.
5         So I presume -- if I've given that --
6   I presume it was Matthias Warnig.
7         Yes.  So I -- I presume it was
8   Matthias, yeah, who then said there's a
9   different -- that Rosneft wasn't interested in
10  this.  Yeah.
11    Q.  So let's -- given the -- you
12  mentioned earlier the internal sensitivity of
13  the idea.  So -- so now your e-mail is to
14  Mr. Jennings, Mr. Pertsovsky.  Who is Chris
15  Baxter?
16    A.  He was at that point either the
17  co-head of IBD, investment banking department,
18  with Ruben, or he was the sole head, or he
19  was -- I think that was before -- at some point
20  he was -- but I think after the Lot 19 auction,
21  he was the head of Renaissance Partners.  That
22  would have been probably 2008.  So he was
23  either the head of the investment banking
24  department or senior -- he was private side
25  investment banking.

Page 124

1     Q.  And Andrew Cornthwaite?
2     A.  Cornthwaite was at some point the
3   co-head of IBD, investment banking department,
4   with Ruben.  I think by this stage, I think he
5   was our -- what we call our global head of
6   equity capital markets.  So, again, private
7   side, equity capital markets.
8     Q.  And then the last new name is Anton
9   Cherny?
10    A.  Equity capital markets, banker, MD.
11    Q.  And so, I mean, are these all people
12  who were kind of within what you considered to
13  be the internal sensitive group who should be
14  thinking about this transaction?
15    A.  Yes.  They're all private side of the
16  Chinese wall.  Yes.
17    Q.  So you believe -- you're friends with
18  Mr. Warnig.  Do you know who he showed the --
19  who the necessary person was that's referred to
20  here?
21    A.  I assume that that would have been
22  the CEO, Mr. Bogdanchikov.
23    Q.  And then you said, "Unfortunately,
24  they have a different agenda for the auction
25  than what I proposed."

Page 125

1          Who is the "they"?
2      A.  Rosneft.
3      Q.  So Rosneft had a different agenda for
4   the auction of its shares?
5      A.  Well, you had -- that's -- as I
6   understood it.
7      Q.  And -- and the -- the -- the Rosneft
8   trade presentation was your -- was it a -- I'm
9   sorry.  Strike that.
10         It mentions here a Rosneft trade
11  presentation or a pres.  Was there some written
12  document pertaining to this that was shown,
13  or -- do you know what you meant by that?
14     A.  Apparently there was, because I said
15  that my friend showed Rosneft a trade
16  presentation, so that implies that we gave --
17  certainly my friend didn't write a
18  presentation.  So we must have given a
19  presentation, which I haven't seen in the
20  production, but we would --
21     Q.  Do you recall having put one
22  together?
23     A.  No.  But it sounds like we did.  And
24  I don't know that I would have put it together,
25  because that wasn't my thing.

Page 126

1      Q.  So when you said here, "They have a
2   different agenda for the auction than what I
3   proposed," I mean, is that -- does that suggest
4   that your suspicion that these auctions might
5   be rigged was correct?
6          MR. PEES:  Objection.
7      A.  No.
8          MR. PEES:  Objection.
9          Go ahead.
10     A.  No.
11     Q.  What was -- what did you mean by
12  Rosneft's -- "Rosneft's agenda for the
13  auction"?
14     A.  I don't know that I knew at the time
15  that Rosneft -- what Rosneft's agenda was.  But
16  you told me a few minutes ago that Rosneft
17  ended up buying the shares.  So -- so they --
18  they didn't like our idea, from what I recall
19  now, because they had a different plan.  They
20  were going to buy this principal.
21     Q.  But as you sit here, you don't know
22  the discount at which Rosneft bought the
23  shares?
24     A.  No, I don't.
25     Q.  So the e-mail also says that you --

Page 127

1   as you mentioned, you had separately flagged
2   Mr. O'Brien.  So you discussed the idea with
3   Mr. O'Brien.  Do you remember what Mr. O'Brien
4   told you?
5      A.  No, other than what's in this e-mail,
6   that -- that he appreciated it; that it was
7   outside-the-box thinking; and that we should
8   get some kudos or goodwill points for showing
9   it to them.
10         And then he said -- confirmed again
11  that they'll give us serious equities business
12  in 2007.
13     Q.  Did Mr. O'Brien tell you that he had
14  nothing to do with the Yukos auctions?
15     A.  Did he tell me -- when I asked him --
16  can I --
17     Q.  Sure.
18     A.  I would say "not necessarily" would
19  be the answer.  And when I had spoken to him
20  when he was on vacation in August of 2007 about
21  the auction Lot 19, he said he wasn't involved
22  in the -- and whether it was that Yukos auction
23  or the Yukos auctions, I don't recall at this
24  point whether he told me he had nothing to do
25  with Yukos auctions, that he was -- yeah.  So

Page 128

1   I -- I don't remember a blanket statement from
2   him, certainly at this point, that he has
3   nothing to do with the Yukos auction.
4          But I remember specifically when I
5   called him in, I think it was August 2007 about
6   Lot 19, where he said, I'm not involved -- he
7   was on vacation, said, "I am not involved in
8   that."  I don't know that that was a blanket
9   answer, and that was the last auction lot,
10  so --
11     Q.  So, as you mentioned, he,
12  Mr. O'Brien, said that you should get some
13  goodwill points for showing the idea to them.
14  To your knowledge, did you cash in those
15  goodwill points at some point?
16     A.  Not that I recall, no.
17         No, actually.
18         MR. PEES:  How are we doing on the
19  tape?  We have a while left.
20         MR. JACOBSON:  If you need a break,
21  we can take one.  I just --
22         MR. PEES:  At some point I will.  But
23  I don't want to interrupt your flow of
24  questioning.
25         MR. JACOBSON:  Yeah.  Let's -- let's

Page 129

1   do this and one more, so about ten more --
2   about eight minutes.
3          MR. PEES:  That's perfectly fine.
4                      ---
5      (Foreman Exhibit 13 was marked for
6              identification.)
7                      ---
8      Q.  It will the same first question,
9   whether you've seen this document before.
10     A.  So let me just read it one more time.
11     Q.  Of course.
12     A.  Yes, I have seen it before.
13     Q.  Did you prepare this document?
14     A.  Sorry.  But can I still read it?
15     Q.  Of course.
16         THE WITNESS:  (Perusing document.)
17     A.  Okay.  I'm sorry.  Could you
18  repeat --
19     Q.  Sure.  Did you prepare this document?
20     A.  No, I did not.
21     Q.  Do you know who did?
22     A.  I can surmise based on the document,
23  but I don't know that I knew --
24     Q.  Understanding that it's just a
25  surmise, who do you think wrote this?

Page 130

1      A.  It says, "Prepared by VB," Vladimir
2   Blinov.
3      Q.  Did you -- do you remember whether
4   you reviewed this document at the time it was
5   prepared?
6      A.  I don't -- I've seen this a few
7   times.  This -- and -- from the production.  I
8   don't recall that I had seen it -- I don't
9   exclude that I did, but I don't recall that I
10  saw it or read it at the time, but I may have.
11     Q.  So you know where I'm going with
12  this.  In the background section, it says,
13  "Despite that Russian law prescribes all assets
14  to be sold through open auctions, it is
15  understood," with the "understood" in quotes,
16  "that in this case, key assets are likely to go
17  to Rosneft."
18         I'm ending the sentence early.  But
19  was that your understanding at -- in October of
20  2006?
21     A.  So it was apparently Mr. Blinov's
22  understanding.
23     Q.  I was asking whether it was your
24  understanding as well.
25     A.  My assumption -- I didn't have an

Page 131

1   understanding.  My assumption, which turned out
2   to be incorrect, at least on one occasion or
3   two occasions, was that the main production
4   assets would go to Rosneft, because they had
5   bought the biggest production asset, YNG.
6          And I'm not an in-the-weeds oil
7   analyst.  But my assumption was that a lot was
8   tied in with the main production asset.  These
9   aren't just separated business.  Rosneft had
10  bought the main production asset, which Gazprom
11  had intended to acquire.  But the Houston
12  Bankruptcy Court got involved.
13         THE COURT REPORTER:  I'm sorry.
14  What?
15     A.  Sorry.  But the Houston Bankruptcy
16  Court got involved.  So Rosneft bought the main
17  production asset.
18         And it was my assumption, not an
19  understanding, that -- that they would likely
20  bid for the other large, at least oil-producing
21  assets.  And other bidders were being scared
22  away from the PR.
23         So is it -- it was -- I think it was
24  a fair assumption.  It did turn out to be wrong
25  on at least one occasion when other oil

Page 132

1   companies bought an important asset.
2      Q.  So in the -- it also says this is
3   a -- a new business form to discuss valuing
4   assets.  And it says that selected consultants
5   work --
6      A.  I'm sorry.
7      Q.  Of course.
8          I've done that before too.
9      A.  That was quite a distance.
10         I'm sorry.
11     Q.  It says, "Selected consultants work
12  is likely to be heavily affected by state
13  Rosneft agenda."
14     A.  Uh-huh.
15     Q.  Which is tied together with when it
16  says, "Any potential reputational issues for
17  RenCap's state agenda and Rosneft influence --"
18         THE COURT REPORTER:  Counsel, slow it
19  down, please.
20         MR. JACOBSON:  Sure.
21     Q.  -- "state agenda and Rosneft
22  influence might result in significant pressure
23  on advisors' independence and integrity."
24         So was there concern that pressure
25  would be exerted to shade the valuations based

Page 133

1   on, as this terms it, Rosneft's agenda?
2       A.  Let me read this with -- that I
3   didn't write at the time.  Let me read it
4   again.
5       THE WITNESS:  (Perusing document.)
6       A.  Okay.  I'm sorry.  Could you then
7   repeat the question?
8       Q.  Sure.  Were you --
9       A.  I see the area that you're talking
10  about.
11      Q.  Did -- did -- did you -- I'm going to
12  ask you in particular, and then I'll generalize
13  it to RenCap.
14      Did you have a concern that the
15  state's agenda or Rosneft's agenda would exert
16  pressure on RenCap to shade valuations to suit
17  that agenda?
18      A.  I wouldn't use today and I don't
19  believe I would have thought in these terms
20  back then, shade valuation.  But I would have
21  been concerned that, given the sensitivity of
22  the Yukos saga with the Russian state, that
23  anybody advising on that process, including
24  valuation, could have to navigate through a
25  host of pressures, as I had had to do in the

Page 134

1   previous role.  I would not have thought in
2   terms of shady evaluations, if that -- you
3   know.
4       Q.  So I want to do one more document.
5       A.  Okay.
6       Q.  And then we'll -- then I'll
7   accommodate the request for a break.
8       A.  I've had three cans of water, so --
9       Q.  Two-minute break.
10      A.  Yes.
11      Q.  And if you need it more urgently,
12  that's fine too.
13      A.  No.  That's okay.
14              ---
15  (Foresman Exhibit 14 was marked for
16          identification.)
17              ---
18      Q.  Let me know when you're ready.
19      THE WITNESS:  (Perusing document.)
20      A.  Okay.
21      Q.  Did you -- have you seen this
22  document before today?
23      A.  I saw it reviewing things this week.
24      I -- yes.
25      Q.  And did RenCap seek to participate in

Page 135

1   the auction for Lot 8?
2       A.  Sorry.  Lot -- where do you see
3   reference to Lot 8?  Sorry.
4       Q.  I --
5       A.  The Khanty-Mansisk Bank.
6       Q.  Yeah.  I thought -- oh, so was
7   that -- that was not Lot 8?
8       A.  It may be.  I don't know --
9       Q.  I'm sorry.  Did -- just in case I'm
10  wrong, let me ask you:  Did RenCap seek to
11  participate in the auction for the shares in
12  Khanty -- you're better at pronouncing it than
13  I am.
14      A.  The Khanty-Mansisk Bank, K-H-A-N-T-Y
15  M-A-N-S-I-S-K bank.
16      Khanty-Mansisk.
17      Sorry.  Could you repeat your
18  question?
19      Q.  To your knowledge, had RenCap tried
20  to participate in the auction for those shares
21  in this bank?
22      A.  I did not recall that prior to the
23  production.  And somewhere -- I don't know if
24  you have them with you -- there were e-mails.
25  I think it was on this one.  I think it was on

Page 136

1   Khanty-Mansisk Bank.
2       Where our Renaissance asset
3   management fund, RenFin, which was a fund,
4   sought to participate, as did the RenCap as a
5   principal or RenCap, an investment -- probably
6   an investment banking client, I think.
7       And so there was some conflict there.
8   So I think we did, according to these, seek to
9   participate.  I can't remember whether the
10  decision was made to participate as Renaissance
11  investment management, the RenFin fund, or on
12  behalf of an investment banking client or as a
13  principal.  But I think the -- the short answer
14  is yes, but I have to explain that nuance.
15      Q.  And do you recall whether the Russian
16  FAS excluded whichever the bidding -- RenCap
17  bidding entity was as a potential bidder?
18      A.  Yes, I recall from seeing the e-mails
19  that I saw.  I frankly hadn't remembered this
20  transaction.  But my -- I saw the e-mails from
21  this week that indicated that that's what
22  happened.
23      Q.  And do you recall having gotten a
24  call from someone named Shokhin, S-H-O-K-H-I-N,
25  to see whether you were interested in getting

## Page 137

1   the auction redone?
2       A.   I don't recall that, but I don't
3   dispute it, because it's here in the e-mail
4   from me.
5       Q.   And who -- who is Mr. Shokhin?
6       A.   Mr. Shokhin was a senior advisor to
7   Renaissance Capital.  He had been a -- a deputy
8   prime minister in the '90s for economic
9   matters.  And I believe he was then, and
10  remains today, the chairman of the Russian
11  Union of Industrialists and Entrepreneurs,
12  which is the chief business lobby or business
13  organization in Russia.  And he was the senior
14  advisors to Renaissance.
15      Q.   Was he also a friend of the Yukos
16  bankruptcy receiver, Mr. Rebgun?
17      A.   I have no idea.  Not that I'm aware
18  of.  Did I mention that?  I'm not aware.  I'm
19  not -- I'm not aware of ever having heard that
20  or known that.
21      Q.   And Mr. Shokhin also serves with you
22  on the TMK board; is that correct?
23      A.   That is correct.
24      Q.   How did you come to serve on that
25  board, by the way?

## Page 138

1       A.   So TMK was -- TMK was a client for
2   mine back in the -- probably from like 2004 or
3   '5.  When I left to Renaissance, it remained a
4   client.  We had helped to take it public.
5       And then right before the 2008
6   financial crisis, unfortunately, they spent a
7   lot of money buying an American -- a North
8   American pipe producer.
9       So the company now has 10 or 12
10  plants in the United States.  And so I was
11  asked, I think, five or six years ago when I
12  was at Barclays if I would serve as an
13  independent director.  I replaced Ambassador
14  Thomas Pickering, who was one our most
15  distinguished ambassadors.  They wanted to have
16  some people with a U.S. knowledge and presence.
17      Q.   So do you -- as you --
18      A.   Mr. Chubais, for the record, joined,
19  I think, two years ago.  Well after I did.
20      Q.   Do you recall, as you sit here today,
21  whether RenCap expressed an interest in having
22  the -- this auction process redone?
23      A.   I can't recall.  I can't recall.  It
24  wasn't a big thing in my world, 2 percent of
25  Khanty-Mansisk Bank.

## Page 139

1       But I think that the record should
2   show whether we did or we didn't.
3       Q.   And then last question, and then we
4   can take break.  You mentioned a few questions
5   ago, you said that as you had -- we can have
6   the reporter read it back, but it was something
7   along the lines of, as you had navigated it,
8   navigated political pressures in a previous
9   role.  What did you mean by that?
10      A.   For the Yuganskneftegaz valuation --
11      THE COURT REPORTER:  I'm sorry.  For
12  the what?
13      A.   Sorry.  YNG.  YNG valuation, while
14  with Dresdner.
15      Q.   So you had -- did you come under any
16  pressure yourself during that valuation to
17  cause it to say or not say anything in
18  particular?
19      A.   I wouldn't describe it as that I came
20  under pressure but the -- I would describe it
21  as the justice -- the bailiff, the chief
22  bailiff misrepresented our valuation and
23  compelled us to put it on our website.
24      Q.   Forgive me.  I do have one --
25      A.   That's okay.

## Page 140

1       Q.   I promise this --
2       A.   Yeah.
3       Q.   Do you know whether the Federal
4   Antimonopoly Service had any legitimate reasons
5   to exclude RenCap from the bidding for Lot 8?
6       A.   I'm not --
7       MR. PEES:  For the assumption of
8   this -- for the purposes of this question,
9   we're assuming that Lot 8 is the Khanty?
10      MR. JACOBSON:  Correct.  Yeah.
11      A.   I'm not aware that I ever looked into
12  that or ever heard about that.  I just don't --
13  I just don't know.  I wasn't -- I wasn't really
14  dealing with it.
15      MR. JACOBSON:  Let's take a break.
16  Thank you for your indulgence.
17      THE VIDEOGRAPHER:  We're off the
18  record at 11:50 a.m.  This marks the end of
19  Media 2.
20      (Recess from 11:50 to 11:59.)
21      THE VIDEOGRAPHER:  We are back on the
22  record at 11:59 a.m.  This marks the beginning
23  of Media 3.
24      Q.   So Lot 19.
25      Do you recall the means by which

Page 141

1  Mr. Lynch first contacted you about Lot 19?
2  Was it telephone? e-mail? in person?  Do you
3  recall the means?
4       A.  I do not recall the means.
5       I don't recall the means, no.
6       I presume he would have had to call
7  to even meet, but I don't know whether --
8       Q.  Yeah.  I assume you met at some
9  point.  But I was wondering whether, if you
10 remembered whether the first approach you had
11 from him was by e-mail or another means, like a
12 call.  And you don't remember.
13      A.  I don't remember.  I don't remember.
14      But I believe it was more likely a
15 meeting or a phone call.
16      Q.  So I -- I'm going to come back to
17 Lot 19 in one second, and we're going to spend
18 a fair amount of time on it.  But do you know
19 someone at RenCap named Irina (phonetic)
20 Illyina, I-L-L-Y-I-N-A?
21      A.  Yeah.  She's not at RenCap now.  But,
22 yes, I knew Irina.
23      Q.  And what was -- what was her job at
24 RenCap when you were there?
25      A.  Her job was my personal assistant.

Page 142

1       Q.  And on September 6, 2009, did you
2  e-mail Ms. Illyina and ask her to empty the
3  deleted items folder in your Microsoft Outlook
4  account?
5       A.  Per the documents that were produced,
6  yes, I did.
7       Q.  Why did you do that?
8       A.  That was the day, as I recall, that I
9  resigned from Renaissance Capital to go to
10 Barclays.  I was discussing -- because I didn't
11 use a personal e-mail much or at all.  And I
12 was having those discussions with the
13 headhunter and with Barclays from my
14 Renaissance computer.  She was in the know
15 because I took her to Barclays and then took
16 her to UBS.
17      Q.  Do you recall having received an
18 e-mail from Mr. Lynch at any time pitching the
19 idea of his -- pitching his Lot 19 idea?
20      A.  I -- I don't -- I don't recall.  I
21 don't know -- and the record would show.  I
22 don't know if I ever got an e-mail from
23 Mr. Lynch before July 2018 -- or 2007 on
24 anything.
25      Q.  I think the -- part of the reason I'm

Page 143

1  asking these questions is the record doesn't
2  show it.
3       A.  Okay.
4       Q.  And we don't -- we don't have an
5  e-mail -- we don't haven't e-mail from him to
6  you.  What -- I'm trying to figure out if there
7  might have been one and you don't remember.
8       So -- in -- please.
9       A.  I'm sorry.  If there was an e-mail
10 from Mr. Lynch to me, you would have it in your
11 cache.
12      Q.  So if Mr. Lynch was of the view that
13 he had sent you an e-mail, would you disagree
14 with that?  I mean, you just don't remember one
15 way or the other?
16      A.  No, I would not.
17      Q.  What is this -- can you recall the
18 setting of your first discussion with Mr. Lynch
19 about the Lot 19 idea?
20      A.  No.  I -- it was not at that time
21 memorable.
22      In retrospect, it's become very
23 memorable, the whole event.  At that point it
24 was a drop in the ocean.
25      Q.  And so you don't remember, for

Page 144

1  example, whether he called you to arrange a
2  meeting or ran into you?  You just don't
3  remember one way or the other?
4       A.  Only thing I remember is that it was
5  his initiative to contact me, whether that was
6  by phone to set up a meeting, whether it was by
7  phone to tell me an idea.  I think it is highly
8  implausible that I bumped into him because he
9  was seeking me out.
10      And -- but other -- I don't have any
11 recollection of that -- the circumstance of
12 that first meeting.  It wasn't memorable at the
13 time.
14      Q.  And do you recall when you first
15 discussed the idea with Mr. Jennings?
16      A.  I'm not sure that I do.
17      I have some thoughts, but I'm not
18 sure that I do recall the first time I
19 discussed it with Mr. Jennings.
20      Q.  And at some point, you met with
21 Mr. Lynch and Richard Deitz together.  Is that
22 correct?
23      A.  That's correct.
24      Q.  Do you remember where that meeting
25 took place?

Page 145

1       A.   I have a recollection which is not
2   absolutely vivid, but I believe it was in
3   Mr. Deitz's office.
4       Q.   I've heard tell that Mr. Deitz
5   doesn't like leaving his office for meetings?
6   Is that --
7       A.   During the trading hours, yes.
8       Q.   So it would be -- you would agree
9   with me that it's fairly likely that if
10  Mr. Deitz was in a meeting, it was at his
11  office?
12      A.   Given that globally, it's always
13  someone's trading hours, yes, I think it was in
14  his office.
15      Q.   And do you recall how long past from
16  the first time you and Mr. Lynch discussed the
17  idea to the time that you and Mr. Lynch and
18  Mr. Deitz all met together?
19      A.   Not exactly, but it would have been
20  less than a couple weeks and maybe even -- I'm
21  sorry.  Could you repeat the question?
22      Q.   You got it.  It was from the first
23  time you and Mr. Lynch discussed the idea,
24  until you and Mr. Lynch and Mr. Deitz all
25  met --

Page 146

1       A.   Yeah.
2       Q.   -- how long transpired.  And I think
3   you got the question.
4       A.   Yeah.
5       Yeah.  I -- so I --
6       MR. PEES:  I think you answered the
7   question.
8       THE WITNESS:  Okay.  Yes.
9       Q.   At some point in your thinking about
10  the Lot 19 transaction, did it seem appropriate
11  to you to bring Rosneft into the discussion?
12      A.   At some point, yes.
13      Q.   Why did you think it was necessary to
14  bring Rosneft into the discussion?
15      A.   Because they were a key stakeholder.
16  They were -- they had the attachments, things
17  that I speak about relatively fluently now, but
18  didn't then.  But they had attachments.  And --
19  Yukos Finance.
20      Q.   Was there any other reason, in your
21  mind, as to why Rosneft should be brought into
22  the discussion besides their attachments on the
23  assets?
24      A.   There are other things that we
25  discussed with Rosneft, including eventually

Page 147

1   buying its bidding vehicle, but that the -- no
2   other issue would have been germane, if we
3   didn't have a discussion with them about their
4   attachments.
5       Q.   Was Mr. O'Brien, Peter O'Brien, the
6   first person you contacted at Rosneft to
7   discuss the Lot 19 issues?
8       A.   Yes.
9       Q.   And he was on vacation, as you said.
10      A.   As I recall, yes.  In August.
11      Q.   Mr. O'Brien serves with you on the
12  TMK board, too, doesn't he?
13      A.   He does, yes.
14      Q.   Small world.
15      A.   Yes.  Small expat community.
16      Q.   So when Mr. O'Brien advised that he
17  was uninvolved in the issues, what did you next
18  do to further your desire to bring Rosneft to
19  the table?
20      A.   I have a very vague recollection of
21  what transpired between the time that Lynch
22  first brought the Lot 19 idea to me, which is
23  at the end of July or early August, and the
24  flurry of the activity closer to August 12 and
25  13 when we actually heard from Rosneft that

Page 148

1   they were intrigued by our proposal and wanted
2   to learn more.
3       So I can't recall today whether I had
4   any...
5       Q.   When you -- when you reached out to
6   Mr. O'Brien, did you tell him why you were
7   trying to get Rosneft involved in the
8   discussions?
9       A.   I don't -- I don't recall what I told
10  him.  I believe that I told him that we had
11  a -- an idea we wanted to -- I wanted to
12  discuss, this auction, 19.  And I believe at
13  that point he said, I'm not involved, and I'm
14  on vacation.
15      So I don't believe I -- I don't
16  believe I described to him what -- what our
17  thesis was, to the best of my recollection.
18      Q.   But so I -- I don't -- if you -- if
19  you answered the question, I didn't -- I didn't
20  hear it.
21      When Mr. O'Brien said that he was not
22  able to help you, what did you do next in order
23  to bring -- who did you contact next in order
24  to try to start a discussion with Rosneft?
25      A.   See, I don't recall whether I spoke

Page 149

1  to Peter O'Brien, upon Lynch first having
2  approached me in early August or end of July or
3  when we learned that Rosneft had registered a
4  bidding vehicle on or about the 12th of August.
5        But there was nobody at Rosneft that
6  I can recall having -- having spoken with,
7  other than that one phone call to Mr. O'Brien,
8  until such time as I was in contact with their
9  external lawyer.
10       Q.   And did you know -- at the time you
11  were having this first conversation or
12  attempted conversation with Mr. O'Brien, did
13  you know that Rosneft had attachments on the
14  assets in Lot 19?
15       A.   I suppose I must have, because the
16  only time I had thought about Lot 19 was after
17  Lynch explained to me his so-called thesis.
18       And my reaction, while documented, we
19  don't want a hostile situation with either of
20  these two protagonists.
21       I'm presuming that he would have
22  given me enough context to talk about claims or
23  attachments or liens, whatever terminology.
24  But in speaking with Mr. O'Brien, again, I
25  don't recall having said anything other than --

Page 150

1  anything more than, Lot 19, Yukos Finance BV,
2  we have an idea.  Can I propose it to you?
3        And him saying, I'm not dealing with
4  that.  I don't think I would have gone through
5  attachments and all that.  I don't think I -- I
6  don't even know if I knew that term when I
7  spoke to Mr. O'Brien.
8        Q.   Did you approach Mr. Warnig about
9  trying to get an appropriate contact at
10  Rosneft?
11       A.   Yes.
12       Q.   And was it Mr. --
13       A.   Well, excuse me.
14       About getting the idea to someone at
15  Rosneft, yes.
16       Q.   And was it -- was it Mr. Warnig's
17  idea that you make contact with a gentleman
18  named Rashid -- Rashid Sharipov, R-A-S-H-I-D,
19  S-H-A-R-A-P-O-V -- or S --
20       A.   Two words.
21       Q.   R-A-S-H-I-D.
22       A.   I-D.  First name, R-A-S-H-I-D.
23  Surname, capital S-H-A-R-I-P-O-V.
24       No.
25       Q.   Whose idea was it that you contact

Page 151

1  Mr. Sharipov?
2        A.   I understood it to be -- it was
3  conveyed to me by Mr. Warnig.  I believe it to
4  have been the idea of the CEO,
5  Mr. Bogdanchikov.
6        Q.   So when you were --
7        A.   But he -- Mr. Warnig conveyed it to
8  me.  Yes.
9        Q.   When you were seeking Mr. Warnig's
10  advice, do you recall how you did it?  Was it
11  an in-person meeting, a phone call?
12       A.   I don't know that I sought his
13  advice.  I -- to the best of my recollection, I
14  conveyed the idea, maybe in the presentation
15  for Mr. Lynch, to ask him to get it to the CEO.
16       Q.   So I was asking when you approached
17  Mr. Warnig --
18       A.   Yes.
19       Q.   -- for his counsel on how to get the
20  presentation to the CEO, how did you approach
21  Mr. Warnig?
22       MR. PEES:  Okay.  So -- do you
23  understand the question?
24       THE WITNESS:  I think I do, yeah.
25       A.   I called him -- or I met him, and I

Page 152

1  gave him a presentation.
2        Q.   So I -- I want to make sure I'm
3  getting this right.  So you wanted to get a --
4  let me back up.  Strike that.
5        At the time that you met with or
6  spoke to Mr. Warnig, you had some kind of a
7  written presentation.  Is that what you're
8  saying?
9        A.   I believe.  From Mr. Lynch.
10       Q.   And what presentation was that?
11       A.   I don't know -- I don't believe -- it
12  wasn't a presentation if by "presentation," you
13  mean a PowerPoint presentation.  I believe it
14  was a note, like a memo, to the best of my
15  recollection.
16       Q.   In English or in Russian?
17       A.   In English.
18       I believe in English.  It was from
19  Mr. Lynch, as I recall.
20       Q.   And so do you recall having --
21  please.
22       A.   Sorry.
23       I don't have a hundred percent
24  recollection that I gave Mr. Warnig something
25  in writing.  I may have explained it.  But it

Page 153

1  was pretty complicated.  I may have simply
2  said, I have a -- very interesting idea.  I
3  need to meet with someone at Rosneft.  Can you
4  help me arrange that?
5      Because Mr. O'Brien was my best
6  contact.  He was on vacation.  And I didn't
7  have direct access to the CEO.
8      I -- I'm assuming, after all these
9  years, that I had given him something that he
10  could -- so he wouldn't struggle to explain
11  what I was struggling to explain, what Lynch
12  had struggled to explain to me.
13      So I think I gave him something in
14  writing, but I can't -- I don't have a hundred
15  percent recollection of that.
16      Q.   But you do think that at the time you
17  spoke to Mr. Warnig, you had a presentation.
18  Whether you gave it to him or not is what we're
19  not sure of?  Is that --
20      A.   I believe so.  I believe so.  A note,
21  a memo, not a presentation.
22      Q.   And then so you had this conversation
23  with Mr. Warnig.  How, then, did you get in
24  touch with Mr. Sharipov?
25      A.   Mr. Warnig, after he spoke with the

Page 154

1  Rosneft official, which I presume to be the
2  CEO, or handed him a document, if there was a
3  written document -- I don't know whether it was
4  5 hours, 24 hours, 48 hours, 72 hours.  In some
5  relatively short space of time, Warnig, as I
6  understand it, was called by Rosneft and said,
7  This idea is worth exploring.  Please ask your
8  contact, your friend at Renaissance, to contact
9  Mr. Sharipov.
10      And I understood Matthias did not
11  know who that was, and he referred to him as
12  Ruslan Sharipov.  I then did for the next few
13  days.
14      Q.   Had you heard of Mr. Sharipov before
15  you got that message from Mr. Warnig?
16      A.   The name didn't -- I didn't know the
17  name.  When I eventually met him, shortly after
18  connecting, I realized that I had seen his
19  face.  I was on the other side of a transaction
20  regarding Gazprom and Rosneft several years
21  prior, and I may have seen him in -- in one of
22  the IPO preparation meetings for Rosneft in the
23  spring.  But I -- so I definitely -- it's
24  recognizable, but I didn't recognize the name.
25      Q.   And --

Page 155

1      A.   I don't think I had ever heard the
2  name.
3      Q.   And when you first communicated with
4  Mr. Sharipov, was that a meeting? a call? an
5  e-mail? something else?
6      A.   So as I recall, I recall it was an
7  evening.  I don't know if it was the Sunday
8  evening prior to the auction or the Monday or
9  the Saturday.
10      But in some evening close to the
11  auction, Matthias said, I showed the idea to
12  Rosneft.  They've just contacted me and said,
13  You should call this -- what he called Ruslan,
14  R-U-S-L-A-N, Sharipov.
15      So I called this number and I said,
16  Hi, Ruslan.  This is Bob Foresman.  I
17  understand you looked at the presentation.
18      And say, Yeah, we should meet to
19  discuss.
20      And I believe that evening we met to
21  discuss it for the first time.
22      Q.   Was he expecting -- Mr. Sharipov, was
23  he expecting your call?  Did he know you would
24  be calling?
25      A.   As I understood it, he did.  Yes.

Page 156

1      Q.   By the way, if you remember,
2  temporally, you had a meeting with Mr. Lynch
3  and Mr. Deitz and -- and you contacted
4  Mr. Warnig.  Do you know which came first?
5      A.   I presume it must have been the
6  Lynch/Deitz because that's when -- I believe I
7  went to Warnig only when we had a little bit of
8  a more refined idea, which would have required
9  Mr. Deitz to have his input.
10      Q.   And did you -- the written document,
11  did you convey it to Mr. Sharipov or did he
12  already have it?
13      A.   I don't -- I don't recall whether at
14  that stage the -- a written document had been
15  given to him.
16      I recall him saying, having some
17  general understanding about -- I recalled him
18  prior to me explaining anything, him having
19  a --a general understanding about a reciprocal
20  lifting of attachments.
21      But I don't recall whether he had
22  seen the details that were written -- well,
23  insofar as there were details that were written
24  in a memo.  I can't recall.
25      Q.   You don't remember whether you,

Page 157

1 yourself, gave a written memo of some kind to
2 Mr. Sharipov?
3      A.  I -- I may have.  I can't, I can't
4 recall.  It's not some -- but he -- shortly
5 came to -- to learn all of -- the substance of
6 our thesis.
7      Q.  And the document itself, the written
8 memo of some kind, did you have a role in
9 writing it?
10     A.  It -- Stephen wrote that, Lynch.  No.
11     Q.  So he wrote it.  You didn't edit it
12 at all?
13     A.  I may have edited it.  I didn't -- I
14 wasn't familiar with any of the concept.  So I
15 don't -- I don't -- I don't recall having had
16 any editing, except maybe grammar.  I'm a
17 stickler for grammar.
18     Q.  Me too.
19         Do you recall whether -- you said the
20 document was prepared in English.  Do you know
21 whether it was ever translated into Russian?
22     A.  I don't know.
23         But it may have been if it were
24 handed to Mr. Bogdanchikov.  I don't recall him
25 being an English speaker.  So it may have been

Page 158

1 translated, if there was a written document.
2 Or if -- again, if -- and I can't say that
3 there was.  If there was at that point a
4 written document, the Matthias's English would
5 have been good enough to read it.  And maybe
6 the CEO gave it to Rashid.
7         And maybe the CEO didn't read it.
8 He -- that's not -- he's not a detail guy.  He
9 may have simply given it to Rashid.  I don't
10 believe -- I don't recall ever having seen or
11 ever having thought about a Russian version.
12     Q.  Do you know why you didn't have
13 direct access to Rosneft's CEO?
14         I mean was there a reason you
15 couldn't have gotten him directly?
16     A.  Presumably, if I had written a letter
17 for my -- and asked for a meeting over the
18 coming weeks, he may have seen me, but --
19 but --
20     Q.  Not necessarily in time?
21     A.  Not in time.  No.
22     Q.  We've been talking about a memo.  Now
23 we'll find out if this is the memo.
24         ---
25         (Foresman Exhibit 15 was marked for

Page 159

1         identification.)
2         ---
3     A.  Uh-huh.
4     Q.  So is this the -- the written
5 presentation we've been discussing?
6     A.  Memo.  Memo or note.  Yes.
7     Q.  Yeah.  Yeah.  The thing.
8     A.  Yeah.  I don't know if this is a
9 first version, the last version.  But this --
10 I've seen this document.  Yes.  I've seen this
11 document.
12         And I apparently thought very shortly
13 thereafter, on October 21 of 2007 that that's
14 what Lynch had given to me to summarize.  Yeah.
15     Q.  So as you sit here today, I would
16 like you to tell me everyone you know outside
17 of the consortium who you know has seen this
18 document.  So I'm going to start with you know
19 have seen this document.
20     A.  Outside the consortium.
21         I don't know of anyone that's seen it
22 outside -- I assume that Mr. O'Brien did, but I
23 don't know.  I've already talked about that.  I
24 assume I did.
25         Mr. Sharipov, if -- a document was

Page 160

1 given to Rosneft through Mr. Warnig, at this
2 time, I presume Mr. Sharipov would have
3 received this.
4         Mr. Lynch may have provided it to --
5 likely did provide -- well, may have provided
6 to other investors that he was pursuing.
7         Outside -- that did not end up in the
8 consortium.
9         I didn't give it, to the best of my
10 knowledge, to anyone outside the consortium
11 other than Mr. Warnig, if I gave it to him.
12 And I'm not aware of others having done so.
13         But you could refresh my memory.
14     Q.  Do you have any reason to believe
15 that any government officials other than
16 Mr. Warnig saw this document?
17         MR. PEES:  Objection.
18     A.  He's not a government official.
19     Q.  Do you -- do you have any reason to
20 believe that any government official saw this
21 document?
22     A.  I -- as I testified, I'm not sure
23 whether Mr. Bogdanchikov, if you could -- he
24 was the CEO of Rosneft, which is a government
25 company.  But I'm not aware of anybody else,

---

Page 161

1  particularly given that I don't know that it
2  was in Russian.  So I'm not aware of any
3  others.  I don't know if I was aware at the
4  time.  I don't believe I was.
5      Q.  And if you gave this document to
6  Mr. Warnig, what's the most likely means by
7  which you conveyed it to him?  Did you hand it
8  to him?  Did you e-mail it to him?
9      A.  I would have had -- he's not a strong
10  e-mailer.
11      I would have handed it had to him.
12  Handed it to him or we would have couriered it
13  to his office.
14      Q.  And -- go ahead.
15      A.  Well, I shouldn't ask you this, but
16  I'll say it not as a question.
17      MR. PEES:  Is there a question
18  pending?
19      MR. JACOBSON:  No.
20      MR. PEES:  Okay.  Just --
21      THE WITNESS:  No.  But I was
22  clarifying --
23      MR. JACOBSON:  If he needs to clarify
24  an answer, he can clarify.
25      A.  I was going to clarify an answer.

---

Page 162

1      MR. PEES:  Okay.
2      A.  I -- sorry.  I was going to say, I
3  don't know whether Lynch first handed me the
4  e-mail or -- or e-mailed to me.  But I now have
5  answered my question.  He's e-mailed it to me
6  on the 13th.
7      Q.  Well, yeah, he -- whether -- I just
8  don't know whether this is the first time you
9  saw it or not.  Do you know whether that e-mail
10  on the 13th is the first time you saw this
11  document?
12      A.  I don't know.  I don't know.  I don't
13  know whether that was the first time I saw a
14  document.  I don't know if that was the only
15  draft.
16      Q.  Because the document says it needed
17  an answer by August 10, which would make sense
18  because August 13 was the deadline to register.
19      A.  Correct.
20      Q.  It would seem unlikely that August 13
21  is the first time you saw it, but I --
22      A.  It's plausible, yeah -- I mean,
23  that's sensible.
24      Q.  Do you know who -- you mentioned that
25  one reason for this memo was -- was explanation

---

Page 163

1  of a concepts.  Whose idea was it to write
2  this?
3      A.  Stephen Lynch, as I recall.  The
4  whole thing was his idea.
5      Well, I may have said, If you want me
6  to take this Rosneft, I need something in
7  writing.  And then he wrote it.  I can't recall
8  if it was that or he had already produced it
9  for others.  I'm not sure.
10      Q.  This e-mail, as you mentioned, from
11  Mr. Lynch to you on August 13, do you know why
12  it wasn't in your particular mailbox at RenCap?
13      MR. PEES:  Objection.
14      Sorry.  Go ahead.
15      A.  If it was not, I would refer to your
16  associates.
17      Q.  So you do not recall making an effort
18  to delete it?
19      A.  I forwarded it.
20      I -- I wouldn't have -- not only did
21  not make an effort to delete it that I recall;
22  I forwarded it.
23      Q.  Not at the time, but subsequently?
24  You don't recall --
25      A.  No.

---

Page 164

1      Q.  You don't recall --
2      A.  I don't.
3      I don't.
4      It's a straightforward memo.
5      Q.  So in the conclusion section of the
6  memo, so this is -- given the immediacy of the
7  auction, if MV, which is Monte Valle, is to
8  participate we need -- we will need on Friday,
9  August 10, the following.
10      And the first item is, an indication
11  that the general strategy is acceptable.
12      So --
13      A.  I'm sorry.  I want to make sure I'm
14  not -- where does it say we'll need it on
15  Friday?
16      MR. PEES:  So -- with the --
17      A.  Oh, okay.  It's not the last page.
18      Q.  I'm sorry.
19      A.  No.  That's okay.
20      Q.  If I said the last page, I didn't
21  mean it.
22      A.  That's all right.
23      Q.  In the conclusion section.
24      A.  Okay.  Sorry.  Sorry.  You probably
25  didn't say "last page."

---

---

Page 165

1    I'm sorry.  Your question?
2        Q.  So I said, it -- I -- I -- all I was
3    doing so far -- I hadn't asked a question
4    yet -- was directing you to the statement that
5    an indication would be needed by August 10,
6    that the general strategy is acceptable.
7            Who did you need an indication from?
8        MR. PEES:  My objection is to the
9    question.  I think there's inadvertently a
10   false premise in it.
11       MR. JACOBSON:  I'll withdraw the
12   question and clean it up because I think I know
13   why you mean that.  But I didn't intend it that
14   way.
15       MR. PEES:  No.  I understand.
16       Q.  But -- so just reading it, "Given the
17   immediacy of the auction, if MV is to
18   participate, we will need on Friday, August 10,
19   the following:  One, indication that the
20   general strategy is acceptable."
21           Do you know what was meant by that in
22   terms of from whom would such an indication be
23   needed?
24       A.  So I would assume, and I think it's a
25   pretty reasonable assumption, Rosneft and

---

Page 166

1    Moravel or GML -- or Rosneft and GML.  That was
2    the general strategy, is to get these two.
3            Can I clarify something?
4        Q.  Sure.
5        A.  I don't know whether -- and maybe
6    it's in all the e-mails, which I may see
7    eventually.
8            I don't know whether the conversation
9    or note to Warnig in his -- whatever he did at
10   Rosneft, if that was after August 10th when --
11   when we learned or whenever we learned about
12   Rosneft having set up the bidding vehicle and
13   that that would be our only way to participate,
14   to purchase that.
15           Or whether I first went to him, when
16   Lynch first came to me earlier in August or at
17   the end of July.  The reason I mention that now
18   is because this memo indicates that
19   August 10th -- I'm sorry.
20       Q.  Okay.
21       A.  No.  I'll wait.
22       Q.  No.  Go ahead.
23       A.  This memo indicates that August 10th
24   was in the future.
25       Q.  Yes.

---

Page 167

1        A.  And I'm not -- I'm not sure -- and
2    maybe the documents will refresh my memory, the
3    documents that I've received but not yet read
4    through in their entirety.  I'm not sure
5    whether I was able to communicate via Warnig or
6    through Sharipov, anything to Rosneft, before
7    August 10th.
8            So I -- it just goes to say I'm not
9    sure that this document, which was obviously
10   pre -- well, apparently predating August 10th,
11   was something that by that point I would have
12   given to Rosneft.  I'm not sure.
13       Q.  Understood.
14              ---
15       (Foreman Exhibit 16 was marked for
16          identification.)
17              ---
18       A.  Can I read this?
19       Q.  Sure.
20       THE WITNESS:  (Perusing document.)
21       A.  Okay.
22       Q.  So there's a new gentleman on this
23   chain.  Pavel, P-A-V-E-L, Vasilyev,
24   V-A-S-I-L-Y-E-V.
25           And it says here he's the vice

---

Page 168

1    president of structured solutions at RenCap; is
2    that correct?
3        A.  He was a vice president, which is a
4    mid-level role.
5        Q.  Understood.
6            So it seems from this chain as though
7    Mr. Vasilyev and Mr. Lynch are trying to get
8    the documents together to enable -- I'm going
9    to butcher this -- is it Monte Valle?
10       A.  Yep.
11       Q.  To enable Monte Valle to bid in the
12   auction.  So at 314 -- I'm sorry.  Make sure
13   I'm doing this right.
14           At -- 3:41 p.m., it's the -- one,
15   two -- third e-mail down on the first page,
16   Mr. Lynch says, "Alas, it's not looking likely,
17   but you never know."
18           As you read that, was Mr. Lynch
19   expressing pessimism that you were going to be
20   able to bid in the auction at that point?
21       A.  Yes.
22       Q.  Do you know why he was so pessimistic
23   at that point?
24       A.  I believe, yes.
25       Q.  Why?

Page 169

1    A.  So, for the record, I don't recall
2  having seen this e-mail.
3        And this, importantly, refreshes my
4  memory that we apparently continue -- we went
5  through the motion.  This -- Vasilyev was, I
6  think, the one guy, other than Pertsovsky, that
7  I first flagged Lynch's idea to.  And Vasilyev
8  was the only resource that I was given to sort
9  of try to see if we could pursue this.
10        And this would have been before we
11  got the -- well, either before we knew that
12  Rosneft had set up a bidding vehicle or, in any
13  event, before we had any indication that
14  Rosneft might be interested.
15        And so this was like -- this would
16  have been -- "pessimism" is a good word.  I
17  think "moot" Lynch mentions at the top.  This
18  looked like it was just going through the --
19  spinning wheels because we were not going to
20  have time to bid for this thing, even if we had
21  agreements about attachments and stuff, because
22  the deadline was coming up.
23    Q.  Well, so you're -- you're
24  anticipating my next question.  So it's --
25  Mr. Lynch's e-mail to you at 4:17 p.m.  And I

Page 170

1  recognize the times may not line up exactly,
2  but I think they do.
3        He says, "We are all ready on the
4  corp. side but for bank account."  So is it
5  fair to say that the motions had all been
6  completed.  You had everything ready except an
7  actual bank account?  Is that your
8  recollection?
9    A.  Well, so Lynch wrote this.
10    Q.  Right.
11    A.  He said we're all ready on the
12  corporate side, meaning like the corporate
13  documents and whatnot.
14        But it would be inaccurate to say
15  we're all ready, except for the bank account,
16  because that would imply that we had already
17  agreed with Moravel and Rosneft that they
18  wouldn't be hostile to us.
19        So this was mechanical stuff.  We --
20  even if we had had that bank account, we needed
21  understanding from the protagonists that they
22  were not going to be hostile to this.
23    Q.  And I wasn't -- I wasn't trying to
24  imply --
25    A.  No, no.  And I wasn't implying that

Page 171

1  you were trying to imply.  It's confusing.  So
2  I know that I'm sometimes going beyond the
3  question, which is not a good thing.  But --
4  because I'm trying not to be cute.  I'm trying
5  to explain a complicated thing to you to save
6  us all time.
7    Q.  I appreciate that.
8        And then understanding that this is
9  Mr. Lynch's writing, he says, "Now the answer
10  would have to be of the 'yes, solid green,
11  do-it-now' type."
12        So basically, if it's going to come
13  together, he seems to be suggesting that there
14  is -- there needs to be a -- a strong "yes"
15  from someone.  Is that correct?
16    A.  I think that's a good interpretation,
17  that there had -- this -- there can't be any
18  gray area.  It has to be:  We're all in.  We've
19  ticked all the boxes.  Let's do this.
20    Q.  And who -- to the best of your
21  knowledge, who was he expecting that strong
22  green yes to come from?
23    A.  It seems like at this point from no
24  one.  And it was going to be moot.
25    Q.  But he was anticipating the

Page 172

1  possibility of a yes answer from someone who
2  could have turned it around at this point?
3    A.  I -- reading this at the time, it was
4  not looking plausible.  And I certainly didn't
5  spend a lot of time on it, and I think at this
6  point it was like, Well, we tried.  So you
7  would have to ask Mr. Lynch, and I'm sure
8  you've had an opportunity to ask him.
9        I believe I would have taken it to
10  mean that we need not only the agreement from
11  the -- from GML and Rosneft that they would
12  have this reciprocal attachment dropping, but
13  that we would have a technical way to actually
14  have a bidding vehicle.
15        You may have documents that refer
16  when we learned about Rosneft's having set up a
17  bidding vehicle, PNS.  I don't know if that
18  predates this e-mail or not.  But short of that
19  idea, there was no practical way that we would
20  do it.
21    Q.  At this point in time, August 10th,
22  had the consortium had any contact with
23  Moravel, M-O-R-A-V-E-L, or Group Benetuck
24  (phonetic)?
25    A.  Prior to --

Page 173

1      Q.   Prior to the August -- the afternoon
2  of August 10?
3      A.   I -- I'm not -- Deitz, I know had
4  some discussions with Tim Osborne, maybe with
5  Mr. Godfrey or others.  I'm not sure if that
6  was before the 10th, on the 10th, 11th, 12th.
7  I'm not sure.
8           I may have -- I would have known at
9  the time.  I believe that Deitz would have told
10  me.  I can't recall whether he at this time
11  had -- but I think it's in our records.
12      Q.   Because what I'm trying to get at is
13  that the "yes, solid green," was it -- was it
14  Rosneft?  Was it Moravel?  Was it somebody
15  else?  Who would the solid green need to have
16  come from at this point in your thinking on
17  August 10th at 4:00 p.m.?
18      A.   I don't know what he was thinking.
19  But -- and at this point on August 10th, I knew
20  less than a fraction of what I know now about
21  this whole matter.
22           I was simply looking at things in
23  terms of we're not going to go forward unless
24  we get a clear green light from the two
25  protagonists.

Page 174

1           I didn't -- don't recall thinking
2  about that.  Lynch, given what he was
3  responsible for, would have also been thinking
4  about like the technical stuff, like bank
5  accounts and chart -- I wasn't dealing with
6  that stuff.  I -- you know.
7           ---
8      (Foresman Exhibit 17 was marked for
9                identification.)
10          ---
11      Q.   I prefer to ask people about e-mails
12  they wrote themselves, so that's why we're
13  moving on to this one.
14      A.   Thank you.  Can I familiarize
15  myself --
16      Q.   By all means.
17      A.   -- with the chain?
18      Q.   It's the same -- I'll represent to
19  you it's the same chain --
20      A.   Okay.
21      Q.   -- except there's a new message from
22  you at the top, which is what I'm going to
23  focus on.
24           THE WITNESS:  (Perusing document.)
25      A.   For the record, I don't recall having

Page 175

1  seen this.
2           And I would ask my counsel to note
3  that we haven't received this.  Or --
4           MR. PEES:  Well --
5      A.   -- perhaps we have.  Sorry.
6           MR. PEES:  Yeah, so just -- wait for
7  the question.  Answer the question.
8      Q.   Familiarize yourself.
9      A.   Read the document now.
10           Okay.
11      Q.   So I -- you said you don't recall
12  having seen it.  Do you recall having written
13  it?
14      A.   No, but I don't dispute it.
15      Q.   So your first sentence here --
16           MR. JACOBSON:  And this was
17  Exhibit 17; is that correct?
18           THE COURT REPORTER:  Yes.
19      Q.   This was Exhibit 17.  The first
20  sentence is, They -- I should start just for
21  the record.
22           So this is -- this is a response to
23  Mr. Lynch's e-mail, of a moment ago where --
24  that we discussed a moment ago where he said,
25  "We're all ready on the corp. side but for bank

Page 176

1  account."
2           And then your response to him was,
3  began, "They are clearly interested, as I
4  confirmed again earlier today, but prior to
5  their having read the note."
6      A.   Uh-huh.
7      Q.   Who is "they"?
8      A.   I'm not sure.  I would guess, I mean,
9  Rosneft.  That's -- would be my assumption.
10      Q.   Well, was there someone with whom you
11  confirmed interest earlier that day?
12      A.   No.  So when I was responding to your
13  previous questions, I explained that it's vague
14  in my mind the timing of when -- if someone saw
15  a note, when.
16           I don't recall having heard anything
17  from the Rosneft side prior to whenever that
18  was on the 10th or 11th or 12th that I was
19  asked to contact Sharipov.
20           According to this, I see that I'm
21  stating that -- I'm implying that I had had
22  some feedback from them that they were clearly
23  interested.  I don't know whether I had grounds
24  to say that.
25           That was probably not your

Page 177

1   question -- or beyond your question.
2       Q.   Well, so -- and the next sentence
3   says, "We'll know soon enough."  And then the
4   next sentence after that is, "Unfortunately,
5   what usually happens in such situations when
6   they are not interested in going forward, is
7   that I probably won't get a call to say,
8   'Sorry.  It's a no-go,' but will just get
9   silence to the point that we realize they are
10  not interested."
11      A.   Uh-huh.
12      Q.   So, again, that's a long sentence, so
13  we'll unpack it a little bit.  But "what
14  usually happens such situations"?
15      A.   Uh-huh.
16      Q.   Such situations with Rosneft or such
17  situations with someone else?
18      A.   I think with clients, whether they're
19  state clients or not clients.  You're a banker.
20  You're showing ideas to a client.  If they're
21  interested, they're going to let you know.  If
22  they're not, they're not going to say, Hey --
23  they're not going to call you up and say, Thank
24  you very much, but here's the reasons why we're
25  not going to pursue this.

Page 178

1       THE WITNESS:  I'm sorry.
2       Q.   Did you have in mind the Russian
3   government when you wrote that sentence or key
4   officials in the Kremlin?
5       A.   I don't know what I had in mind.  But
6   as I've stated on more than one occasion,
7   Rosneft is a state-controlled company, and --
8   you know, with the state officials on the
9   board, I would use -- I didn't use the word
10  "government" in here.  Or --
11      Q.   I didn't say you did.
12      A.   Yeah.  Yeah.
13      Q.   I was asking, Did you have in mind?
14      A.   I had in mind Rosneft, Rosneft as a
15  broad entity.  I didn't have specific people in
16  mind.
17      Q.   So back to the first sentence.
18           It says, "You confirmed again earlier
19  today."  So had you had a prior conversation in
20  which whoever the "they" was had expressed
21  interest?
22      A.   I didn't -- I don't recall having had
23  that.  I'm -- I'm not sure what I meant by
24  that, as I said, whether I was -- but it
25  appears that I had.

Page 179

1       Q.   And then you mentioned the note.  Was
2   the -- is the note the -- the Lynch memo?
3       A.   I presume it was that memo or a
4   version thereof, if there was more than one
5   version.  As I testified, I have a vague
6   recollection of the timing of that note.
7       Q.   So do you recall having had a
8   conversation with someone who would fit this
9   description after they had read that memo?  To
10  confirm their interest?
11      A.   Other than Mr. Sharipov, with whom I
12  would have spoken after this, no, I don't.  But
13  I don't dispute it.  I just don't have such a
14  recollection.
15      Q.   So -- and then the last sentence of
16  your response was, "So if by tomorrow I haven't
17  heard back, I probably won't at all (about
18  this)."
19           So I'm -- I'm -- is it correct that
20  you were the person expecting to hear back?
21      A.   From Rosneft?
22      Q.   From the --
23      A.   Yes.
24      Q.   From the "they."
25      A.   Yes.

Page 180

1       THE COURT REPORTER:  I'm sorry,
2   Counsel.  Your question was from the --
3       MR. JACOBSON:  I said, Was it you who
4   was expecting to hear back from the "they"?
5   And he said, "From Rosneft?"
6       Q.   And did you, in fact, get a response
7   back from Rosneft?
8       A.   I got the response back to contact
9   Mr. Sharipov.  And, again, I don't know if that
10  was the 10th, 11th, 12th, 13th.  But it was
11  right around this date, this --
12      Q.   And Mr. Sharipov -- Sharipov?
13      A.   Sharipov, yes.
14      Q.   And when Mr. Sharipov and you spoke,
15  what did he tell you?
16      A.   So this -- for the record, this is
17  the conversation that I referred to previously
18  when we spoke by phone and he said, I would
19  like to learn more about this consortium's
20  idea.  And I believe we then agreed to meet.
21  And then we talked about the idea.
22      Q.   And was this over a weekend?
23      A.   Again, I don't recall whether this
24  was on the 12th, the 13th, the 11th, the 10th,
25  but it was -- I have a vague recollection that

Page 181

1  it may have been a Sunday night, because I have
2  a recollection that I had to get some people to
3  come back into the office to work.  But in
4  theory, that could have been any evening.  But
5  it -- I just have a vague recollection it was a
6  Sunday evening.
7      Q.   And ordinarily, Mr. Foresman, I
8  wouldn't -- I wouldn't be expecting people to
9  remember.  The only reason why I'm pressing you
10 on this is because the e-mail conversations are
11 late on a Friday afternoon, and Monday is the
12 bidding deadline.  So that's why I'm asking
13 you.  If you had heard back, it would seem to
14 make sense that a conversation might happen on
15 a Sunday because it needed to happen between
16 Friday and Monday.
17     So your -- are you -- you seem to
18 have -- is it correct that you have a
19 recollection that you had a meeting with
20 Mr. Sharipov on a Sunday night, to the best of
21 your recollection?
22     A.   To the best of my recollection.  But,
23 sorry, I -- I can't confirm because I don't
24 know this.  I -- I would have known at the
25 time, and it would be in some of these e-mails.

Page 182

1          Did you say the bidding deadline was
2  the 10th or the 13th?
3      Q.   The -- no.  The deadline to register
4  was the 13th, which was the Monday.
5      A.   I thought the 10th was some deadline.
6      Q.   You needed to hear by the 10th.  The
7  memo said you needed to hear by the 10th, and
8  that was because --
9      A.   Okay.
10     Q.   -- Monday was the bidding deadline,
11 and then Wednesday was the auction.
12     MR. PEES:  For clarity of the record,
13 the registration deadline, I believe you
14 stated, was on Monday, the 13th.  You just now
15 referred to the bidding deadline.  That was --
16     MR. JACOBSON:  You are correct, and I
17 thank you for that.  Yes.
18     Q.   The registration deadline was Monday
19 and then the auction was on Wednesday.
20         When you met with Mr. Sharipov, maybe
21 on Sunday night -- we don't know -- was there
22 any discussion of the Transpetrol pipeline?
23     A.   I -- I don't recall specifically
24 whether it was on a Sunday night.  Eventually,
25 whether it was Sunday or Monday, Transpetrol

Page 183

1  certainly came up.  I don't recall whether it
2  was on the -- it may have -- we talked about
3  the auction lot.  That was one of the few
4  things in the lot.  So I -- I assume it was,
5  but I don't specifically recall.
6      Q.   And what do you -- what -- whenever
7  the conversation occurred, what do you recall
8  them -- what do you recall Mr. Sharipov saying
9  about the Transpetrol pipeline?
10     A.   Okay.  Whether it was that night or
11 subsequently --
12     Q.   Understood.
13     A.   -- I -- in my time -- there's so much
14 going on during this 72 hours.  So my timing,
15 will be off, not maybe, but it will be off.
16     We didn't know what to do with
17 Transpetrol.  It was a distraction.  It was
18 hard for us to get our heads around it.
19     We at some stage prior to the auction
20 asked Mr. Sharipov whether Rosneft might want
21 that asset, and we could have an arrangement.
22 And he said, "No."
23     Either at that time or later that day
24 or the next day, he indicated to us that while
25 Rosneft wasn't interested, he could introduce

Page 184

1  us to a party that he thought was interested.
2  That's what I recall.  But not -- I
3  don't have a good recollection of the timing of
4  that.
5      Q.   Did Mr. Sharipov indicate to you that
6  Rosneft's approval of your proposal was
7  conditioned upon your agreement to sell
8  Transpetrol at a particular price?
9      A.   To the best of my recollection, we
10 initiated the discussion, whether we could sell
11 them Transpetrol, not he.
12     So, in other words -- sorry.  I beg
13 your pardon.
14     To the best of my recollection, which
15 is pretty firm, I believe, it was the
16 initiative of the consortium to try to find a
17 buyer for Transpetrol in advance of the auction
18 because we didn't know what to do with it.  And
19 we wanted to limit our exposure.  That was the
20 best of my recollection.  I don't recall it
21 being his initiative, let alone a condition
22 precedent.
23     Q.   Who first brought up the price at
24 which Transpetrol would be sold?
25     A.   Who first --

Page 185

1      Q.   At some point a price was mentioned.
2  You said it was your idea to sell it.  Who
3  brought up the price?
4      A.   The consortium.
5      Q.   The consortium.  Fair enough.
6      A.   I don't have a firm recollection on
7  when we first started discussing the price.  I
8  don't know if that would have been with
9  Sharipov or when he introduced us to the party
10  Halebay that ended up having the put option
11  with us.
12      I believe -- and it's not a firm
13  recollection, but I believe that the buyer of
14  the put -- the Halebay or -- Rashid, if he had
15  known this from Halebay, was the party that
16  indicated that 105 would be the maximum that
17  they would pay for this.  And that was -- I
18  believe they didn't get much pushback from us
19  because it came with a -- at that stage or
20  subsequent, shortly thereafter, with a loan
21  agreement.
22      Q.   Do you believe that you could have
23  gone ahead with the transaction if you had not
24  agreed to sell the Transpetrol stake to Halebay
25  for 105 million?

Page 186

1      A.   I've never thought about that.  I've
2  never thought about that.  I -- at the time,
3  I -- I think -- I think -- I thought -- I think
4  I then -- I thought then that we could have.
5      Because, again, to the best of my
6  recollection -- and you'd have to ask the other
7  consortium partners about their recollection --
8  it was our initiative to try to offload TP, I
9  believe, "TP" being Transpetrol.
10      And at no stage did I -- do I ever
11  recall having heard, to the best of my
12  recollection, any indication from Rosneft or
13  another party that us selling on or on-selling
14  Transpetrol was some condition to -- supporting
15  our bid for an auction -- for auction Lot 19.
16      MR. JACOBSON:  So why don't we take
17  as short of a lunch break as we all are
18  comfortable with.
19      THE WITNESS:  Yeah.
20      MR. JACOBSON:  I'd ask -- we can go
21  off the record.
22      MR. PEES:  Yeah.  And, also, I -- you
23  guys will need some sort of a rest, too.
24      MR. JACOBSON:  Yeah.  That's why I
25  was going to -- yeah.  That was the "we all are

Page 187

1  comfortable with."  So whatever -- whatever the
2  reporters are -- you tell me when we -- we
3  were --
4      THE COURT REPORTER:  Should we go off
5  the record first?
6      THE VIDEOGRAPHER:  We are going off
7  the record at 12:55 p.m.  This marks the end of
8  Media 3.
9      (Luncheon recess at 12:55)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 188

1      A F T E R N O O N   S E S S I O N
2      (1:36)
3  ROBERT FORESMAN
4      resumed, having been previously duly
5      sworn by a Notary Public, was
6      examined and testified further
7      as follows:
8      THE VIDEOGRAPHER:  We are back on the
9  record at 1:36 p.m.  This marks the beginning
10  of Media 4.
11  CONTINUED EXAMINATION BY MR. JACOBSON
12      Q.   Mr. Foresman, I understand from your
13  counsel that there's something you wanted to
14  clarify from earlier.  Go right ahead.
15      A.   Yes.  Thank you.  Yes.  So when you,
16  Mr. Jacobson, had read to me the conclusion
17  from this memo, which is Exhibit --
18      MR. PEES:  15.
19      A.   -- 15, which was, again, drafted by
20  Steven Lynch, and there's a line that says in
21  the conclusion, "Given the immediacy of the
22  auction, if MW is -- if MV is to participate,
23  we will need on Friday, August 10th, the
24  following."  And the first was, "Indication
25  that the general strategy is acceptable."



Page 189

1    And I had, in a rush, assumed that
2  that was the two protagonists. But I now
3  understand it to be the prospective investors
4  in the consortium, Renaissance Capital and
5  VR Capital, that -- he was presenting this to
6  consortium partners and if the general strategy
7  was acceptable to the proposed consortium
8  partners.
9    Q.  Okay.
10   A.  Thank you.
11   Q.  Thank you for that clarification.
12     So we'll come back to the frenetic
13  August period in a bit. But for now, I would
14  like to talk about -- is it correct that on
15  September 25th, 2007, the consortium entered
16  into a put and call option with a company
17  called Halebay, H-A-L-E-B-A-Y, with respect
18  Transpetrol?
19   A.  I'm not sure of the exact dates, but
20  we did enter into such an agreement. And I
21  believe it was in September of '07.
22     But I'll take your word that it
23  was --
24       ---
25     (Foresman Exhibit 18 was marked for

Page 190

1    identification.)
2       ---
3     MR. PEES:  Mr. Jacobson, there -- to
4  the extent that there are attorneys on both
5  sort of segments of this e-mail string, that --
6  there may be privileged communications that are
7  captured. And I would caution Mr. Foresman not
8  to discuss privileged communications.
9     That being said, the underlying
10  information, as opposed to communications, we
11  understand, is not necessarily privileged. So
12  to the extent he's using this as an
13  aide memoire, we are not objecting to it being
14  in front of him right now. But I would caution
15  the witness not to reveal any attorney-client
16  communications.
17     MR. JACOBSON:  I wasn't planning on
18  asking any, but that's a fair -- certainly a
19  fair instruction. I mostly -- just trying to
20  get at some facts here.
21     MR. PEES:  Right.
22   Q.  Mr. Foresman, I would direct your
23  attention in particular to the second e-mail,
24  on the chain here. It's from Robert Reid to
25  Mr. Deitz, Mr. Lynch, and then to a gentleman

Page 191

1  at Clifford Chance, and then it's copied to
2  you.
3     And it -- it -- in particular, I'm
4  looking at item 2, which says, Option
5  agreement, circulated to N as in Nancy, B as in
6  boy, N Rashid.
7     Does NB stand for nominated buyer?
8   A.  That would be my understanding.
9   Q.  And Rashid is Rashid Sharipov,
10  correct?
11   A.  Correct.
12   Q.  And then it says, "Rashid has
13  provided comments, and these have been
14  incorporated."
15     Do you know why Mr. Sharipov was
16  offering comments on an option agreement to the
17  nominated buyer?
18   A.  I don't recall with great certainty,
19  but I recall that -- I do recall that Rosneft
20  had loaned us the $60 million deposit and -- to
21  participate in the auction and that Halebay was
22  taking over that loan obligation. So I'm
23  assuming that's why this was relevant for him.
24     They were swapping lenders, to the
25  best of my recollection.

Page 192

1   Q.  And then...
2       ---
3     (Foresman Exhibit 19 was marked for
4    identification.)
5       ---
6     (Witness reviewing document.)
7   Q.  In this timeframe, Mr. Foresman, in
8  late September, had the Rosneft part of the
9  transaction already been concluded? In other
10  words, did Rosneft still have any interests at
11  this point in -- in 2007? The swap you
12  mentioned, had that been already taken -- had
13  already been completed?
14   A.  "Swap" was probably not a word that
15  we used. What I meant by "swap" was Rosneft --
16  Rosneft's loan to PNS was taken over by
17  Halebay, which then had the -- the call option
18  on Transpetrol.
19   Q.  But that had already been done by the
20  time of the change that we looked at of -- in
21  the last --
22   A.  I don't know. These were -- as a
23  matter of days or weeks, I don't know the
24  technical details, but --
25   Q.  I think it was September 7th was

Page 193

1 when --
2     A. I'm not sure. It may have been.
3     Q. And then to your knowledge, did
4 Mr. Sharipov represent anyone other than
5 Rosneft in -- in the entire Lot 19 story?
6     A. Not to my knowledge. But he was --
7 he was an external lawyer, and he --
8     I don't know. I don't know whether
9 he had a formal engagement with any other
10 parties.
11     Q. Did he represent Halebay?
12     A. Not that I'm aware of.
13     Could you --
14     Q. Sure.
15     A. You had made a statement a minute ago
16 that you thought by this point Rosneft was
17 already --
18     Q. Well, Rosneft had -- Rosneft had
19 exchanged -- as you said, you didn't use the
20 word "swap," but Rosneft had exchanged its --
21 its interests so that Halebay was not now
22 holding the loan.
23     A. Yeah. So -- but Rosneft remained
24 very much an interested party.
25     Q. Sure.

Page 194

1     A. Yeah. I meant specific, that Rosneft
2 had gotten out of the loan to PNS but was still
3 involved in the attachments, reciprocity, and
4 the -- Rosneft remained a stakeholder in the
5 broader matter. So I didn't mean to suggest
6 that they got out of anything having to do with
7 Yukos Finance B.V. in September of 2007.
8     Q. Understood. But would any of the --
9 those remaining interests of Rosneft have
10 involved the option agreement of the nominated
11 buyer that Mr. Sharipov would be offering
12 comments on behalf of Rosneft at that time?
13     A. Beyond the loan agreement, I -- I'm
14 not sure. I'm not sure. Maybe we'll come to
15 that. I'm not --
16     Q. He's -- but you don't know one way or
17 the other whether he was representing Halebay?
18     A. I don't know one way -- one way or
19 the other. I do know that as -- that he was
20 the party that introduced us to Halebay.
21     And there were occasions beyond
22 September 2007, where he would flag
23 Halebay-related issues to me that he felt that
24 we might need to address.
25     Q. And under the option agreement with

Page 195

1 Halebay, Halebay had the option to buy
2 Transpetrol from the consortium for
3 $105 million; is that correct?
4     A. As I understand, yes.
5     Q. And that was something that you knew
6 at the time in September of 2007; is that
7 correct?
8     A. Yes.
9     Q. Were you the one who transmitted the
10 agreement to Mr. Sharipov for his comments?
11     MR. PEES: Objection. Are you
12 referring to the option agreement?
13     Q. The option agreement, correct. Did
14 you -- did you give the option agreement to
15 Mr. Sharipov to get his comments?
16     A. I don't believe I did. I was
17 involved in the drafting of legal
18 documentation.
19     Q. And do you know why it was -- do you
20 know why it was shown to him in particular?
21     A. I -- I -- I assume I would have at
22 the time, and I assume someone in the
23 consortium would know. But I don't -- I don't
24 recall now other than, as I said, they were --
25 they were a lender. They -- the option

Page 196

1 agreement was tied to them getting their
2 exposure out and transferred to Halebay.
3     Q. Do you know what Mr. Sharipov's doing
4 now?
5     A. Yes.
6     Q. What's he doing now?
7     A. He's deputy CEO for Transneft, one
8 word, T-R-A-N-S-N-E-F-T.
9     Q. Do you have any ongoing contact with
10 him?
11     A. Yes, I do.
12     Q. How often would you say?
13     A. Probably two meetings in the last
14 year. Probably.
15     And -- and probably no meetings the
16 previous year.
17     Q. Have you any -- had any discussions
18 with Mr. Sharipov about this case?
19     A. When? I'm sorry.
20     Q. Over the past year, have you had --
21 or over the past two years, have you had any
22 discussions with Mr. Sharipov about this case?
23     A. No, not -- does he know of the case?
24     I don't recall that I've had
25 discussions with him about this case.

Page 197

1      Q.  Ever?
2      A.  Oh.  No.  I have -- ever.  Yeah.
3      Q.  About -- about the lawsuit, you've
4 had conversations with Mr. Sharipov about the
5 lawsuit?
6      A.  Oh.  I thought you meant Yukos
7 Finance B.V.  Sorry.
8      Q.  No.
9      A.  I believe -- I believe he -- yes, I
10 did make him aware of the fact of the lawsuit,
11 I believe, at -- at some point.  Yes.
12      Yeah.  I think back closer to the
13 time that it was served.
14      Or the -- or that I was -- enjoined
15 or whatever the -- whatever the term is as a
16 defendant.  Yeah.
17      ---
18      (Foresman Exhibit 20 was marked for
19      identification.)
20      ---
21      Q.  So the document you've just been
22 handed is an e-mail exchange from July 2008.
23      So the -- one of the recipients, or
24 one of the people on this e-mail exchange, is a
25 gentleman by the name of Duco, D-U-C-O, last

Page 198

1 name Oranje, O-R-A-N-J-E.
2      Is Mr. Oranje one of your attorneys
3 in the Netherlands?
4      A.  Yes, he is.  What -- well, he was --
5      Q.  Was?
6      A.  -- one the consortium's attorneys
7 with Clifford Chance in the Netherlands.
8      Q.  And before July 28, 2008, when
9 this -- when he sent the first e-mail in this
10 chain, did Mr. Oranje know that the consortium
11 had entered into the option agreement with
12 Halebay?
13      A.  Sorry.  Where are you -- oh, there's
14 his name.
15      So -- I --
16      MR. PEES:  Given that Mr. Oranje is
17 the consortium's counsel and you're asking
18 about a communication --
19      MR. JACOBSON:  This was produced to
20 us by you, so there's no privilege issue here.
21      MR. PEES:  Well, no, no.  I'm just --
22 I want him to be mindful.
23      MR. JACOBSON:  I understand, but I'm
24 asking, did -- and this was a discussion.
25      Q.  Did Mr. Oranje know the fact that

Page 199

1 Halebay -- that Transpetrol -- I'm sorry.  Did
2 Mr. Oranje know the fact that the consortium
3 had entered into the option agreement with
4 Halebay on July 28, 2008?
5      A.  I'm not sure.  That wasn't normally
6 part of my responsibilities, to communicate
7 with Dutch counsel about our legal agreements.
8 I presume someone in the consortium would know
9 that answer.
10      Q.  So would it surprise you to learn
11 that Mr. Oranje had not been told that the
12 consortium had entered into that option
13 agreement with Halebay?
14      A.  I -- am I seeing that here?  Or are
15 you just asking me?
16      Q.  No.  You're seeing that there.
17 That's what -- go ahead and read it.
18      Just for your aid, I'm going to make
19 it a little easier for you.  I'm going to give
20 you two documents to look at at once.
21      ---
22      (Foresman Exhibit 21 was marked for
23      identification.)
24      ---
25      MR. JACOBSON:  What number is that?

Page 200

1      THE COURT REPORTER:  That's 21.
2      A.  Okay.
3      THE WITNESS:  (Perusing document.)
4      Q.  So I'm going to let you read anything
5 you wanted to read.
6      A.  Yes, please.  I'd like to read it.
7      Q.  I'm just wanted to tell you where
8 I'm -- where I'm going to direct your
9 attention?
10      A.  Okay.
11      Q.  Then you can take your time.
12      In Exhibit 21 that I just gave you,
13 second, the second e-mail in the chain is from
14 Mr. Deitz.  And where Mr. Deitz said says, "We
15 should have told Duco about this earlier," and
16 acknowledging that he said things in court that
17 are not accurate.  So that's what I was -- but
18 take your time.
19      (Witness reviewing document.)
20      A.  Okay.
21      Q.  So do you have any idea why the
22 consortium didn't tell its lawyer that this
23 agreement existed?
24      A.  No.  I -- my -- this is the first
25 time I'm seeing this document, I believe.

Page 201

1    Since the -- the time and I would share Richard
2    Deitz's surprise that -- that he wasn't aware
3    of it and -- and that seems to have been an
4    oversight that wasn't part of my mandate.
5        MR. JACOBSON:  I'm going to hand the
6    reporter two exhibits that I'm going to put in
7    a specific order so that he marks them in
8    order, and then you will get both at the same
9    time.
10        ---
11    (Foresman Exhibit 22 was marked for
12        identification.)
13        ---
14        ---
15    (Foresman Exhibit 23 was marked for
16        identification.)
17        ---
18        Q.   I'll let you get back to that in a
19    moment, Mr. Foresman.
20        A.   Okay.
21        Q.   Were you aware that you were -- that
22    the consortium was under a court order to
23    disclose any agreements that it had with
24    respect to Transpetrol in July 2008?
25        A.   No.  Which court order?

Page 202

1        Q.   The --
2        A.   No, I'm not.
3        Q.   The Netherlands court.
4        A.   I'm not -- I was not engaged with the
5    lawyers in those respects.
6        Q.   Please go back to those documents.
7    Sorry to interrupt you.
8        I'll just -- while you're reading,
9    I'll just state for the record what's going on
10    here.  So there are -- there are two versions
11    here of a WikiLeaks cable from the U.S.
12    embassy.  The first one is redacted and has Xs
13    with respect to the name of a source.
14        And the second document, which is, I
15    guess, Exhibit 23, is unredacted and has your
16    name where the Xs had been.  So you can look at
17    either one of them, assuming you agree that
18    they're the same but for that and that the Xs
19    are -- refer to you.
20        A.   Uh-huh.
21        Q.   So did you, in fact, have a
22    conversation with an embassy official on
23    26 October 2007, to the best of your
24    recollection?
25        A.   I --

Page 203

1        MR. PEES:  What was the date again?
2        MR. JACOBSON:  October -- well, it's
3    a good point.  The -- the conversation would
4    have been in October 23rd, 2007.
5        MR. PEES:  Why don't you rephrase it
6    or just repeat the question.
7        MR. JACOBSON:  Sure.
8        Q.   In -- in or about the 23rd of
9    October 2007, did you have a conversation with
10    an official of the U.S. embassy?
11        A.   Yeah.  I would like to note that the
12    document that you showed me was stolen from the
13    U.S. government by WikiLeaks.  So just as a
14    record, that you're asking me to comment on
15    such a document.
16        So I can't verify the -- the veracity
17    of a WikiLeaks document.  But I don't dispute
18    that I could have met the -- the named embassy
19    official to discuss such a topic around that
20    time.
21        Q.   And did you tell someone from the
22    U.S. embassy that Transpetrol had a value to
23    the consortium of between 100 and $150 million?
24        A.   The totality of what I could remember
25    about such a conversation would be in a

Page 204

1    WikiLeaks cable, so I don't recall anything
2    specific about what I said to him.  I only had
3    this to go by.
4        So -- and this is his take on what I
5    said to him.  So I don't dispute that, although
6    I also can't confirm it's validity, not only
7    because of the source, but because somebody
8    else, who was not taking notes, as I recall at
9    the time or who was not recording himself,
10    conveyed the substance of our conversation.
11        Q.   So at this time in -- in October of
12    2007, did the consortium have an internal
13    estimate of the profits that it expected to
14    recognize from this transaction if everything
15    had gone according to its plan?
16        A.   It was a bit -- a bit all over the
17    place.  From the first time we looked at the
18    project and the ensuing weeks, it was modified
19    substantially down, downward.
20        Q.   So in October of 2007, what did you
21    you -- what was your -- the consortium's
22    expected profit from the transaction?
23        A.   It was vague.  It was vague.  It
24    was -- it was -- yeah.  I don't know off the
25    top of my head.  I saw some e-mails that

## Page 205

1   referred to some of the calculations. We --
2   but it would have been, hopefully, a good
3   profit.
4         But it was very -- it was very -- I
5   don't recall us having a set figure that this
6   was what we were aiming for. It was very much
7   a moving target as other -- as we considered
8   other claims or other -- other components of
9   the transaction. And this was all leading
10  up -- five days later we had the October 31st
11  judgment.
12        So at that time, we were still
13  optimistic because it was before the October
14  judgment, but not as optimistic as we had been,
15  because we were running into some headway with
16  the -- some of the former Yukos managers.
17      Q.  In the years, frankly, before the
18  consortium won the auction for Lot 19, had --
19  were you -- are you aware of publicized
20  disputes between Russia and Slovakia about the
21  future of the Transpetrol stake?
22      A.  I don't recall being aware of it
23  before we ended up getting involved with
24  Transpetrol after the auction.
25      Q.  And at the time you may have met with

## Page 206

1   the U.S. embassy official in October 2007, were
2   you aware of any interest the United States
3   Government had in the outcome of, you know,
4   where Transpetrol might end up, who might
5   control the stake going forward? Are you aware
6   that the -- of whether the United States had an
7   interest in the future of the Transpetrol
8   stake?
9       A.  I don't believe in 2007 I was
10  thinking about what the United States
11  Government thought about a pipeline in
12  Slovakia.
13        At some point when I was contacted by
14  an embassy official specific to Transpetrol, it
15  piqued my interest that they were -- that they
16  had -- that they were interested in knowing
17  what was going on.
18        But I didn't know that they had
19  some -- if you're inferring that the U.S.
20  government had some interest in the outcome of
21  that asset, that was not something that I would
22  have been aware of, to the best of my
23  knowledge --
24      Q.  And --
25      A.  -- to the best of my recollection.

## Page 207

1       Q.  -- did you tell an embassy official
2   that the consortium had not yet focused on the
3   sale of the Transpetrol stake at the time of
4   this meeting?
5       A.  Can I --
6       Q.  Sure.
7       A.  Because I don't recall anything from
8   that meeting other than this.
9       Q.  It's in paragraph 6.
10        I mean, this document either
11  refreshes your recollection or it doesn't. I
12  don't necessarily disagree with you about
13  WikiLeaks. I'm just asking whether you recall
14  having told an embassy official that the
15  consortium would not have focused on the sale
16  of the Transpetrol stake.
17      A.  Uh-huh. Okay.
18      Q.  Had you -- do you recall telling an
19  embassy official that the consortium had not
20  yet focused on the sale of Transpetrol?
21      A.  I don't recall using those words. I
22  believe I could have said to him that that's
23  not our focus right now, which was -- which
24  was -- it was not our focus. Transpetrol was
25  always a side issue.

## Page 208

1         And -- but I may have -- I may have
2   indicated that. And I may have indicated that,
3   as suggested here, that we could be interested
4   in a negotiated solution. And I would have
5   said this -- I would have said this knowing
6   that we had an option agreement with somebody
7   else. But I -- I would have -- I think I still
8   indicated that we could be interested in
9   another solution.
10      Q.  So did you -- I'm sorry. Did you say
11  you indicated that you had an option agreement
12  to -- in place?
13      A.  No.  I said I would have known at the
14  time that I said this that we had an option
15  agreement with Halebay. But I still said this.
16      Q.  And is there any reason you would
17  have not disclosed that existence of that
18  option agreement to the embassy official you
19  met with?
20      A.  Yes, because it was a commercial --
21  it was a commercial transaction that I was
22  meeting voluntarily, not testifying. I was
23  meeting with a economics official. That's
24  not -- that's not something you -- that's not
25  something that I would -- that I would

Page 209

1    disclose.  It wasn't in the public domain.  I
2    wouldn't disclose that.
3        Q.   But you affirmatively misled him; is
4    that correct?
5        MR. PEES:  Objection.
6        A.   No.  No, it's not correct.
7        Q.   So when you said you hadn't focused
8    on it --
9        A.   No, I didn't say -- those were his
10   words, that we haven't -- I -- I believe that
11   what I would have conveyed is that that wasn't
12   our focus at this point.
13       Not that we had -- that wasn't
14   the -- that wasn't central to what we were
15   looking to do with respect to Yukos Finance
16   B.V.  I did not disclose to him, to the best of
17   my recollection, and in accordance with this
18   note, that we had an option agreement to
19   another party.
20       But I recall entertaining in my
21   head -- and there's some e-mails from much
22   later that indicate that we were not excluding,
23   although it would have been tricky, we wouldn't
24   have excluded a sale to a party that was not
25   Halebay.

Page 210

1        We paid the loan and dealt with --
2    and -- but we would have obviously taken legal
3    advice as to whether we could have -- whether
4    that would have been a legal breach of the
5    option agreement.
6        Q.   So you think at this time there was
7    still a possibility that the Transpetrol stake
8    might have gone to someone --
9        A.   Yes.
10       Q.   -- other than Halebay?
11       A.   Yes, and subsequent to this, I
12   believe --
13       MR. PEES:  Bob, let him finish the
14   question so that -- for the benefit of both the
15   court reporter and the general clarity of the
16   record.
17       Q.   We have both been doing great so far.
18   That was -- that was a rare slip.  A rare slip.
19       So just to be clear, there was a
20   possibility in your mind that the -- that
21   the -- the Transpetrol stake could have been
22   sold to someone other than Halebay at this
23   time?
24       A.   Yes.
25       Can I clarify?

Page 211

1        Q.   Sure.
2        A.   That doesn't refer to a specific
3    other buyer.  It means in general.
4        Q.   Who is the gentleman by the name of
5    Stephen Hellman?
6        A.   Yeah.  I -- I'm not the most
7    knowledgeable person in the room about him, but
8    I have a vague understanding of who he is.
9        Q.   What's the understanding you have?
10       A.   Let me clarify, as I did in my
11   previous deposition.  There are two Steve
12   Hellmans --
13       Q.   Ah, yes.
14       A.   -- in Moscow.  One was for many years
15   the head of Credit Suisse.  This is a different
16   Steve Hellman.
17       So, Mr. Jacobson, was your question
18   what I knew then -- what I knew in 2007
19   about --
20       Q.   What you know -- your understanding
21   now.
22       A.   Today?
23       Q.   Yeah.
24       A.   Was -- he is a -- was somebody that,
25   I think, was a family friend or a childhood

Page 212

1    friend or -- some connection with Stephen Lynch
2    from back -- wherever that was, New York
3    State -- and that he was some sort of a -- an
4    investor.  I don't know what he did, real
5    estate.  I don't know what -- some sort of
6    investor.
7        And he had been in contact with Lynch
8    and maybe Deitz, but at least Lynch before the
9    auction about putting together a consortium on
10   his own or joining our consortium to bid for
11   this asset and that he was in consultation with
12   Mr. Godfrey.
13       And there was -- I've heard that he
14   had some state department advisory role, which
15   I have not confirmed, owing to some
16   acquaintance that he may have had with
17   Secretary Rice at the time.
18       And that he was someone that looked
19   to be engaged in -- today, I know, or have
20   reason to believe that he was looking to
21   involve himself in certain matters, including
22   Transpetrol, not always clear what -- whether
23   this was for the benefit of the United States
24   Government or his own benefit or other parties.
25       That's pretty much the extent.  I

Page 213

1    know him -- and other than one meeting I had
2    with him, at his initiative, after I left
3    Renaissance.
4        Q.   So that was my -- that was my next
5    question:  Have you ever -- have you ever met
6    him?
7        A.   Yes.
8        Q.   So you met him once?
9        A.   I believe it was just once.  Might
10   have been twice.
11       Q.   When was that?
12       A.   I was at Barclays, so it was -- I
13   don't know if 2010, '11, '12, one of those
14   times.
15       Q.   And did you have any conversations
16   with Mr. Hellman regarding Lot 19?
17       A.   No.  I don't -- I don't believe that
18   it was respect to Lot 19.  I believe it was
19   with respect to something else that he had in
20   mind.
21       Q.   No.  I know.  But when -- during the
22   2007 timeframe, did you have any exchanges?
23       A.   No, not to my -- I don't think I had
24   ever spoken to him before I met him, to the
25   best of my recollection.

Page 214

1        Others in the consortium did.
2        Q.   Am I correct that you had
3    conversations with the Slovakian government at
4    some point with regard to the sale of the
5    Transpetrol stake?
6        A.   Correct.
7        Q.   And we'll talk about those in a
8    little bit more detail later, but did the
9    Slovakian government officials mention
10   Mr. Hellman to you?
11       A.   Not that I -- I don't recall.  If
12   they did, I don't recall it.
13       I don't believe they did, but I
14   can't -- I feel like that would be the sort of
15   thing I would remember.
16       Q.   So we'll come back to that.
17       After the Lot 19 auction, did
18   Mr. Sharipov ever express a concern to you that
19   the consortium might sell the Transpetrol stake
20   to someone other than the nominated buyer?
21       A.   I'm not sure.  He -- he may have.  I
22   suspect if he did, we would -- it would be
23   somewhere in the e-mail cache, but I can't
24   recall right now.
25       ---

Page 215

1        (Foresman Exhibit 24 was marked for
2        identification.)
3        ---
4        MR. JACOBSON:  25?
5        THE COURT REPORTER:  It's 24.
6        Q.   So when Mr. Sharipov --
7        A.   I'm sorry.  Let me just finish
8    reviewing it.
9        Q.   Take your time.
10       THE WITNESS:  (Perusing document.)
11       A.   Yes.
12       Q.   So when Mr. Sharipov expressed
13   concerns about the --
14       A.   I'm sorry.  My e-mail that -- at the
15   top.
16       Q.   That's where I wanted to focus your
17   attention.
18       A.   Yeah.  Uh-huh.
19       Q.   When Mr. Sharipov expressed his
20   concerns, you had a rather pithy response to it
21   that I would like you to read out loud, please.
22       A.   Rashid, for the record, I strongly
23   disagree with your comment that the sellers --
24   that, quote, the sellers -- possibility to
25   transfer the shares to a third-party does not

Page 216

1    look so remote even today, end quote, period.
2    We are not insane.
3        Yeah.
4        Q.   So is it fair to say that that e-mail
5    is suggesting that there is no possibility that
6    anyone other than Halebay would get Transpetrol
7    from you?
8        A.   It does -- it does suggest that, at
9    least without -- without their approval.  It
10   does suggest that.
11       Q.   And why would it have been insane for
12   the consortium to have sold the stake to
13   someone other than the nominated buyer?
14       A.   Because we were talking likely
15   about -- potentially about the state company.
16   Well, I don't know if at that point we assumed
17   that Halebay could have been representing
18   Gazprom Neft.  But, yeah, it would have been --
19   it would have been -- to do that in a hostile
20   way would have been very risky.  Very risky.
21       Q.   In a manner -- in a manner unapproved
22   by the nominated buyer, is what you're saying?
23       A.   In a manner unapproved by the
24   nominated buyer.  Yes, in a manner unapproved
25   by the nominated buyer.  Yeah.

Page 217

1    Q.   Which you understood to be likely a
2  state-controlled entity, but you didn't know.
3    A.   No.
4    Q.   So is it fair to say that you were
5  not interested in selling Transpetrol for the
6  highest price you could get?
7    A.   Well, at that point we had an option
8  agreement.  We had -- sorry.  At that point, we
9  had taken out a loan of $60 million or a loan
10  was extended to us by Rosneft for $60 million.
11        And we were in negotiations with
12  Halebay on taking that loan over, that
13  $60 million, in exchange for an option
14  agreement at 105 million.  We wanted to
15  preserve that $60 million loan.  So at that
16  point, that was -- that was our priority.
17        I don't know if I answered your
18  question or --
19    Q.   Well, so if someone had come to you
20  with an offer to sell it for, say,
21  $200 million, would that have been more
22  beneficial to you than the $105 million option
23  agreement?
24    A.   If they had -- if they had come to --
25  if they had come to us at that stage and

Page 218

1  offered to either pay that to us now, prior to
2  us having an ability to actually transfer the
3  shares, or had said, We'll give you a
4  $60 million loan.  We'll take the loan, and
5  we'll pay you 200, then I have no doubt that we
6  would have taken that deal.
7    Q.   Even though that would have been
8  insane.
9    A.   That was -- this is -- I'm saying at
10  that point, prior to the option agreement
11  having been signed with Halebay, as I
12  understand it, this is -- we're negotiating the
13  wording of the option agreement.
14        And as I understand it, Rashid is
15  saying, Rob, there's some wording in there that
16  basically indicates that potentially you could
17  sell this to a third party, so this would have
18  been after signing.
19        This is prior to signing.  And I
20  understood your question to be, if someone had
21  come to you and said, Here is 200 instead of
22  105, if they came to us at this time, we would
23  have taken that.  That was a lot -- or if they
24  had said, 105 valuation but instead of a
25  $60 million loan, we'll make it a

Page 219

1  hundred-million-dollar loan, we would have
2  taken that.  It was -- we -- Halebay was the
3  only option that we had.
4    Q.   Did the consortium carve out
5  specialty rights for Mr. Lynch with regards to
6  Transpetrol?
7    A.   Did the -- not sure if I understand
8  the question.  I don't -- it doesn't ring a
9  bell.  If you could -- I don't recall special
10  rights to Mr. Lynch with respect to
11  Transpetrol, specific to Transpetrol.
12        ---
13  (Foresman Exhibit 25 was marked for
14        identification.)
15        ---
16    A.   Did you want me to read the entire
17  thing, or --
18    Q.   Take your time.  Take a look at it.
19        THE WITNESS:  (Perusing document.)
20    Q.   It's really paragraphs 4 and 5 that
21  refer to SL as Mr. Lynch, and giving him some
22  rights with regard to the Transpetrol sale.
23    A.   Yeah, I --
24        MR. PEES:  Wait till there's a
25  question pending.

Page 220

1    A.   So I'm not answering -- no, I wasn't
2  going to answer the question.  I was just going
3  to say if you only --
4        MR. PEES:  Don't.  Wait.  Wait till
5  you have a question, and you can answer.  Is
6  there a question pending?  I don't want to --
7    Q.   The question pending was, I'm going
8  back to -- does this refresh your recollection
9  as to whether Mr. Lynch had special rights with
10  regard to Transpetrol?
11        MR. PEES:  Okay.  And I'm going to
12  object to the question insofar as it calls for
13  a legal conclusion.
14        But you should feel free to answer
15  the question.
16    A.   Yeah.  Thank you.
17        But I was just going to say that if
18  you want me to give a view on this, I -- it's a
19  legal document that I don't recall having seen.
20  I may have seen it at some point.  I may have
21  read it or not.  I would really need to
22  familiar -- this is a legal document.  It looks
23  a little technical.  And I would need to -- if
24  you want to point me to specific --
25    Q.   All right.  I mean, it's --

Page 221

1      A.  -- paragraphs.
2      Q.  It speaks for itself.  I mean, I'm
3  pointing -- I pointed you to paragraphs 4 and
4  5, which describe him having rights to bring
5  forward alternative purchasers and all that.
6  And basically, I'm -- I'm asking you to agree
7  with me that he had rights that no other member
8  of the consortium did.  But -- and --
9          MR. PEES:  With the objection that
10  the question calls for a legal conclusion, you
11  can answer --
12      Q.  If you can.
13          MR. PEES:  -- what your lay
14  understanding is, to the extent you know, Bob.
15  I'm not trying to instruct you not to answer
16  the question.  But I'm just noting the
17  objection on the record.
18      A.  Understood.  Understood.
19          Yeah.  As a nonlawyer, as layperson,
20  this seems to -- this document seems to give
21  Stephen Lynch the ability to seek an
22  alternative purchaser, which must have escaped
23  my mind.
24      Q.  Did RenCap have similar rights, to
25  your knowledge?  Without regard to that -- you

Page 222

1  know, just not necessarily with regard to that
2  document, did RenCap have the ability to bring
3  forward an alternative --
4      A.  Not to my knowledge.  But I should
5  clarify that I don't recall Stephen Lynch
6  having this right or Richard Deitz or RenCap.
7          Yes.
8      Q.  As you sit here today, again, you've
9  said you don't remember this document.  But as
10  you sit here today, do you think that Mr. Lynch
11  would have been in a better position from
12  RenCap to identify alternative buyers for the
13  Transpetrol stake?
14      A.  No.  But -- but, again, I'm not a
15  lawyer.  He was the, I think, general director
16  of Promneftstroy.  And I -- I think it's the
17  shareholder -- I -- I thought it was -- I
18  thought it was -- I read it not as a lawyer to
19  be specific to his role as general director of
20  the company, the shareholders, the shareholders
21  giving him some -- guidelines as the general
22  director.  But, yeah, I'm -- I guess I'm the
23  wrong guy to ask.
24      Q.  We'll get away from legal documents
25  now.

Page 223

1          ---
2      (Foreman Exhibit 26 was marked for
3          identification.)
4          ---
5          MR. JACOBSON:  Just for the record,
6  Mr. Foresman, I've just shown you an e-mail
7  exchange, the earlier message of which is dated
8  27th of August 2007, at 8:20 p.m.  And then
9  there's a couple of messages above it, the most
10  recent of which is August 28, 2007, at 8:34 in
11  the morning.
12          And you can take as much time as you
13  need to read it.  The one that I want to focus
14  your attention on, though, is your message --
15  I'm sorry -- Robert Reid's message -- I'm
16  sorry.  No.  I was right the first time.  Your
17  message to Robert Reid, second in the chain,
18  Augusts 28 at 11:56 a.m.
19      A.  Okay.
20      Q.  So you said that you had spoken again
21  with Lynch and that he's nervous but he trusts
22  you.  Do you recall what he was nervous about?
23      A.  I believe I've seen this document
24  in -- in production.  And I think I -- I think
25  I interpreted this to mean, because I don't

Page 224

1  recall writing it, but I don't dispute it.
2          I think I recalled that the agreement
3  that Lynch had had, with the consortium in
4  terms of his compensation, for success, was
5  somehow at risk of being -- he thought it was
6  at risk of being retraded.
7          For the -- avoidance of doubt, I
8  don't understand this to have anything to do
9  with --
10          THE COURT REPORTER:  For the what?
11      A.  For the avoidance of doubt, I don't
12  understand this to have any relation to the
13  previous document with respect to Lynch's
14  rights with respect to Transpetrol.
15          This was his overall consortium,
16  upside agreement, that he seemed to think
17  that -- that someone in the consortium behind
18  his back was trying to retrade on that.  And I
19  assured them that that wouldn't happen.
20      Q.  And then you -- you tell Mr. Reid
21  that with respect to Mr. Lynch, we cannot screw
22  him.  Not only would it be wrong and
23  reputationally bad, but the Kremlin would not
24  be amused.
25      A.  Uh-huh.

Page 225

1    Q.  So why would the Kremlin care about
2  your deal with Mr. Lynch and his compensation?
3    A.  Again, the --
4    MR. PEES:  Objection.
5    But you can answer the question.
6    A.  Again, not the most precise word
7  choice of "the Kremlin."  We had entered into
8  an agreement with Rosneft, a state company with
9  a board of government officials.  And Mor --
10  and GML acquired the lot, 19, through Stephen
11  Lynch's vehicle, MonteValle, and all these
12  complex arrangements about attachments and
13  reciprocal dropping of claims and option
14  agreement -- loan from Rosneft, option
15  agreement to sell to Transpetrol.
16    And if our consortium, three weeks
17  after the auction, started to show all this
18  dissent, people were -- consortium partners
19  were suing each other, this would be very
20  poorly received.
21    And I was trying to -- I, understand,
22  give comfort to Stephen:  Don't worry about it.
23  We are not going to -- this would not be well
24  perceived so soon after the auction and we've
25  got this interfighting.

Page 226

1    Q.  So what was Mr. Lynch's compensation
2  in this deal that the consortium had agreed to
3  with him?
4    A.  To the best of my recollection -- and
5  there are some e-mails that refreshed my mind
6  because I didn't recall this -- he was given, I
7  believe, an -- an upfront payment upon either
8  successful winning of the auction or some --
9  some milestone of, I think it was -- I was it
10  is 1.25 million but -- dollars.  But it's in
11  some of the documents.
12    And then he was given what I
13  considered a quite generous upside and any
14  profit beyond the -- profit.  Meaning beyond
15  the consortium's investment --
16    Q.  And --
17    A.  -- of 10 percent, I think.
18    Q.  -- was there any -- were these terms
19  that Mr. Lynch proposed to the consortium, or
20  was there a negotiation, first?
21    A.  So I found out about the -- his
22  upside, his 10 percent, after a negotiation
23  between, I believe, Mr. Olphert, at Renaissance
24  Capital, maybe Mr. Jennings.  But I believe
25  Mr. Olphert was representing RenCap in that.  I

Page 227

1  don't know about Deitz's involvement.
2    I found -- I was not in that
3  negotiation.  I found out subsequent to that,
4  that it -- 10 percent had been agreed.  And I
5  said that I felt that that was too aggressive,
6  that that was -- sorry -- that that was too
7  generous.
8    Q.  And the response was?
9    A.  Well, we've already agreed it with
10  him, so...
11    Q.  Is -- to your knowledge, would anyone
12  in the Kremlin have been displeased if
13  Mr. Lynch's upside had been reduced below that
14  10 percent?
15    A.  I see where you're -- where you're
16  inferring.  And that's the first time in my
17  life that I've heard such an inference.  And I
18  don't know what to say beyond that, other
19  than -- other than that that never crossed my
20  mind.
21    Q.  Did Mr. Deitz ultimately oust
22  Mr. Lynch from a position in the consortium?
23    A.  So if -- if you're referring to -- so
24  well after I left -- I left Renaissance and all
25  matters related to this in 2009.

Page 228

1    There's been a -- a lot of litigation
2  between Lynch and Reid that I haven't followed
3  closely.
4    MR. PEES:  Excuse me.  I apologize
5  for interrupting the witness, but you said
6  "between Lynch and Reid."
7    A.  Sorry.  Lynch and Deitz.  I'm sorry.
8    MR. PEES:  I won't -- just --
9    THE WITNESS:  Sorry.  Thank you.
10    A.  Sorry.  Lynch and Deitz that I
11  haven't followed closely, don't know all the
12  terminology.  But I believe your description of
13  the -- the Deitz -- I don't want to put --
14  don't want to misquote you, but kicking --
15    Q.  Ousting, I said.
16    A.  Yeah.
17    Is understood, except by that point,
18  I don't know that "consortium" was the right
19  word.
20    Because at that point it was --
21    Q.  Right.
22    A.  -- Richard Deitz basically.
23    Q.  And to your knowledge, was there any
24  sort of governmental resistance to Mr. Lynch
25  being --

Page 229

1    A.   Not to my knowledge, no.
2    Q.   -- ousted?
3         Did Mr. Lynch raise the idea of being
4  appointed to the board of Transpetrol?
5    A.   I -- I don't recall.
6    Q.   See if this refreshes your
7  recollection.
8                       ---
9         (Foresman Exhibit 27 was marked for
10                  identification.)
11                      ---
12        THE WITNESS:  (Perusing document.)
13   Q.   It's item 3 on this e-mail that I'm
14  most focused on, but take your time and read as
15  much as you want.
16   A.   Okay.
17   Q.   So does this refresh your
18  recollection as to whether Mr. Lynch made a
19  request to be on the board of Transpetrol?
20   A.   No, it doesn't.
21   Q.   And have you ever -- did you see this
22  document before today?
23   A.   I think I -- I think it may be in our
24  packet.  And focus on it?  But I see that I'm
25  copied here, and I think -- I think it is in

Page 230

1  the -- in the cache.
2         But it doesn't -- I don't know why he
3  would have sought a seat on the board of
4  Transpetrol.  And I don't think this -- I can't
5  imagine this issue got a lot of air time.
6    Q.   And have you heard before him stating
7  his reason as, quote, that comes from higher
8  than you and me?
9    A.   No.  I've -- I -- I'm not aware of
10  that.  I see it says, "Can Bob explain?"
11   Q.   That was my -- going to be my next
12  question.
13   A.   No, I can't.
14   Q.   Bob can't.
15   A.   I mean, the only thing I -- 8/29, was
16  that -- I'm not sure if we were already in
17  discussions with Halebay at that point or
18  Rashid had already introduced us.  He must --
19  there must have been -- yeah, Rashid must
20  have -- so he may have heard it from Halebay or
21  Rashid.  But -- but I -- I don't know that I
22  can explain that background.
23   Q.   So let's get away from documents for
24  a minute.
25        Mr. Lynch -- I'm just going to

Page 231

1  represent to you that Mr. Lynch testified that
2  his first approach to you about the Lot 19 deal
3  was by e-mail and that he did all of his
4  e-mails on the same day, which was the 2nd of
5  August, which was a Thursday.
6    A.   Uh-huh.
7    Q.   Is that inconsistent with your
8  recollection?  In other words, is that -- is
9  that -- is that possible?  And do you remember
10  it any differently?
11   A.   It's possible.  It's -- I -- I don't
12  recall that.  I don't recall that.  I wasn't
13  having -- I didn't really have a relationship
14  with Stephen other than the short time that he
15  was looking to speak to Renaissance.  I don't
16  know if we e-mailed with each other.
17        So I don't exclude that, but I don't
18  recall it.
19   Q.   And the other point in time that
20  Mr. Lynch testified to was that the meeting
21  with him and you and Mr. Deitz took place on
22  Friday, August 10.
23        And so does that -- is that
24  consistent with your recollection?  Or do
25  you -- do you know -- is that -- is that

Page 232

1  possible or do you recall it another way?
2    A.   Well, first of all, I'm not sure.
3  You said "the meeting."  A meeting.  I think we
4  had --
5    Q.   Fair enough.  A meeting with --
6    A.   A meeting may have taken place on --
7  on August 10th.  As a general rule and not to
8  be applied across the board necessarily, but as
9  a general rule, Steve -- this was a -- this
10  whole Yukos Finance B.V. thing from then up
11  until today was much bigger in Stephen Lynch's
12  life than in my life.
13        So as a general rule, not always
14  true, he tends to have a better recollection of
15  some dates and -- and -- and whatnot.
16   Q.   I'm smiling only because every
17  deposition I've ever taken has been focusing in
18  some small moment in someone's life that turns
19  into a whole different thing 10 years later.
20  So I did not mean to be --
21   A.   No, no, no.
22   Q.   I was smiling along with you, not --
23  not suggesting anything different.
24   A.   Oh, and I didn't take it differently.
25   Q.   And the reason why I was -- I was

Page 233

1  using Mr. Lynch's testimony is just because I
2  think it helps to frame the days of the week.
3  Because if, in fact, the first approach to you
4  was on a Thursday and then a -- a significant
5  meeting with Mr. Deitz was the following
6  Friday, one of the questions that I was -- if
7  it helps to refresh your recollection -- it may
8  not -- is if, in fact, the first approach for
9  Mr. Lynch came on a Thursday, do you recall
10 whether you met with him as quickly as the day
11 after?  Or would it have been after that
12 intervening weekend?
13      A.  With Mr. Deitz?
14      Q.  With Mr. -- with Mr. Lynch.
15          So, in other words, if the first
16 approach and then you had -- if the first
17 approach came by e-mail, which I know you don't
18 remember, but if the first approach came by
19 e-mail, do you recall whether you had a meeting
20 with him on a Friday before the weekend, or do
21 you remember it being toward the start of the
22 week?  Maybe you don't remember.  But that's --
23 I'm trying see if this timeline helps to
24 refresh your recollection about how compact the
25 time frame was between your first meeting with

Page 234

1  Mr. Lynch and when there was a significant
2  meeting on Friday, with all these e-mails going
3  back and forth about today's the day we got to
4  go.
5          So might it have been longer than
6  sort of a four-day period when all this happens
7  together?  Or -- you see where I'm going with
8  this?  Does this refresh your recollection at
9  all about how quickly all of this was coming
10 together?
11         MR. PEES:  So that was a long --
12     A.  Yes.
13         MR. PEES:  You understand it --
14     A.  I think so.  Let me answer as
15 follows, and you tell me if I'm
16 misunderstanding your question.
17         So as I testified, at some point
18 Lynch came to me.  I've said before early
19 August, end of July.  I don't know if that's
20 July 28. I don't know if that's August 1st.  I
21 don't know if it's August 5th.  But he came to
22 me with this idea, the -- which was more raw at
23 the time.
24         I first flagged it with Alexander
25 Pertsovsky, the CEO.  He gave me one resource

Page 235

1  to do a little research on this thing.  I have
2  a pretty vivid -- not absolute iron-clad, but a
3  pretty vivid recollection that more time had
4  passed than the time period -- between that
5  first approach and us coalescing around the
6  agreed consortium, with Rosneft's interests
7  confirmed, more time would have passed between
8  that initial approach, when Lynch came to me
9  with that raw idea and I flagged it with the
10 CEO of RenCap.  More time passed than would
11 have passed between the 10th and the 13th.
12         So this could not -- the first time
13 Lynch ever mentioned Lot 19 to me could not
14 have been the Thursday before this Friday.
15 Sorry.  You say Friday was the 10th?
16     Q.  No.  So Friday was the 10th.  And I
17 would suggest so if -- if the first e-mail to
18 you came on August 2, which was a Thursday, I
19 would be suggesting an eight-day period of time
20 between that first approach and the August 10th
21 frenetic go/no go date.  Is that -- is an
22 eight-day timeframe consistent with your
23 recollection?  Or do you think it was longer?
24     A.  That would be a plausible timeframe.
25 But what I would note is I don't -- the memo

Page 236

1  that we discussed earlier today, I don't know
2  if that was a first memo that was in raw form
3  as I talked about it or whether there was a
4  more refined memo that would have been closer
5  to the 10th.
6          But in the event that that was the
7  one and only memo, then one day -- i.e.,
8  Thursday, the 9th, to August 10 -- would not
9  have been plausible, because I remember
10 there --
11     Q.  Oh, of course.
12     A.  It would have been 8 days or 15 days.
13     Q.  Understood.
14         So, first of all, you mentioned twice
15 that you flagged the possibility with
16 Mr. Pertsovsky.  How did you do that?  Was that
17 a meeting? an e-mail?
18     A.  I think it was -- we sat next to each
19 other, so I assume it was a -- well, if I had
20 gotten an e-mail from Lynch, I may have
21 forwarded that to him, but not necessarily
22 because it was -- Stephen is a good man, but
23 he -- it's not very crisp and concise.  It's a
24 bit of a novella.  So I may -- and Alexander
25 was a trader by art.

Page 237

1    So I may have just walked in and
2 explained really pithy, not expecting him to
3 read a three-page, you know, narrative.  So
4 I -- I assume I just walked next door and told
5 him and -- and waited for his reaction.
6    Q.   So at what point do you recall
7 knowing that Rosneft held attachments in the
8 Lot 4 -- Lot 19 assets?
9    A.   I don't know if I knew or ever used
10 the word "attachments" at that stage.
11    Q.   Credit interests.
12    A.   I may have used claims or liens.
13    I -- Deitz distinguishes.  For me, I
14 don't distinguish between all those things.
15 He's in the distressed debt world.
16    It could not have been until -- I
17 can't fathom it had been -- I can't fathom it
18 being before Lynch approached me about Lot 19
19 that I had ever heard of Rosneft attachments on
20 Yukos Finance B.V.  So I'm assuming it was when
21 Lynch -- I assume when he first approached me
22 about it.  If I'm not being clear, maybe I'm
23 not understanding --
24    Q.   No, no.  You're doing the best you
25 can, and I appreciate it, because there's --

Page 238

1 certain events that you testified to, and I'm
2 just trying to get the timeline to the best of
3 your recollection, because that's why we are
4 here.
5    So to the best of your recollection,
6 it was Mr. Lynch who told you that Rosneft held
7 some kind of credit interests in the assets?
8    A.   To the best of my recollection, or
9 that could have been when we sat down with
10 Deitz, who knew the -- these sort of concepts
11 more than Lynch, Lynch or Deitz.  I don't
12 recall beyond that.
13    I -- what I recall from the first
14 approach from Lynch was that there was a --
15 Yukos Finance B.V. had some cash; it had some
16 pipeline stake.  It was a messy, tangled, Dutch
17 legal battle with claims from different
18 parties.
19    And so complicated, foreign
20 jurisdiction, that he thought an international
21 investment consortium might be able to bid for
22 this asset because nobody would know what to do
23 with it.
24    And -- yeah.  I don't know that I was
25 thinking about Rosneft attach -- it was -- it

Page 239

1 was very -- I didn't take it very seriously
2 initially, to be honest with you.
3    Q.   What did you have on your mind when
4 you called Peter O'Brien?
5    A.   Okay.  Do we know when I called Peter
6 O'Brien?
7    Q.   That's what we are trying to find
8 out, is that you -- you didn't say.  And so the
9 point is, at some point in this process, you
10 called Peter O'Brien.
11    A.   Yeah.
12    Q.   And so I'm trying to find out what
13 you had in your mind at the time you called
14 him.
15    A.   All I recall saying -- and it may be
16 beyond this, but to the best of my
17 recollection, all I recall saying to -- sorry,
18 saying to Peter and who -- as I understand from
19 my own e-mails, after much more recently, he
20 was on vacation.
21    And I asked him, I said that we
22 have -- there's an idea about auction Lot 19,
23 and we think there's a compelling opportunity.
24 And we wanted to -- to discuss this with
25 Rosneft.

Page 240

1    And he said, "I'm not involved in
2 this."
3    But I don't -- I don't -- I -- I find
4 it highly implausible, highly unlikely that I
5 would have spoken to him about attachments or
6 any details.  It was -- they could just flag
7 the lot number; we're going to talk to Rosneft.
8    He said, "Not for me."
9    Q.   Are you sure you knew about the
10 attachments?
11    A.   No, I'm not sure.  I'm not sure.
12    Q.   And if you didn't know about the
13 attachments, why else would you have been
14 calling Rosneft to talk about the Lot 19
15 opportunity?
16    A.   Well, whenever I call -- whenever it
17 was that I called Peter O'Brien, I must have
18 known that Rosneft was a -- was somehow
19 involved in the -- in the Yukos Finance B.V.
20 Whether I knew the word "attachment" or "claim"
21 or "lien," I don't know.
22    But I would have known that there
23 was -- I don't think I ever had thought of
24 Lot 19, including from the very first time
25 Lynch mentioned it to me, without knowing of

Page 241

1   some relevance of Rosneft.  But because I'm not
2   expert in the liens, claims, attachments, I --
3   I -- I -- but I don't think there was ever a
4   time that Lynch or anybody else discussed Yukos
5   Finance B.V. without it being clear that
6   Rosneft was a -- an interested party.
7        MR. JACOBSON:  We've been going about
8   an hour.  Now would be a good time to take a
9   little break.  I want to consult with my
10  colleagues anyway.  So go off.
11       THE VIDEOGRAPHER:  Going off the
12  record at 2:42 p.m.  This marks the end of
13  Media Unit Number 4.
14       (Recess from 2:42 to 3:00.)
15       THE VIDEOGRAPHER:  We are back on the
16  record at 3:00 p.m.  This marks the beginning
17  of Media 5.
18       Q.  Mr. Foresman, are you familiar with a
19  company called Muse Stancil, M-U-S-E
20  S-T-A-N-C-I-L?
21       A.  I don't believe so.  Doesn't ring a
22  bell.
23       Q.  If I told you that Muse Stancil
24  prepared a valuation for Transpetrol, does that
25  help refresh your recollection?

Page 242

1        A.  No, but I don't exclude that I may
2   have read the name at some point, but it
3   doesn't ring a bell at all.
4        Q.  Are you familiar with any valuations
5   for Transpetrol that you knew about in August
6   of 2007?
7        External valuations?
8        A.  I -- I don't recall.  I recall
9   several markers for Transpetrol valuation.  I
10  don't -- I don't recall whether one of them was
11  an actual valuation report.
12       No.
13       Q.  So I'm going to show you an e-mail
14  that you're on.
15       ---
16       (Foresman Exhibit 28 was marked for
17       identification.)
18       ---
19       Q.  There are parts of this that are
20  garbled, but there's really only one
21  non-garbled piece that I want to direct your
22  attention to, which is on the second page of
23  the document that I've just handed you.
24       There's an e-mail that's from Steve
25  Hellman, to Richard Deitz.  And the copy to a

Page 243

1   bunch of other people.  And then one above
2   that, Mr. Deitz forwards the e-mail to you.
3        THE WITNESS:  (Perusing document.)
4        A.  Okay.
5        Q.  So does this refresh your
6   recollection at all about the existence of a
7   valuation for Transpetrol by Muse Stancil?
8        A.  Would you mind if I just read my
9   response here?
10       Q.  Take your time.
11       A.  Yeah.
12       MR. PEES:  And, Bob, after you're
13  finished reading the response, perhaps you can
14  repeat the question, or the court reporter
15  could.
16       MR. JACOBSON:  Sure.
17       THE WITNESS:  (Perusing document.)
18       A.  Okay.  I'm sorry.  Could you repeat
19  the question.
20       Q.  The question was, does this refresh
21  your recollection as to whether there was a
22  third-party valuation for Transpetrol that came
23  in at $200 million?
24       A.  I -- I see it here, and I see I was
25  copied.  It doesn't -- it doesn't freshen my --

Page 244

1   refresh my memory at all, to be frank.  But I
2   see that I was copied.
3        I think it demonstrates where I've
4   seen that 200 million in another place, and I
5   see it probably came from this.  But yeah.  I
6   don't -- I don't remember -- I see the e-mail.
7   It doesn't refresh my memory about having seen
8   a valuation report, but -- but --
9        Q.  Did Mr. Deitz tell you himself that
10  there was a valuation report for Transpetrol at
11  $200 million?
12       A.  I don't recall.  I -- what I see in
13  the -- in these e-mails was Deitz having
14  received well in -- two weeks prior to the
15  auction something from Hellman that I
16  understand he did not forward to us at
17  Renaissance until a year later.
18       So I can't --
19       Q.  That's why I asked if Mr. -- if
20  Mr. Deitz told you in August 2007 that there
21  was a valuation for the Transpetrol shares.  If
22  you remember.
23       A.  He may have.  I can't recall.
24       Q.  And did Stephen Jennings ask you to
25  work with the investment team to conduct due

Page 245

1    diligence into the Yukos Finance shares?
2        A.   Sorry.
3            I -- I don't understand the question.
4        I --
5            MR. PEES:  By Yukos Finance shares,
6    you're referring to Lot 19?
7        Q.   Lot 19.  Right.
8        A.   Prior to the auction?
9        Q.   Prior to the auction.
10       A.   I -- he may have.  I don't -- I
11   don't -- sorry.  Can you repeat the question?
12       Q.   Sure.  So did Stephen Jennings -- do
13   you recall whether Stephen Jennings asked you
14   to work with the investment team to perform due
15   diligence into the Lot 19 assets?
16       A.   I don't recall specifically, but
17   Stephen -- when Stephen and I discussed that it
18   was worth us pursuing, you know, quite -- close
19   to the auction, his expectation was that I
20   would be very involved in understanding whether
21   we should do this, whether -- whether he used
22   the word "due diligence" and -- I don't think
23   he used such specific words as due diligence on
24   Yukos Finance shares.  I think he meant --
25   yeah, try to do as much due diligence on this

Page 246

1    asset as you can.  But --
2        Q.   No.  I understand.  I think this
3    may -- just so you have it.
4            ---
5            (Foreman Exhibit 29 was marked for
6                identification.)
7            ---
8        Q.   So what I've shown you, Mr. Foreman,
9    is a affidavit that Mr. Jennings submitted to
10   the Dutch court, eight years ago now.  And in
11   particular, I would direct your attention to
12   paragraph 18.  You don't need to read the whole
13   thing, but that's -- 18 is where I'm going with
14   this.
15           And feel free to read as much as you
16   need to in order to --
17       A.   Okay.  Just -- I'll just start from
18   16.
19       Q.   Sure.
20           THE WITNESS:  (Perusing document.)
21       A.   Okay.
22       Q.   So, I mean, is there anything in
23   paragraphs 16, 17, and 18 of this that -- that
24   you disagree with?
25           MR. PEES:  Objection.  Compound.

Page 247

1    But --
2        Q.   I'm --
3            MR. PEES:  You're trying move things
4    along.
5        Q.   I'm trying to move things along, but
6    I'm happy to break it up.
7            If you would take a look at
8    paragraphs 16, 17, and 18.  And if there's
9    anything in there that you wish to disagree
10   with, that's the easiest way for me to do this.
11   And we can...
12       A.   So I would -- so I -- I understand
13   this and don't dispute it.  I would point out
14   that when Stephen says, I suggested that Bob
15   work with the investment team to perform due
16   diligence of the investment opportunity, he did
17   not mean and would not have meant the sort of
18   formal legal, financial, accounting due
19   diligence that some in the room would interpret
20   that as being.
21           He -- but sort of bigger picture, due
22   diligence, not getting into the -- the
23   documents.  He understood what I did and what I
24   didn't do.
25       Q.   So take a look at paragraph 22 as

Page 248

1    well, please.  He became a little bit more
2    specific about what he meant by, in his
3    words -- and I recognize that these are his
4    words:  "Rigorous due diligence on all aspects
5    of the proposed transaction, as required by the
6    Renaissance partners investment committee."
7        A.   Paragraph 22?  I'm sorry?
8        Q.   Yes.  Just because he -- he kind of
9    took it up a notch and talked about rigorous
10   due diligence on all aspects of the proposed
11   transaction.
12           So I -- I'm going to ask you if you
13   would agree with that characterization.
14           MR. PEES:  In the first sentence of
15   paragraph 22?
16           MR. JACOBSON:  Yes.
17           THE WITNESS:  (Perusing document.)
18       A.   So I would note he's referring to the
19   team, not specifically to me.  I would say that
20   the -- I would say that the -- the due
21   diligence that we performed was as rigorous as
22   it could have almost possibly been, given the
23   short time in which we did it.
24           I believe that that due diligence was
25   less than it would have been had we had a

Page 249

1 longer period of time.
2      So the maximum -- we did the most
3 rigorous -- I would have -- what I would say to
4 you today is we performed the most rigorous due
5 diligence possible, within the timeframe, but
6 sufficient to make a positive decision about
7 going forward.
8      Q.  Did the -- and I'm going to call it
9 the due diligence team, but I'm not asking you
10 to adopt that.  I'm just going to -- for
11 purposes of shorthand.  Did anyone who was
12 conducting this review speak to the former
13 managers of Yukos Finance, in particular Dave
14 Godfrey and Bruce Misamore?
15      A.  From the Renaissance investment team?
16      Q.  Yes.
17      A.  I don't recall someone from
18 Renaissance speaking to David, no.
19      Q.  To your knowledge, did anyone else
20 from --
21      A.  I'm sorry.  I spoke to David but not
22 about -- I spoke to David.  Sorry.  I spoke to
23 David -- I spoke to Daniel Feldman.  Sorry.  I
24 think Richard Deitz spoke to David, but I
25 wouldn't say that was rigorous due diligence.

Page 250

1      Q.  And way earlier in the deposition, we
2 talked about you having a meeting with
3 Mr. Sechin to discuss a proposal that Mr. --
4 that --
5      A.  Oh.
6      Q.  -- to discuss a proposal for
7 Mr. Godfrey.
8      What did you discuss with Mr. Sechin
9 on that occasion?
10      A.  I don't recall the specifics other
11 than that these were claims, I think, that were
12 not related to Yukos Finance B.V.  They were
13 claims with other structures that Mr. Godfrey
14 was involved with in the Yukos world, claims
15 against Rosneft.
16      And he had approached me about seeing
17 if we could broker a deal with Rosneft for
18 the -- to settle those claims.
19      Q.  Who -- I'm sorry.  Too many pronouns.
20 Who approached who?
21      A.  David approached me, as I recall,
22 either directly or through Daniel Feldman or
23 both to see whether, in principle, I and
24 Renaissance Capital or I in my Renaissance
25 capacity might be able to -- or interested and

Page 251

1 able to broker an agreement between Rosneft and
2 some of these Yukos entities to settle claims,
3 I guess, against Rosneft that the Yukos
4 structures had.
5      And Mr. Godfrey and Mr. Feldman and I
6 had discussed whether there could be a
7 possibility to wrap this into a broader
8 settlement of the Yukos Finance B.V. saga.
9      And that was something that I raised
10 with Mr. Sechin at the dinner, but that dinner
11 was not set up in order for me to discuss this
12 topic with him.
13      Q.  What was Mr. Sechin's response to
14 this?
15      A.  To work with Rashid to try to find an
16 acceptable solution and keep him posted.  He
17 was eager to have a settlement involving
18 Rosneft.  But he wasn't the sort of person that
19 you discuss the specifics with.
20      Q.  And what was the dinner set up for if
21 it was not discuss the --
22      A.  It was a -- it was a social -- it was
23 a social dinner that -- that Mr. Warnig had
24 with -- Mr. Sechin.  There may have been a
25 couple other people that I didn't know.  I --

Page 252

1 or may have just been the three of us, and I'd
2 never met Mr. Sechin other than shaking his
3 hand at an IPO event.
4      And so I was invited to -- to meet
5 him, and I had wanted to express -- I wanted to
6 get his personal sanction, so to speak, for
7 these negotiations with Mr. Godfrey.
8      Q.  Do you know why that deal wasn't
9 consummated?
10      A.  I think I knew it at the time.  I --
11 and I think it's probably in some of the
12 documents.  I think -- I think I do.
13      Q.  You think you -- you think you do?
14      A.  I think I -- I think I may.
15      Q.  And what's -- to the best of your
16 recollection today, why didn't the deal come
17 together?
18      A.  It's my own view.  It may not be --
19      Q.  Sure.
20      A.  Mr. Lynch was also having some
21 dialogue with Mr. Feldman, maybe with
22 Mr. Godfrey, maybe with just Mr. Feldman, about
23 this.  And this I was only reminded of in the
24 e-mails that I saw this week.
25      And according to those e-mails,

Page 253

1    Mr. Feldman had said to Mr. Lynch that --
2    something along the lines of, would -- do we
3    understand the consortium correctly that a
4    hundred-million-dollar return or a
5    hundred-million-dollar profit beyond the
6    consortium's investment amount, end of the
7    auction, you know, would that be sufficient to
8    settle all the claims?
9         And Stephen said, If it's -- if
10   that's the figure you're talking about, then --
11   then we'll see you in court.  And -- which I
12   then and now question.
13        Q.  In 2007, do you know how many oil
14   pipelines flowed between Russia and Europe?
15        A.  No.
16        I know of the Druzhba pipeline.
17   That's the main pipeline.
18        Q.  And you're going to know more about
19   the pipeline than I do, and neither one of us
20   may know -- but the Druzhba pipeline split into
21   a southern branch and a northern branch; is
22   that your understanding?
23        A.  I don't dispute it.  I'm not -- I'm
24   not expert in that, but it sounds plausible.
25        Q.  Did Transpetrol operate one of those

Page 254

1    branches?
2         A.  I can't tell you.
3         I -- my understanding was that
4    Transpetrol operates the part of the Druzhba
5    pipeline that is on a territory of Slovakia.
6    That may be inaccurate, but that was my
7    understanding.
8         Q.  Do you have an understanding about
9    the relative importance of the Druzhba pipeline
10   as a conduit of oil from Russia to Europe?  Was
11   it very important?  Was it slightly important?
12        A.  So you said relative importance?
13        MR. PEES:  Before -- before he
14   answers that, could we just spell the word
15   for --
16        THE WITNESS:  Druzhba?
17        MR. PEES:  -- the benefit of the
18   court reporter.
19        A.  Sorry.  D-R-U-Z-H-B-A.
20        And could you -- I'm sorry.
21        Q.  I'll withdraw it.
22        A.  Okay.
23        Q.  So I'm going to show you 25 -- I'm
24   sorry, not 32.  Getting late.
25        ---

Page 255

1         (Foresman Exhibit 30 was marked for
2         identification.)
3         ---
4         A.  Do you want me to read it?
5         Q.  Sure.  I'm just going to say for the
6    record while you're doing that, this is a Dow
7    Jones report dated the 25th of February, 2005.
8         Keep reading.  The first question I'm
9    going to ask is whether you've seen this news
10   report before.
11        THE WITNESS:  (Perusing document.)
12        A.  Okay.
13        Q.  So have you seen this news report
14   before now?
15        A.  I -- I don't recall.  I don't rule
16   out that I've seen it.  I -- I don't know if
17   I've seen it.
18        Q.  Is it -- do you find it surprising
19   that Russian President Putin and the Slovakian
20   prime minister discussed who was going to end
21   up with the Transpetrol stake?
22        A.  Not -- not particularly.
23        Q.  So it -- is it fair to say that
24   the -- that the ownership of that Transpetrol
25   stake was sufficiently important to you that it

Page 256

1    would come up in meetings between the Russian
2    president and the Slovakian prime minister?
3         A.  To me?
4         Q.  To you.  In other words, I'm asking
5    you, is it surprising to you to learn that this
6    was -- it was so important to the countries of
7    Russian and Slovakia that the president and the
8    prime minister were talking about it?
9         A.  I'm sorry.  Yeah.  I just -- yeah.
10   You had earlier said that it would come up with
11   me.
12        Q.  No.  I'm saying, is it surprising to
13   you that --
14        A.  No, it's not.  No, it's not.  No,
15   not.
16        Q.  Because as we discussed earlier, the
17   Transpetrol pipeline is an important asset to
18   the Russian Federation and to Slovakia, I would
19   imagine.
20        A.  Yes.  Yes.
21        Q.  Are you aware as to whether the
22   ownership of the former Yukos stake in
23   Transpetrol gives the owner managerial control
24   over the pipeline?
25        A.  I don't know if I knew that or not.

Page 257

1   I -- at the time -- I may have at the time.  I
2   certainly do not now.  I thought that I had
3   a -- I -- I thought that -- my understanding
4   was that the Slovak government has the
5   controlling stake and has -- you said
6   "operating control"?
7       Q.  Managerial control.
8       A.  Yeah.  I guess I wouldn't have
9   thought about what the -- the difference
10  between -- manager control -- yeah.  Sorry.  I
11  don't think I gave it great thought, as you can
12  see from my answer.
13      Q.  And were you aware of whether the
14  Slovakian government had had any discussions
15  with the United States Government about
16  eventual control of the Yukos stake in
17  Transpetrol?
18      A.  Am I aware now?
19      Q.  Of -- are you aware -- were you aware
20  at the time, in 2007, of any discussions
21  between the Slovakian government and the United
22  States Government about the fate of the
23  Transpetrol stake?
24      A.  I believe, to the best of my
25  recollection -- to the best of my recollection,

Page 258

1   the first that I had heard about the U.S.
2   Government having an interest in the fate of
3   Transpetrol when I was -- was when I was
4   approached by the American embassy in Moscow.
5       Q.  If I showed you a news report from
6   November of 2006 describing a meeting between
7   the Slovakian prime minister and the United
8   States Government about Transpetrol, would that
9   surprise you?
10      A.  It would -- it wouldn't surprise me.
11  I wasn't -- I didn't actively follow Slovak
12  news, so I don't think I would have seen it.
13  But it wouldn't surprise me.
14      Q.  But it didn't come up in the
15  diligence that you were conducting about the
16  asset, any interest the United States -- any
17  interest -- I'm sorry.  Sorry.  Terrible
18  question.
19          To what extent did your diligence
20  about the Lot 19 assets focus on the political
21  implications of the fate of the Transpetrol
22  stake?
23      A.  You mean the geopolitical?
24      Q.  Yes.
25          MR. PEES:  And -- objection.

Page 259

1       To the extent you can clarify whether
2   by diligence -- "your diligence," you're
3   referring to him personally, Renaissance
4   Capital, or the consortium.  It might be --
5          MR. JACOBSON:  Let you get away with
6   the speaking --
7          MR. PEES:  I did not intend it as a
8   speaking objection.  I was just trying to move
9   things along.
10      Q.  So to your knowledge, did RenCap
11  study the geopolitical implications of the
12  ultimate fate of the Transpetrol stake when it
13  was deciding whether or not to engage in this
14  transaction?
15      A.  To the best of my recollection,
16  Renaissance did not think about or think to
17  think about the geopolitical consequences, to
18  the best of my recollection, beyond what the --
19  Renaissance had three days to consider this
20  asset in totality.
21          Transpetrol was a footnote to what
22  the consortium was interested in, but it had to
23  allocate some time to figuring out Transpetrol.
24  But it was a fraction of the time that
25  Renaissance spent, the entirety of which was

Page 260

1   only three days.
2          Renaissance, being an international
3   investment bank, was a -- a New Zealand
4   controlling shareholder based in Moscow, I
5   don't know that the first thought of
6   Renaissance would have been U.S.-related
7   geopolitical concerns, particularly within
8   those three days.  And I don't recall having
9   had such a discussion.
10      Q.  Was it a footnote in your thinking
11  because it was in the mind of you and the
12  others that the stake was going to end up in
13  the hands of the state-controlled entity?
14      A.  No.  No.  That's not why it was a
15  footnote.  It was a footnote because
16  Transpetrol had nothing to do with our
17  interests in Lot 19.  It was a nuisance that we
18  had to -- that as a financial consortium that
19  was focused on settling claims between two big
20  players, GML and Rosneft, to free up some
21  frozen cash and potentially hopefully have some
22  sort of a surplus and settle the two things.
23          Transpetrol happened to be a part of
24  that lot and needed to be dealt with, but it
25  wasn't -- it was an afterthought that didn't,

Page 261

1    as I think the record will show, prior to the
2    auction, didn't have -- it was not the focus of
3    our thesis. It was more how do we -- what do
4    we do with this asset.
5        Q. If you had believed that RenCap did
6    not have state support to participate in the
7    Lot 19 auction, would you have participated in
8    the Lot 19 auction?
9        MR. PEES: Objection.
10       A. I -- sorry.
11          We were not looking for state
12   support. We were looking for confirmation that
13   the -- to protagonists, which was GML and you
14   can say the Russian state for Rosneft -- I'll
15   allow that that can be the Russian state. It's
16   controlled by the Russian state, Rosneft, that
17   is -- that they wouldn't be -- that they
18   wouldn't view us as being hostile.
19          Support -- we weren't looking for
20   support from the Russian state. The only
21   support we were looking for from a Russian
22   state entity was to support our idea, because
23   of the reciprocal removal of attachments. We
24   weren't looking for political support.
25       Q. Was one of Rosneft's interests that

Page 262

1    would go into its granting or withholding of
2    that support or consent, or call it what you
3    will, was one of the considerations for Rosneft
4    the control the Transpetrol stake?
5        A. I never -- I -- you would have to ask
6    Rosneft. If you're asking my view about
7    Rosneft, to the best of my recollection, I
8    didn't give that any thought before the
9    auction, to the best of my recollection, about
10   Rosneft's -- in fact, my only discussions
11   that -- that -- the only discussions that I
12   recalled that the consortium had with Rosneft
13   prior to the auction was that they were not
14   interested in Rosneft.
15       Q. But they had a buyer for it?
16       A. But, again, to the best of my
17   recollection, you've got all these e-mails.
18   And maybe there's something -- maybe my memory
19   is foggy. It -- maybe it was a long time ago.
20          As I've testified to before, I
21   recall, because I was in the conversation, that
22   we sought to find -- we sought to -- again,
23   best of my recollection, we sought to find a
24   buyer for Rosneft -- for Transpetrol.
25          And we asked Rosneft if they would

Page 263

1    take that off our hands to make it easier for
2    us to focus on the priority of the thing. And
3    they said -- sorry -- the priority of the --
4    the lot.
5          And they said, We can introduce you
6    to a buyer, but we're not interested. I'm not
7    aware of having given any thought or anyone in
8    the consortium having given any thought to the
9    importance of Transpetrol to Rosneft prior to
10   the auction.
11       Q. And we talked earlier about in
12   October 2008, so I recognize I'm now jumping
13   ahead some 14 months. You traveled to
14   Bratislava. I actually didn't ask you this
15   question. I said if you had conversations with
16   the Slovakian government?
17          In October 2008, did you travel to
18   Bratislava to discuss matters with the
19   Slovakian government?
20       A. I don't recall the -- but if that's
21   the date, I'll take it. I'll -- I don't have
22   the document in front of me, but I did travel
23   in 2008 to Bratislava. And October sounds
24   right, but I'd have to see the e-mail.
25       Q. I will show you a document in a

Page 264

1    minute, but I'm not trying to trick you up.
2        A. No. I know.
3        Q. Did you meet with the Slovakian prime
4    minister?
5        A. I think I met with the economics
6    minister. I don't -- I don't -- I don't know
7    that I met the prime minister. I think it was
8    the economics minister.
9        Q. I wasn't sure if it was both. I
10   knew -- I knew -- I was going to ask you next
11   if you met with the economics minister. And
12   then -- so you did -- you did meet with the
13   economics minister?
14       A. I met with the economic -- I don't
15   recall -- I don't believe that the prime
16   minister was in the meeting. I believe it was
17   the minister of economics.
18       Q. And were you accompanied on this trip
19   by a gentleman by the name of Timur, T-I-M-U-R,
20   Ivanov, I-V-A-N-O-V?
21       A. Yes, Timur Ivanov.
22       Q. And what was Mr. Ivanov's position at
23   the time?
24       A. So relevant to that -- so he was
25   the -- I think it was called the co-chairman of

Page 265

1  the Russian-Slovak business commission or
2  something, a bilateral Russian-Slovak business
3  group.
4        And an official at a Russian state
5  energy company called Atomstroyexport.  Sorry.
6  A-T-O-M -- it's all one word,
7  A-T-O-M-S-T-R-O-Y-export.  One word.
8      Q.  Did Mr. Sharipov introduce you to
9  him?
10     A.  I -- I can't recall whether
11  Mr. Sharipov introduced me to him or the
12  representative from Halebay.  It may have been
13  Mr. Sharipov.  I can't -- I can't recall.
14     Q.  Did you -- were there any particular
15  representatives of Halebay that you met other
16  than Mr. Sharipov?
17     A.  I didn't consider Mr. Sharipov a
18  representative of --
19     Q.  That's fair enough.  So who did you
20  meet who you considered to be a representative
21  of Halebay?
22     A.  Mr. -- sounds like "pigskin."
23  P-I-K --
24     Q.  S-I-N, I think.  Piksin?
25     A.  -- S-I-N.  Sorry, not pigskin.

Page 266

1  Piksin.  So Piksin, he was the only person that
2  I ever recall having had a Halebay affiliation.
3      Q.  So now I'll show that you document
4  that I was talking about.
5            ---
6        (Foreman Exhibit 31 was marked for
7            identification.)
8            ---
9      A.  Can I read this?  This is quite long.
10     Q.  Of course.  I'm going to want to talk
11  to you primarily about your magnum opus in the
12  middle.
13     A.  Goodness.
14     Q.  But we can -- I mean, it's -- I'm
15  going to have some specific questions for you
16  that I know will require you to read it in
17  context.  And so it's -- the good news is it's
18  only -- it's a page and a half, because it
19  stops at the top of the third page.
20     A.  The bad news is I haven't seen it.
21  So --
22     Q.  Okay.
23     A.  -- I'll be reading it for the first
24  time now.
25     Q.  Understood.

Page 267

1        THE WITNESS:  (Perusing document.)
2      A.  Sorry.  What is the -- this is
3  redacted?
4      Q.  It was redacted by your side.  This
5  was a document that was produced by -- by --
6      A.  No.
7        MR. PEES:  No.  Produced -- the Bates
8  number D reflects whom?  Deitz?
9        MR. JACOBSON:  Yeah.  I was --
10     A.  Okay.
11        MR. JACOBSON:  Your side of the "v."
12     A.  I haven't seen --
13     Q.  Understood.  But not my redactions.
14     A.  Okay.
15        MR. JACOBSON:  Which is a subject for
16  another day and another witness.
17     Q.  Do you recall writing this e-mail in
18  October 2008?
19     A.  Vaguely.  I mean, I'm sure I did.  I
20  didn't recall it until you showed it to me.
21     Q.  So in the -- it's got the -- it says,
22  "Guys," and then there's paragraph under it
23  starting "Sorry," and then there's a paragraph
24  under that introduced by a couple of dashes.
25        When you say, "I was accompanied by a

Page 268

1  senior official of one of Russian's state-owned
2  companies that's active in Slovakia," and then
3  you describe them in other ways, is that
4  Mr. Ivanov?
5      A.  Yes.
6      Q.  By the way, where is Mr. Ivanov now?
7  Do you know?
8      A.  I don't know.
9      Q.  Do you have any current dealings with
10  him?
11     A.  No, not for many years.
12     Q.  Do you know why this e-mail was not
13  in your RenCap account?
14        MR. PEES:  Objection.
15     A.  I've no -- I had no access to my
16  RenCap account since 2009.
17     Q.  You don't --
18     A.  I don't know that it's not in there.
19  You would have to --
20     Q.  But you don't have a recollection of
21  deleting it?
22     A.  No, absolutely not, no.  I sent it
23  the consortium.
24     Q.  And then later on in that paragraph,
25  you -- your characterization was that

Page 269

1    Mr. Ivanov's presence was a clear signal to the
2    Slovaks that the Russian government recognizes
3    PNS as the legitimate owner of the 49 percent
4    stake, meaning Transpetrol, and that the
5    dialogue with the Russian side with respect to
6    the future sale of the stake to a Russian crude
7    supplier and, therefore, the security of the
8    crude supply going forward, is interlinked with
9    the Slovaks' handling of the PNS versus
10   Misamore situation.
11        A.   Uh-huh.
12        Q.   Nice little crude supply you got
13   here; shame if something happened to it?  Was
14   that the intention of Mr. Ivanov's presence?
15        MR. PEES:  Objection.
16        Q.   In other words, what -- are you -- is
17   this saying that Mr. Ivanov was there to
18   threaten the government that if they didn't
19   resolve this dispute in your favor, something
20   might happen to their crude supply?
21        MR. PEES:  Objection.
22        Q.   You can answer.
23        A.   As this note shows, the prime
24   minister's advisors or the minister of
25   economics had indicated to me that they wanted

Page 270

1    a Russian to own it.  A Russian was going to
2    own it.  They wanted to buy it first and sell
3    it to a Russian -- it had to be a Russian crude
4    supply owner.  That's what -- that's what I was
5    told.
6         Our -- my point in meeting with the
7    minister was to explain that we are in
8    litigation in the Netherlands, and so we are a
9    relevant party.
10        As I stated in here, it wasn't to
11   lower the price.  It wasn't to object to the
12   sale.  It was to make sure that we were
13   considered relevant.
14        Q.   But then how could the security of
15   the crude supply going forward be interlinked
16   with the Slovaks' handling of the PNS versus
17   Misamore situation?
18        A.   Sorry.  Point that out again to me.
19        Q.   The end of -- the end of that first
20   bulleted, dashed paragraph.
21        His presence was to -- a clear signal
22   to the Slovaks that the Russian government
23   recognizes PNS as the legitimate owner of the
24   49 percent stake.
25        And then skipping a bit.

Page 271

1         And, therefore, the security of the
2    crude supply going forward is interlinked with
3    the Slovaks' handling of the PNS versus
4    Misamore situation.
5         A.   Yeah.  I'm not indicating that I --
6    this is what I conveyed to the minister.  I'm
7    indicating that the Russian -- that the
8    presence of the Russian official would convey
9    that.  I'm not saying I said to the --
10        Q.   I didn't say you did.  But his
11   presence there was meant to say, essentially,
12   nice little crude supply you got here; shame if
13   something happened to it.  It's not my words.
14        MR. PEES:  Objection to the form of
15   the question.
16        A.   That's your words.  That's your
17   words.
18        Q.   Your words are that the -- that the
19   secure -- that his presence conveyed that the
20   security of the crude supply going forward is
21   interlinked with their handling of the PNS
22   versus Misamore situation.
23        MR. PEES:  Objection to the form.
24        Q.   A little bit later in this e-mail,
25   you said that we are -- I said that we are

Page 272

1    aware that the Slovaks are in direct talks with
2    Misamore on purchasing the stake, we believe,
3    for around 260 million.  How did you come by
4    that knowledge?
5         A.   I think it was in the media.
6         I think -- I think I saw something in
7    your production.  I think there was a -- wasn't
8    there a press article?  Or was I --
9         Q.   I'm asking you for your best
10   recollection.
11        A.   Well, I'm not -- I don't recall.  I
12   thought -- I thought we got it from a press
13   article or then we must have -- if we didn't
14   get it from the media, then we would have
15   gotten it from some other party, whether
16   through the Dutch process or through -- through
17   somebody in Moscow.
18        I don't know how we came to know
19   that, but I -- or maybe we came to know it from
20   the press subsequently.  I'm not sure how we
21   came to know it, but we came to -- I think we
22   were right.  I thought I recalled seeing some
23   documents that you produced that referred to
24   that.  I don't have them with me.
25        Q.   Did you make an offer to the

Page 273

1    Slovakians that the Russian government would
2    help them find an ultimate owner for this --
3    for the Transpetrol stake, help the Slovakian
4    government?
5    A.  I don't recall -- if I could read
6    the --
7    Q.  Sure.
8    A.  -- memo again.  If it's mentioned in
9    here --
10    Q.  It is.  It's -- it's -- it's -- if
11    you look on the second page after the
12    redactions, go one, two, three, four paragraphs
13    down, starting, "He said that for important
14    political reasons."
15    A.  Okay.
16    THE WITNESS:  (Perusing document.)
17    A.  Okay.  So the question?  I'm sorry.
18    Q.  So it said, did you -- it said, "He
19    said this in response to my offer, which the
20    Russians asked me to state, to help the Slovaks
21    find the ultimate Russian buyer, in the event
22    that the government would prefer not to fund
23    the purchase itself."
24    So to unpack that, did you make an
25    offer to the Slovakians to help them find an

Page 274

1    ultimate buyer for the stake?
2    A.  According to this, I did.  I don't
3    recall doing that.  The entirety of my
4    recollection of that meeting consists in this
5    memo that I'm reading right now for the first
6    time in ten years.  I don't have reason to
7    believe that I was misrepresenting anything to
8    my consortium partners or would have any reason
9    to.  So I take it to be accurate, but it's not
10    a -- it's not meant to be a transcript of my
11    meeting with the minister.
12    But I take it -- I take it to be
13    accurate.
14    Q.  Do you know a person by the name of
15    Ali, A-L-I, Jalili, J-A-L-I-L-I?
16    A.  "Ali."
17    Q.  Ali; is that right?
18    A.  Yes.  Yes.
19    Q.  And you know him?
20    A.  Uh-huh.
21    Q.  Is the oil and -- was he the oil and
22    gas officer in the economics section of the
23    U.S. embassy in Moscow?
24    A.  That was his official title, yeah.
25    Q.  Were you and Mr. Jalili friends?

Page 275

1    A.  Yes.
2    Q.  Good friends?  I mean, how would you
3    describe your relationship?
4    A.  Not particularly close.  We were
5    friendly.  We were neighbors.  We played
6    basketball together.  We -- I think I may have
7    coached his kids.  We sometimes would walk dogs
8    together.  So good -- friends.  But not someone
9    I'm in touch with now, for example.
10    MR. JACOBSON:  I'll ask the court
11    reporter to mark a document.
12    ---
13    (Foresman Exhibit 32 was marked for
14    identification.)
15    ---
16    Q.  This one is nice and short.
17    A.  Uh-huh.
18    Q.  So he asked to speak to you about an
19    effort for a negotiated settlement related to
20    Transpetrol.  Do you know what he meant by
21    that?
22    And just for the record, this is an
23    e-mail dated the 23rd of October, 2007.
24    A.  So what I recall -- sorry.  Can you
25    repeat your question.

Page 276

1    Q.  I said, Do you know what he meant
2    when he said he wanted to speak to you about an
3    effort for negotiated settlement related to
4    Transpetrol?
5    A.  Well, I remember what we discussed.
6    I -- I don't know if I found out, and I
7    certainly don't remember now --
8    Q.  Totally fair.  What do you remember
9    discussing?
10    A.  So as I recall, he -- he asked to get
11    together with me, so we ended up walking the
12    dogs maybe that evening in our neighborhood.
13    And he said that the -- as I recall,
14    the American ambassador in Slovakia -- to
15    Slovakia would like to meet with me to discuss
16    Transpetrol.
17    And I said, I'm an American citizen
18    in Moscow.  If my government would like to --
19    he wanted me to go to Bratislava.  And I said,
20    I'm an American in Moscow.  If my government
21    would like to discuss something with me, then
22    my -- then the American ambassador in Moscow
23    should -- whom I know -- should reach out to me
24    directly.
25    I said, This is -- I got the oil and

Page 277

1   gas guy in Moscow who is telling me that the
2   American ambassador in Slovakia -- I said, I am
3   happy to sit down and meet with the American
4   ambassador in Moscow, but I -- I feel that's
5   most appropriate.
6       Q.   And did your -- in his e-mail, he
7   said there is an aspect which is
8   time-sensitive.  In your discussion with him,
9   did he mention any time sensitivity?
10      A.   He may have.  I don't -- I don't
11  recall -- I don't recall if he did or what
12  that -- what that would have been.
13      Q.   There's a reference to Pokrovsky,
14  P-O-K-R-O-V-S-K-Y.  What was Pokrovsky?
15      A.   That was our neighborhood.
16      Q.   I figured it was -- when you said the
17  dog walk, I figured it was going to be
18  something like that.
19      A.   Pokrovsky Hills is the neighborhood.
20      Q.   Have you had contact with Renaissance
21  since the London proceedings against you
22  started?
23      A.   What you would define as when I was
24  served, when I was enjoined as a defendant?
25      Q.   Yes.

Page 278

1       A.   Yes.
2       Q.   When -- when have you had
3   conversations with Renaissance since then?
4       A.   After I was served -- so at the end
5   of 2016 to try to sort out legal costs and
6   coverage.  And then subsequent to that, earlier
7   this year, I'm not sure about last year, but
8   earlier -- well, and mechanical things like
9   getting old employment contracts and things
10  like that.
11           And then earlier this year, with
12  respect to some matters that my legal counsel
13  was working with me on.
14      Q.   I mean, is that the extent of your
15  conversations -- any other conversations with
16  Renaissance besides what you've just described
17  since the -- you became a -- you were served
18  with the proceedings?
19      A.   Well, some business -- some
20  discussions with Renaissance unrelated to any
21  of this stuff, because they're still a player,
22  not like they were, but they're still a player
23  in Moscow, and I -- as am I.
24      Q.   But with regard to the litigation,
25  you've covered the field?

Page 279

1           THE COURT REPORTER:  I'm sorry.  With
2   regard to --
3       Q.   -- the litigation, you've covered the
4   field?
5       A.   Well, let me -- maybe I should take a
6   minute to think about that so that I don't
7   misrepresent this.
8       Q.   Sure.
9       A.   Certainly to my recollection,
10  that's -- so -- when I was served -- well,
11  discussions that I didn't address that I said
12  or where I was --
13      Q.   But you --
14      A.   -- advised.
15           MR. PEES:  He's not looking to invade
16  the privilege.
17      Q.   No, no.  I know.  We're on the same
18  page.
19      A.   I'm just trying to remember --
20      Q.   So with whom have you spoken at
21  Renaissance about the proceedings since they
22  started against you?
23      A.   So Chris Charlier -- Charlie but with
24  an R on the end, Chris Charlier, who is, I
25  guess, again, the chairman of Renaissance

Page 280

1   Capital.  And Anthony Simone, with a -- Simon
2   with an E at the end, who is the -- I think he
3   is called the president.
4           And I think some e-mails with people
5   like in HR, legal about my contracts or about
6   the policy that -- names I don't recall.
7           That was it.
8       Q.   Have you spoken with any of the
9   owners of Renaissance about this matter or
10  representatives of the owners?
11      A.   Could you define who you mean by
12  that?  Sorry.
13      Q.   Mr. Prokhorov, for example?
14      A.   I've not spoken to Mr. Prokhorov.
15      Q.   Or any representatives for him?
16      A.   I spoke to somebody who is not a
17  representative of his, but someone that knows
18  him.  But I don't know that I'd call this
19  person a representative.  And that would be
20  about matters that I discussed with my legal
21  counsel.
22      Q.   And we're going to talk about your --
23  your conversations with Mr. Simone.
24           Just to try to move things along.
25  Tell me everything you can remember that you

Page 281

1    discussed with Mr. Simone about this case since
2    you've been enjoined in the proceedings.
3        A.   So the first part, which -- first
4    part was contacting -- I believe was contacting
5    him and saying, I've been served.  I need
6    Renaissance to stand behind me, in terms of
7    legal stuff, legal bills or policy -- insurance
8    coverage.  And he helped to direct the -- the
9    RenCap machine, to sort out some of those
10   matters.  And then the -- all the other
11   discussions I had with them were specific to
12   these matters that I had been discussing with
13   my -- my legal counsel.
14       Q.   What's the most recent time you can
15   remember that you spoke with Mr. Simone?
16       A.   This past spring.  I believe April,
17   2013.
18           May have been May, but I think it was
19   April.
20       Q.   And the person you mentioned who was
21   maybe sort of a representative of
22   Mr. Prokhorov, who was that?
23       A.   Let me -- it was a woman.
24           Ellen Pinchuk.
25           Pinchuk.

Page 282

1        Q.   So, again, I don't want to --
2    Mr. Pees is exactly right; I don't want to
3    intrude on any of the conversations you've had
4    with any lawyers.  However -- period, new
5    sentence.
6            Have you had any conversations with
7    Mr. Simone, about the e-mail cache that my
8    clients have obtained?
9        A.   Yes.
10       Q.   And so when you mentioned the -- I'm
11   going to do this carefully, Mr. Pees, and I'm
12   going to do my best and object if you have to.
13   When you just mentioned that you had
14   conversations with Mr. Simone that were the
15   subject of matters you've been talking about
16   with your lawyers, was that one of those
17   matters?
18       A.   That was the matter.
19       MR. JACOBSON:  I thought I -- I
20   thought I did that okay.
21       MR. PEES:  That was good.
22       Q.   And, again, I'm pretty sure I can ask
23   this, but your lawyer will tell me if I can't:
24   Has Mr. Simone -- did Mr. Simone tell you that
25   RenCap did or did not provide those e-mails

Page 283

1    voluntarily?
2        A.   Yes.
3        Q.   And what did -- what did he tell you?
4        A.   Both.
5        Q.   Can you explain that, please?
6        A.   He's --
7        Q.   It's a conversation between you and
8    him, so it's --
9        A.   Yeah.  He told me that Renaissance
10   did not provide those e-mails; does not -- was
11   not aware of such e-mails ever having been
12   provided; and did not authorize it.  Had no
13   involvement whatsoever.
14           And then after a flurry of activity,
15   he said, Our current position is that we
16   voluntarily provided those e-mails.
17       MR. JACOBSON:  So what I would like
18   to do, Mr. Pees, if that's okay with you, is
19   take a break.  I've got to consult with my
20   colleagues.  And we may be in the last --
21           Completely illegible.
22       MR. PEES:  Want to use the break to
23   read Mr. O'Sullivan's note?  And then we can
24   determine whether --
25       THE VIDEOGRAPHER:  Okay.  We're going

Page 284

1    off the record at 3:58 p.m.  This marks the end
2    of Media 5.
3            (Recess from 3:58 to 4:10.)
4        THE VIDEOGRAPHER:  We are back on the
5    record at 4:10 p.m.  This marks the beginning
6    of Media 6.
7        Q.   So, Mr. Foresman, right before we
8    broke, we were talking about your last
9    conversation with Mr. Simone, speaking of the
10   conversation where he told you that, after
11   further review, the e-mails were provided with
12   his permission.
13           To the best of your -- and I don't
14   mean to -- testimony speaks for itself.  I'm
15   not trying to characterize it.  But to the best
16   of your recollection, when did that call occur?
17       A.   To the best of my recollection, in
18   April, maybe May, but I think April of this
19   year.
20       Q.   And was that --
21       A.   Second half of April or in May.
22       Q.   And was that the most recent
23   conversation you've had with Mr. Simone on any
24   subject?
25       A.   I think that's the last conversation

Page 285

1  I'll have with Mr. Simone on any subject.
2      Q.   And was it a call or a meeting?
3      A.   It was a phone call.
4      Q.   Do you ever record your phone calls?
5      A.   Not -- not deliberately, no.  If I'm
6  on the trading floor, the -- the phones are
7  recorded, but I don't record my phones --
8      Q.   And have --
9      A.   -- my phone calls.
10     Q.   In all of the course of over the past
11 ten years of dealings with all manner of people
12 about Lot 19, have you ever recorded a phone
13 call with someone you were speaking with about
14 Lot 19 or the aftermath?
15     A.   I've never in my life recorded a
16 phone call with anybody about anything.
17         Not counting my firm having --
18     Q.   Understood.
19     A.   -- trading floor calls recorded.
20     Q.   And we had talked before about
21 Mr. Feldman.
22         Do you have any ongoing discussions
23 with Mr. Feldman?
24     A.   Discussions or -- yes.
25     Q.   Any contact.

Page 286

1      A.   Relationship, yes.
2      Q.   And is Mr. Feldman working with
3  Promneftstroy?
4      A.   Not that I'm aware of.
5      Q.   And what are your -- what are your
6  ongoing dealings --
7      A.   I'm not working with Promneftstroy, I
8  should point out.
9      Q.   Understood.
10     A.   But to the best of my knowledge --
11 well, I don't know if he's working with
12 Promneftstroy.  I -- I --
13     Q.   And your -- your dealings with him,
14 what do they concern?
15     A.   They -- family, friends, blockchain
16 technology, cryptocurrency, stuff, geopolitics,
17 life, jobs, sports, kids.
18     Q.   And that was one question I wanted to
19 ask.
20         With regard to conversations with
21 Mr. Simone, again, I'm not asking for any
22 communications that you've had with your
23 lawyers.  But to your knowledge, have your
24 lawyers had communications with Mr. Simone,
25 subsequent to your last conversation with him?

Page 287

1      A.   No, I don't believe so.  Not to my
2  recollection.  No, sir.
3      Q.   So the trip to Bratislava, at whose
4  behest was that trip made?
5      A.   I could probably figure it out from
6  all the e-mails at some point.
7          I can't recall whether I wanted to go
8  to Slovakia to make sure that they saw that PNS
9  was relevant, or whether the -- someone on
10 the -- on the Russian side asked me to go.  It
11 was one of those two things.  I'm not -- I'm
12 not sure which.  But I think it's somewhere in
13 the correspondence.
14     Q.   When the U.S. embassy official asked
15 you to go to Slovakia, there was a flat no; but
16 you then went later, possibly at the behest of
17 the Russian side.
18         Is there a reason why you were more
19 willing to go to Slovakia for one than the
20 other?
21     A.   Yes.
22         MR. PEES:  Objection.
23         You can answer.
24     Q.   What was the reason?
25     A.   First, I would not characterize my

Page 288

1  response to the question about -- to the
2  request to meet the American ambassador to
3  Slovakia as a flat rejection.  My proposal was,
4  I'm happy to speak to my government.  I am an
5  American citizen living in Moscow.  The
6  American ambassador in Moscow knows me.  I am
7  happy to meet to him if the government would
8  like to convey something to me, number 1.
9          Number 2, we had 310, or somewhere
10 about, million-dollar exposure, that
11 Transpetrol was a part of.  We had -- I had a
12 fiduciary responsibility, as an officer of
13 Renaissance Capital.  We had reputational,
14 legal obligations toward nominated buyer.
15         And representations to -- to Rosneft
16 about the settlement and all these things.  And
17 I had a very clear commercial objective to make
18 sure that our interests were considered in
19 Slovakia.
20     Q.   So we turned back to Exhibit 31,
21 which is the -- your summary of the Bratislava
22 meeting.  Just want to ask a couple last
23 questions about it.
24         So the first question I want to ask
25 concerns -- there's a paragraph -- the page

---

Page 289

1    with the redactions on it at the very bottom,
2    there's a paragraph that starts with two
3    asterisks and then two dashes.
4        A.  Uh-huh.
5        Q.  Okay.
6        A.  Can I just read that one?
7        Q.  Sure.
8        THE WITNESS:  (Perusing document.)
9        A.  Okay.
10       Q.  So, I mean, the -- the statement that
11   I added the U.S. ambassador to Slovakia tried
12   to approach me last fall about Transpetrol but
13   we considered such channel was not appropriate
14   and that this is a commercial matter that we
15   should continue to handle as such, is that
16   consistent with the idea that you thought that
17   if the government wanted to talk to you, it
18   should come from the U.S. ambassador in Moscow?
19       A.  I understand that to be the same --
20   the same effect, the same data point, yes.
21       Q.  And it just -- a moment ago you said
22   that you had -- you made this trip partly
23   because you had obligations to the nominated
24   buyer.  In your mind, what obligations did you
25   have to the nominated buyer?

---

Page 290

1        A.  Well, to be more exact, I mentioned,
2    in response to your question as to why I
3    rejected the offer from the American ambassador
4    in Slovakia to fly to Bratislava but was ready
5    to go to Bratislava with respect to this.
6        Q.  Correct.
7        A.  And I said that we had -- we had
8    commercial interests, and we had liabilities.
9    We had a loan liability outstanding to Halebay
10   which become due and payable if it was sold to
11   a nonparty.  And we had an option agreement
12   with them.
13       But most particularly, if this sale
14   to Mr. Misamore was negotiating -- was
15   concluded, was completed, as I understand it
16   was, I think my understanding at the time and I
17   think now, as well, was that our $60 million
18   loan to Halebay, would become immediately due
19   and payable.  And my firm was bleeding from the
20   financial crisis.
21       Q.  What would have -- so I think I know
22   your answer to this, but had Mr. Misamore
23   concluded the sale for $260 million, would that
24   not have been -- understanding the -- the loan
25   issue, but would that not ultimately have been

---

Page 291

1    to the consortium's benefit if Mr. Misamore had
2    sold Transpetrol for $155 million more than the
3    option agreement to Halebay?
4        A.  So, as I recall, if the consortium --
5    if we had removed the attachments -- let me
6    rephrase that.
7        If we were determined to be the
8    rightful owner of Yukos Finance B.V. and had
9    the ability to collect the proceeds from such
10   sale, then the consortium's interests
11   absolutely would have been to take the 260, or
12   whatever it was, versus the 105 even though
13   that would have meant that we'd have to early
14   repay -- I'd take that trade any day, repay a
15   $60 million loan --
16       Q.  To get 155 now.
17       A.  But two problems.  One, we'd have to
18   repay that $60 million loan without any
19   visibility that we would ever see any of that
20   155 delta, whatever it was.
21       And two, that the broader point here
22   wasn't -- and my recollection wasn't specific
23   to Transpetrol.  It was we believed that we
24   were the -- that the consortium was the
25   rightful owner of Yukos Finance B.V. and it was

---

Page 292

1    in litigation in the Netherlands and remains,
2    as I understand, somehow in litigation.
3        And I believe we found it -- we felt
4    that it was important that we be seen,
5    including by the Dutch courts, to be doing what
6    an entity that believed it was the rightful
7    owner would be doing in such a case, which is
8    protecting its interests and making sure that
9    no sale is negotiated without our involvement,
10   as I see in my memo but didn't remember until
11   today in this memo about Transpetrol.
12       I recall at the end -- and I'm too
13   tired to put my glasses on to read it, but that
14   I said -- and this is to my consortium
15   partners -- that we would be happy to have the
16   sale go forward for $260 million.  That would
17   be great.  But we should be in the room.  And
18   they should see that, yes, this is possible,
19   maybe not; maybe the court will finally
20   judicially determine in the Netherlands that
21   we're not the rightful owner.
22       But at that point, there was still
23   a -- there was still litigation, and we might
24   be.  And we're, therefore, one of the two
25   parties in there.  One of the two is going to

---

---

Page 293

1  be deemed to be the owner, maybe us, maybe the
2  other. That's what we were doing.
3      Q. So the last couple of questions I
4  want to ask, same page of the document, but all
5  the way up at the top.
6          The sentence that I want to focus on
7  is the one after the colon in the first
8  paragraph, the top of this: "Buy it like this,
9  and you carry a lot of risks, including the
10  risk that the Russians won't reach agreement
11  with you on the crude supply."
12          MR. PEES: Mr. Jacobson, you lost me.
13          MR. JACOBSON: So this is --
14          MR. KROLEWSKI: Trying to find where
15  you are in the document.
16          MR. JACOBSON: This is the page with
17  the redactions on it, Mr. Pees. And then up at
18  the top, second line -- second line down from
19  the top in the middle of the --
20          MR. PEES: Okay.
21      Apologize for the interruption.
22          MR. JACOBSON: No. Of course.
23      Q. So, I mean, this is -- this is
24  similar to the passage we talked about earlier,
25  but --

---

Page 294

1      A. Do you mind if I just read this?
2      Q. Take your time.
3      A. I want to read this --
4      Q. Take your time.
5      A. -- section.
6          THE WITNESS: (Perusing document.)
7      A. Okay.
8      Q. So this was just a second time in
9  your e-mail where you said that the message had
10  been clearly conveyed that if they don't
11  consider your interests, the Russian crude
12  supply is at risk.
13          Is that an accurate -- was it your
14  intention to convey that message to the
15  Slovakian officials?
16      A. No. And for anybody who's ever spent
17  any time with me in any meeting, let alone with
18  a government official, I don't make threats
19  like that. I'm a diplomatic person.
20          I may have been -- sound a little
21  bit -- little bit tough with my consortium
22  partners, that I was in there defending our
23  interests. I would never -- and anybody who
24  was in the room with me, and you can ask the
25  Slovaks, would never have -- have made like a

---

Page 295

1  veiled threat like that.
2          So -- but -- yeah, the point I was
3  making was that if they -- that we didn't
4  object to the sale; but if we weren't involved
5  in the sale, then they would just be taking on
6  legal risks because -- include both potential
7  owners and then -- you know.
8      Q. But I didn't say that you said it. I
9  said that a message was conveyed by Mr. -- and
10  they took away a message by Mr. Ivanov's
11  presence that if they don't -- if they, quote,
12  buy it like this, they carry the risk that the
13  Russians won't reach agreement with them on a
14  crude supply.
15          And that's your summary of the
16  message they took from his presence with you.
17  Is that accurate or not?
18      A. No. That's not -- you're -- sorry.
19  What you just said was not accurate.
20      Q. So this -- so how do you read that
21  sentence differently than I just did?
22      A. Sorry. You -- Mr. Jacobson, you
23  combined the lower paragraph, talking about
24  Mr. Ivanov's presence, at the bottom of the
25  page.

---

Page 296

1      Q. I -- the minister understood the
2  message.
3      A. Sorry. But when I made reference
4  to -- Mr. Ivanov's presence, made clear, that
5  was in the lower paragraph. Up here I'm
6  talking about I conveyed to the minister with
7  my words.
8      Q. Okay. But the minister understood
9  the message.
10      A. Yes.
11      Q. Was there a message communicated by
12  word or deed: Buy it like this, and you run
13  the risk that the Russians will not reach
14  agreement with you on the crude supply?
15      A. Let me look at it again.
16          So I believe the message was clear
17  that they would minimize or eliminate their
18  risks if we were in the room during the
19  negotiation, to which we wouldn't object.
20      Q. Including the risk that the Russians
21  would not reach agreement with them on the
22  crude supply?
23      A. I don't -- I -- I do not recall and
24  don't see -- don't believe that I would have
25  made a veiled threat like that. I referred

---

Page 297

1    here to reading between the lines.  That may
2    have been just the way I presented it to the
3    consortium partners.
4            MR. JACOBSON:  All right.  So,
5    Mr. Pees, subject to...
6            I'm told I need a break because I
7    have one more document that we want to show
8    you.  So we just need to --
9            MR. PEES:  Why don't we stay mic'ed
10   up.  And, Mr. O'Sullivan, you will step into
11   the hallway, whatever you need, for a couple
12   minutes.
13           MR. JACOBSON:  He's just getting a
14   document.
15           MR. PEES:  Oh, I see.
16           MR. JACOBSON:  He's printing.  That's
17   all it is.  It's not -- it's just that we are
18   waiting -- we are waiting for the arrival of
19   the document.
20           MR. PEES:  While we are waiting for
21   the arrival of the document, do you want to --
22           MR. JACOBSON:  Yeah.  I was just
23   going to -- it's the -- from our perspective,
24   the questions that Mr. Foresman refused to
25   answer are -- are relevant to us.  And we

Page 298

1    intend to make an application to the Court.
2            And for that reason, when we
3    conclude, I consider the deposition not closed
4    for that reason, subject to an application to
5    the Court.  And I -- you will respond to that
6    application if we make it.
7            MR. PEES:  Certainly.  If you feel
8    the need to meet and confer prior to making the
9    application, which I think --
10           MR. JACOBSON:  I think our course of
11   dealing would call for that even if the court
12   rules that.  And so -- but -- but I'm -- I'm
13   merely stating for the record that we're
14   holding the deposition open for that purpose.
15   But --
16           MR. PEES:  Understood.  Understood.
17   So we'll just remain in a holding pattern while
18   the photocopy machine does its business.
19           Mr. Jacobson, would it actually be
20   helpful if we went off the record so that the
21   court reporter could get some spellings squared
22   away?
23           MR. JACOBSON:  That's a very good
24   idea.
25           MR. PEES:  So -- okay.

Page 299

1            THE VIDEOGRAPHER:  We are going off
2    the record at 4:28 p.m.
3            (Discussion off the record.)
4    ----
5    (Foresman Exhibit 33 was marked for
6            identification.)
7    ----
8            THE VIDEOGRAPHER:  We are back on the
9    record at 4:31 p.m.
10       Q.   Mr. Foresman, I've just handed you a
11   document which is an e-mail from you dated
12   August 18th, 2008.
13           And the reason why I've shown this to
14   you is because it -- it seems to reflect that
15   you recorded conversations with Mr. Feldman.
16           So is that what this document
17   reflects?
18           THE WITNESS:  (Perusing document.)
19       A.   Okay.  Yeah.
20       Q.   So did you write up a transcript of
21   your conversations with Mr. Feldman?
22       A.   According to this, I -- I hadn't seen
23   this.  I haven't seen this -- I wrote up a
24   transcript.
25       Q.   And --

Page 300

1        A.   I wrote up a transcript.  Okay.
2            Having done that, I see I
3    misrepresented when we talk about Frank --
4            MR. PEES:  Just --
5            THE WITNESS:  Sorry.  Sorry.  Sorry.
6            MR. PEES:  Don't need to read it
7    aloud.
8        A.   I won't read it.  Sorry.  I'll just
9    take a moment and read it through and then
10   answer questions about it.
11           THE WITNESS:  (Perusing document.)
12       A.   Okay.  Yup.
13       Q.   And there's a -- the parenthetical at
14   the end of that first paragraph is, "I have the
15   original recording as well."
16       A.   Yeah.  Okay.  Yes.
17       Q.   So does this refresh your
18   recollection as to whether you recorded calls
19   with Mr. Feldman?
20       A.   So as someone who's never recorded
21   a -- never remembered recording a phone call,
22   because I've -- that's not what I do -- and I
23   know there's people in the room that do -- this
24   must have been an exception.  Probably because
25   of some of the things that we faced from

---

Page 301

1  Mr. Feldman and his partners, I felt we needed
2  to -- someone felt I needed to record the call,
3  as we had understood they had done with us in
4  the past.
5        So this would have been an exception,
6  and I acknowledge that that's what I wrote.
7  And I confirm that I had, prior to receiving
8  this, had no recollection of ever having
9  recorded anybody.  And this seems to have been
10 an exception.
11       Q.  Do you still have the recording
12 that's referred to in this message?
13       A.  No.  I -- I -- if I did have a
14 recording, I don't know what -- depending on
15 what year that was, maybe a phone -- no.  I
16 didn't -- I wasn't even aware of the recording
17 until seeing this.
18       Q.  Do you still have the transcript
19 that's referred to in this document?
20       A.  I don't have any documents that --
21 that -- in the -- except documents that we
22 produced related to Yukos Finance or this.
23       MR. JACOBSON:  Okay.  So subject to
24 the discussion that I had with your counsel a
25 few moments ago, thank you for your time.

---

Page 302

1        MR. PEES:  Thank you.
2        THE VIDEOGRAPHER:  Okay.  This
3  concludes the testimony of Robert Foresman.  We
4  are going off the record at 4:34 p.m.  This
5  also concludes Media 6.
6        (Time noted: 4:34 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 303

1        C E R T I F I C A T E
2
3  STATE OF NEW YORK   )
4                      ) Ss.:
5  COUNTY OF NEW YORK  )
6        I JEFFREY BENZ, a Certified Realtime
7  Reporter, Registered Merit Reporter and Notary
8  Public within and for the State of New York, do
9  hereby certify:
10       That the witness whose examination is
11 hereinbefore set forth was duly sworn by me and
12 that this transcript of such examination is a
13 true record of the testimony given by such
14 witness.
15       I further certify that I am not related to
16 any of the parties to this action by blood or
17 marriage and that I am in no way interested in
18 the outcome of this matter.
19       IN WITNESS WHEREOF, I have hereunto set my
20 hand this 5th day of December, 2018.
21
22        Jane Rose Reporting
23        JEFFREY BENZ, CRR, RMR
24
25

---

Page 304

1        INSTRUCTIONS FOR ERRATA
2
3
4  NOTARY PUBLIC SIGNATURE
5  Not required unless agreed upon by counsel
6  that notary public signature is required.
7
8
9
10 Please return a copy of the signed errata within
11 30 days of receipt, unless otherwise agreed upon
12 by counsel.  Once we receive one signed errata, we
13 will distribute an electronic copy to all parties.
14
15
16 RETURN A SIGNED COPY VIA FAX, EMAIL OR MAIL TO:
17      FAX: 1-800-825-9055
18      EMAIL: janerose@janerosereporting.com
19
20 Jane Rose Reporting
21 Administrative Offices
22 309 South Main Street
23 Luck, WI  54853
24
25

---

Page 305

NOTICE TO READ AND SIGN

1
2
3   This transcript was electronically distributed to
4   Akin Gump Strauss Hauer & Feld LLP to forward to
5   the witness.
6
7
8           ACKNOWLEDGMENT OF THE DEPONENT
9
10      I, ROBERT FORESMAN, do hereby certify that I
11  have read the foregoing pages and that the same is
12  a correct transcription of the answers given by me
13  to the questions therein propounded, except for
14  the corrections or changes in form or substance,
15  if any, noted in the attached Errata Sheet.
16
17  _____  _____
18  (DATE)   ROBERT FORESMAN
19
20
21  Signed and subscribed to before me this
22  _____ day of _____, 2018.
23
24  _____
25      Notary Public

Page 306

1   PAGE   LINE   CHANGE      REASON
2   ____ / ____ / _____ / _____
3   ____ / ____ / _____ / _____
4   ____ / ____ / _____ / _____
5   ____ / ____ / _____ / _____
6   ____ / ____ / _____ / _____
7   ____ / ____ / _____ / _____
8   ____ / ____ / _____ / _____
9   ____ / ____ / _____ / _____
10  ____ / ____ / _____ / _____
11  ____ / ____ / _____ / _____
12  ____ / ____ / _____ / _____
13  ____ / ____ / _____ / _____
14  ____ / ____ / _____ / _____
15  ____ / ____ / _____ / _____
16  ____ / ____ / _____ / _____
17  ____ / ____ / _____ / _____
18  ____ / ____ / _____ / _____
19  ____ / ____ / _____ / _____
20  ____ / ____ / _____ / _____
21  ____ / ____ / _____ / _____
22  ____ / ____ / _____ / _____
23  ____ / ____ / _____ / _____
24  ____ / ____ / _____ / _____
25  ____ / ____ / _____ / _____

Page 307

INDEX OF EXHIBITS

1
2
3   Number                  Page
4   Exhibit 1                11
5   Order granting application of
6   David A. Godfrey
7
8   Exhibit 2                11
9   Subpoena
10
11  Exhibit 3                30
12  News Article from September 29, 2016
13
14  Exhibit 4                48
15  Letter from Ranking Member of the United
16  States Senate Committee on Judiciary
17
18  Exhibit 5                52
19  WikiLeaks Cable
20
21  Exhibit 6                58
22  Document titled Brief Summary of
23  Contents of the Report
24
25

Page 308

1   Exhibit 7                64
2   Dow Jones Regulatory News Service on the
3   Oao Gazprom board of directors meeting
4
5   Exhibit 8                86
6   E-mail chain re: Money making opportunity
7
8   Exhibit 9                105
9   Email dated April 4, 2007, re: Yukos
10  auction transaction with amendments
11  Exhibit 10               108
12  RenCap Memorandum Dated April 20, 2007
13
14  Exhibit 11               111
15  E-mail from Alexander Pertsovsky to
16  Robert Foresman re: Rosneft trade
17
18  Exhibit 12               122
19  E-mail from Ruben Aganbegyan to Robert
20  Foresman, Vladimir Blinov and Nikolay
21  Vasilkov Re: Rosneft trade
22
23  Exhibit 13               129
24  Renaissance Capital new business form
25  for NBC meeting dated October 2, 2006

Page 309

1     Exhibit 14        134
2     E-mail chain re: Yukos auction --
3     Khanty-Mansisk Bank
4
5     Exhibit 15        159
6     E-mail and attached document, Monte Valle
7     participation in Lot 19 Yukos Auction
8
9     Exhibit 16        167
10    E-mail chain re: MV data
11
12    Exhibit 17        174
13    E-mail chain re: MV Data
14
15    Exhibit 18        190
16    E-mail chain re: Surplus - update going
17    into the weekend
18
19    Exhibit 19        192
20    E-mail re: Surplus Update, from Robert
21    Reid to Richard Olphert and Stephen
22    Jennings
23
24    Exhibit 20        197
25    E-mail Exchange from July 2008, Re: Yukos

Page 310

1     Exhibit 21        199
2     E-mail exchange dated July 28 & 29, Re: Yukos
3
4     Exhibit 22        201
5     E-mail from Stephen Lynch and attached
6     Wiki cable
7
8     Exhibit 23        201
     pages from wikileaks.org, headed
9     Bratislava 420
10
11    Exhibit 24        215
12    E-mail string re: Project Surplus
13
14    Exhibit 25        219
15    Agreement dated August 30, 2007, among
16    Mascini Holdings Limited, Lapidem and
17    Stephen Lynch
18
19    Exhibit 26        223
20    E-mail exchange Re: Project Surplus -
21    LuxCo directors
22
23    Exhibit 27        229
24    E-mail exchange between Robert Reid and
25    Richard Deitz Re: I have a window from 2-4

Page 311

1     Exhibit 28        242
2     E-mail exchange between Robert Foresman
3     and Richard Deitz, Subject: Privileged
4     and Confidential
5
6     Exhibit 29        246
7     Affidavit of Stephen Jennings
8
9     Exhibit 30        255
10    Document from Dow Jones headed "Two
11    Companies Want to Acquire Yukos' Stake
12    in Transpetrol"
13
14    Exhibit 31        266
15    E-mail exchange Re: Bratislava meeting
16
17    Exhibit 32        275
18    E-mail dated October 23, 2007 from Ali
19    Jalili to Robert Foresman, forwarded to
20    Robert Reid, Stephen Lynch, and Richard Deitz
21
22    Exhibit 33        299
23    E-mail dated August 16 to 18, 2008, Re:
24    Stephen, did Frank call you back?
25